IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC., a Colorado corporation,

    Plaintiff,

v.

JOHN ROWELL, an individual,

    Defendant.

---

**DECLARATION OF AARON HERZIG
IN SUPPORT OF DEFENDANT AND COUNTERCLAIM PLAINTIFF
JOHN ROWELL'S MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to 28 U.S.C. § 1746, I, Aaron M. Herzig, state as follows:

1.     I am an attorney with Taft Stettinius & Hollister LLP and am counsel of record for Defendant and Counterclaim Plaintiff John Rowell ("Mr. Rowell").

2.     I have personal knowledge of the statements contained herein.

3.     In connection with the preparation of Mr. Rowell's Motion for Summary Judgment, I have reviewed the documents produced to Mr. Rowell by Skilcraft LLC ("Skilcraft") and Aaron, Bell International, Inc. ("ABI"), as well as a copy of the set of documents that ABI collected from Mr. Rowell's electronic devices in January 2018. Based on this review, I have identified the following documents, which are relevant to Mr. Rowell's Motion for Summary Judgment:

4.      **Exhibit A**: is a true and correct copy the transcript of the January 11, 2019

deposition of Skilcraft's 30(b)(6) deponent and the accompany exhibits 1-13.

5.      **Exhibit B**: is a true and correct copy of an email from ABI's former attorneys,

Littler Mendelson, P.C., to Mr. Rowell, dated January 10, 2018. The email attaches two

documents. The first is a letter dated January 10, 2018 from Danielle Kitson of Littler

Mendelson, P.C. to Mr. Rowell. The second is a copy of Mr. Rowell's Transition Employment

Agreement and Release of All Claims (this document is a duplicate of ECF No. 13). This exhibit

is Bates stamped RW000030994-31018.

6.      **Exhibit C**: is a true and correct copy of ABI's Answers and Responses to Mr.

Rowell's First Set of Interrogatories and Requests for Production of Documents, served on Mr.

Rowell on September 25, 2018.

7.      **Exhibit D**: is a true and correct copy of a document produced by ABI, which

appears in the format of an email communication, with a purported sender shown as Patrick

Vaughan of First Line Advisors LLC, a purported recipient shown as Mr. Rowell, and a

purported date sent of January 2, 2018. This documents is Bates numbered ABI (Rowell) 0917.

8.      **Exhibit E**: is a true and correct copy of Mr. Rowell's Responses to Plaintiff's

First Set of Requests for Admission, served on ABI on March 15, 2019.

I declare under penalty of perjury that the foregoing is true and correct.

Aaron Herzig / MMA

Aaron M. Herzig
May 15, 2019

# Exhibit A

CIN-TEL CORPORATION

PH:  513-621-7723                                           FX:  513-263-9023

Page 1

DISTRICT COURT

DENVER COUNTY, COLORADO

- - -

```
AARON BELL                   :
INTERNATIONAL, INC., a       :
Colorado corporation,        :
                             :
        Plaintiff,           :
    -vs-                     : CASE NO. 1:18-CV-01015-RBJ
                             :
JOHN ROWELL, an              :
individual,                  :
                             :
        Defendant.           :
```

- - -

CONFIDENTIAL - ATTORNEYS' EYES ONLY

- - -

Deponent:  JOHN ZURBORG

January  11, 2019

10:00 a.m.

Reported by:  Jennifer K. Starner, RPR

WWW.CINTELCORPORATION.COM        E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH:  513-621-7723                                     FX:  513-263-9023

---

Page 2

```
 1              DISTRICT COURT
 2          DENVER COUNTY, COLORADO
 3               ---
 4   AARON BELL          :
     INTERNATIONAL, INC., a   :
 5   Colorado corporation,    :
                              :
 6        Plaintiff,         :
     -vs-          : CASE NO. 1:18-CV-01015-RBJ
 7                         :
     JOHN ROWELL, an        :
 8   individual,           :
                          :
 9        Defendant.     :
10             ---
11      CONFIDENTIAL - ATTORNEYS' EYES ONLY
12             ---
13        Deposition of JOHN ZURBORG, a witness herein, taken by
14   the Defendant as upon Cross-Examination and pursuant to the
15   Colorado Rules of Civil Procedure and Notice at the offices
16   of Taft, Stettinius & Hollister, 425 Walnut Street, Suite,
17   Cincinnati, Ohio, on January 11, 2019 at 10:00 a.m., before
18   Jennifer K. Starner, RPR, a Notary Public within and for the
19   State of Ohio.
20             ---
21
22
23
24
```

---

Page 4

```
 1           S T I P U L A T I O N S
 2        It is stipulated by and among counsel for the
 3   respective parties that the deposition of JOHN ZURBORG, a
 4   witness herein, called as upon Cross-Examination by the
 5   Defendant may be taken at this time and place pursuant to
 6   the Colorado Rules of Civil procedure and Notice as to the
 7   time and place of taking said deposition; that the
 8   deposition was recorded in stenotypy by the court reporter,
 9   Jennifer K. Starner, RPR, and transcribed out of the
10   presence of the witness; and that said deposition is to be
11   submitted to the witness for his examination and signature,
12   and that signature may be affixed out of the presence of the
13   Notary Public.
14             ---
15
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1   APPEARANCES:
 2      On behalf of the Plaintiff (VIA TELEPHONE):
 3          Colin Barnacle, Esquire
            Littler Mendelson,P.C.
 4          1900 Sixteenth Street
            Suite 800
 5          Denver, Colorado  80202
            (303) 629-6200
 6
 7      On behalf of the Defendant:
 8          Aaron M. Herzig, Esquire
            Taft, Stettinius & Hollister
 9          425 Walnut Street
            Suite 1800
10          Cincinnati, Ohio  45202-3957
            (513) 381-2838
11          aherzig@taftlaw.com
12      On behalf of the witness:
13          J. Corey Asay, Esquire
            Dinsmore & Shohl
14          1900 Chemed Center
            255 East Fifth Street
15          Cincinnati, Ohio  45202-3172
            (513) 977-8200
16          corey.asay@dinsmore.com
17
18      Also present:
19          John Rowell
20
21
22
23
24
```

---

Page 5

```
 1             JOHN ZURBORG,
 2   of lawful age, as having been duly sworn, as hereinafter
 3   certified, was examined and testified as follows:
 4           CROSS-EXAMINATION
 5   BY MR. HERZIG:
 6      Q      Good morning, Mr. Zurborg.  My name is
 7   Aaron Herzig.  I am the lawyer for John Rowell, the
 8   defendant in this matter.  If you could just state and spell
 9   your name for the record.
10      A      Sure.  My name is John Zurborg, J-O-H-N.
11   My last name Z-U-R-B-O-R-G.
12      Q      And you are here today as the corporate
13   representative of Skilcraft, correct?
14      A      I am.
15      Q      Great.  Have you ever been deposed
16   before?
17      A      No.
18      Q      All right.  So your lawyer may have done
19   this, but I'll go over a few general guidelines.
20           No. 1, the court reporter is trying to
21   take everything down as best she can.  So I will try to talk
22   slowly and not talk over you, and I hope you will try not to
23   talk over me.
24           No. 2, because we have folks on the
```

---

2 (Pages 2 to 5)

---

CIN-TEL CORPORATION

PH:  513-621-7723                          FX:  513-263-9023

---

Page 6

1  phone and the court reporter is trying to hear us, please
2  try to keep your voice up.  Nods and shakes of the head
3  can't be recorded.  You'll have to answer yes or no.
4        A.    Okay.
5        Q.    Great.  Okay is also a fine answer.
6  Wait until I ask the question and then you can give an
7  answer.  If you need a break at any time, we do have
8  restrooms available.  So let me know.  The only thing I
9  would ask is that you -- if there's a question pending you
10 answer it and then we go on a break.
11       A.    Okay.
12       Q.    You may hear objections from time to
13 time.  Unless your lawyer instructs you not to answer, those
14 objections are for the record and then you continue to
15 answer.  Does that make sense?
16       A.    Yes.
17       Q.    Great.  And you're represented here
18 today by Mr. Asay from the Dinsmore law firm; is that
19 correct?
20       A.    Yes.
21       Q.    Great.
22             (Whereupon, Defendant's Exhibit 1
23             through 4 were marked for identification
24             purposes.)

---

Page 7

1            MR. HERZIG:  Okay.  For the record,
2  we'll mark as, I guess, Exhibits 1 through 4 the
3  signed protective orders by Mr. Rowell,
4  Mr. Zurborg, Mr. Asay and Miss Starner.  And then
5  I will give you what will be Exhibit 5.
6            And, Collin, I'll do my best -- I'm not
7  sure that the documents you received this morning
8  will be exactly the order that I go in, but the
9  first document I'm going to mark as Exhibit 5 is
10 the subpoena for testimony and documents in
11 this -- to Skilcraft.  All right?
12           MR. BARNACLE:  Okay.
13           (Whereupon, Defendant's Exhibit 5 was
14           marked for identification purposes.)
15           MR. HERZIG:  Thank you.
16       Q.    Mr. Zurborg, I've handed you a copy of
17 the subpoena.  It's called a Rule 30(b)(6) subpoena.  Do you
18 understand what that means?
19       A.    Yes.
20       Q.    Okay.  So what it means is that you are
21 here as a representative of Skilcraft today, correct?
22       A.    That's correct.
23       Q.    So you have the knowledge of the company
24 with regard to the topics that we asked you about on

---

Page 8

1  Schedule A of the subpoena, right?
2        A.    I do.
3        Q.    Okay.  And if you could just turn to
4  Page 9 of the subpoena and take a quick look at Schedule A
5  and confirm that we requested that Skilcraft produce
6  Skilcraft on the six items listed there.
7        A.    Yes, I am.
8        Q.    And then if you could flip to Page 10,
9  which is Schedule B.  Schedule B is a list of three types of
10 documents that we requested that Skilcraft produce.  Did
11 Skilcraft produce documents in response to this subpoena?
12       A.    Yes, we did.
13       Q.    And, to the best of your knowledge, did
14 Skilcraft produce all of the documents relevant to the three
15 topics there?
16       A.    Yes.
17       Q.    Great.  And you're prepared to answer
18 questions about those documents today as well?
19       A.    I am.
20       Q.    Okay.  Thank you.  You can put that
21 aside.  Why don't you start by telling us about your
22 education from college on.
23       A.    My education?
24       Q.    Yes.

---

Page 9

1        A.    Okay.  From college on?
2        Q.    Yeah.
3        A.    So in college and on or after college?
4        Q.    Where did you go to college?
5        A.    Okay.  So it's a long history.  So I
6  went to Cincinnati Technical College here in Cincinnati and
7  got two associate's degrees.  I then proceeded to work for a
8  few years in the workforce, went to school at night,
9  University of Buffalo, to pursue my bachelor's of science.
10 And then left and came -- returned to school full-time and
11 finished the bachelor's of science in electrical engineering
12 from the University of Cincinnati.  I then proceeded to go
13 to school at night at Xavier University to pursue an MBA in
14 entrepreneurism.
15       Q.    Great.  And how long have you worked at
16 Skilcraft?
17       A.    I have been with Skilcraft -- this is my
18 second time with Skilcraft.  And this stint I've been with
19 Skilcraft since 2010.
20       Q.    Okay.  Why don't you take us through
21 your work history at Skilcraft, both stints.  Just kind of
22 walk through what your titles were and --
23       A.    Sure.  Sure.  My first stint with
24 Skilcraft was from '99 to 2002.  I was -- joined as a

---

3 (Pages 6 to 9)

WWW.CINTELCORPORATION.COM      E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

---

Page 10

1  director with the company.  And the goal was to grow the
2  company, which we did successfully.  And I left at the end
3  of the recession in 2002 and returned in 2010.  Oh, when I
4  left the first time from Skilcraft in 2002, I was general
5  manager of the company when I left.
6          Q       And what was your role as a general
7  manager?
8          A       To basically oversee the whole
9  operations of the company.
10         Q       Okay.  And -- okay.  And then you left
11 during the recession?
12         A       I did.
13         Q       They had cutbacks?
14         A       Yeah.  We had hit some tough times.  It
15 was a family-owned business.  Myself and the family didn't
16 see eye to eye as far as what needed to be done.  They
17 weren't willing to make the sacrifices necessary to pull the
18 company back into good financial position.  And at the time
19 I -- you know, for me personally I needed to go somewhere
20 where it was more secure.  So I left.  And the company had
21 been sold from the family by the time I returned in 2010 to
22 two others.
23         Q       What did you do between 2002 and 2010?
24         A       I was vice president of development with

---

Page 11

1  a company by the name of SMC out of Lexington, Kentucky.
2  There I was part of the team that successfully grew the
3  company from 18 to 70 million where we successfully sold it
4  to a company by the name of Creation Technology, where I
5  became executive vice president with the executive team of
6  a -- Creation Technology was the company that acquired us.
7          Q       And then you returned to Skilcraft --
8          A       I did.
9          Q       -- in 2010 when the company sold?
10         A       Yeah.  Well, I spent three years with
11 the company that acquired SMC in Lexington, Kentucky.  And I
12 wanted to return to -- I was looking to purchase a business
13 of my own.  And the gentlemen that had bought Skilcraft in
14 2004 were previous business associates of mine from the
15 early '90s.  And one of them was going to retire within a
16 three to four-year window.  And they asked me to come back
17 and help them grow the company.  And then also succeed the
18 current -- or the CEO at the time and become CEO.  And then
19 I came in as an owner as well.
20         Q       So in 2010 you came in as an owner.  And
21 what title?
22         A       I came in with the title of VP of
23 business development.  And then I came in as an owner.  I
24 bought shares in the company.

---

Page 12

1          Q       Okay.  And how long did you hold the
2  title of VP of business development?
3          A       Until 2012 where I took an interim title
4  of COO for about six to nine months while we were doing the
5  transition of Jim Berding, who was CEO at the time, to
6  retire.  And then at the back half of 2012 I became CEO of
7  the company.
8          Q       And that's the title you currently hold?
9          A       It is, yes.
10         Q       What are your responsibilities as a CEO
11 of Skilcraft?
12         A       The full-blown profit and loss, building
13 team, make sure we have a strategy in place to grow the
14 company to the objectives that we set as owners.
15         Q       And what -- describe Skilcraft for me.
16         A       So Skilcraft is a precision sheet metal
17 fabricator.  It's been in business since 1965.  So it's a
18 longstanding regional fabrication company here in greater
19 Cincinnati.  When I joined the company we primarily serviced
20 what I would call commercial OEMs.  One of the things that
21 we did is, is we entered the aerospace market and now we
22 started a whole separate business unit.  So we've got two
23 business units, one for aerospace and one for commercial
24 OEMs.

---

Page 13

1          Q       Give me some examples.  Are you --
2  particular OEMs or any particular industry categories?
3          A       Well, so I -- yeah.  So on the
4  commercial group side we would service companies like Big
5  Ass Fan, Square D which is now Schneider Electric, Trane
6  Corporation down in Lexington, Kentucky.  That's the type of
7  OEMs we would service out of that side.  Out of the
8  aerospace side we service companies like GE or Rolls Royce
9  that make jet engine components.
10         Q       Okay.  And you oversee the operations of
11 both divisions?
12         A       Yes, I do.
13         Q       Okay.  What's -- what is the corporate
14 structure of Skilcraft?
15         A       It is an LLC.
16         Q       Okay.  And who -- who owns it?
17         A       Jay Vierling, who's the majority owner
18 of the company.  And there are five owners in the company,
19 but he owns, like, right around 60 percent of the shares.
20         Q       Okay.
21         A       I own ten percent and the others are
22 distributed right across three other individuals.
23         Q       Okay.  And does Mr. Vierling have a role
24 in the company besides ownership?

---

4 (Pages 10 to 13)

WWW.CINTELCORPORATION.COM      E-Mail    CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH:  513-621-7723                                        FX:  513-263-9023

Page 14

1       A       Not in a day-to-day basis, no.  I mean,
2   I guess you could say that he's quasi chairman of the board,
3   but that's not official.  So that would be his role.
4       Q       So there's a board of directors of the
5   LLC?
6       A       There is, yes.
7       Q       Okay.  Are -- is the board -- what's
8   your position on the board?
9       A       So my position on the board is as member
10  and president/CEO.  So I call the board meetings, I set the
11  agenda for the board meetings.  That's my role.
12      Q       Does Mr. Vierling chair the board?
13      A       No.  I'd say actually I chair it.
14      Q       And are the other owners the board
15  members?
16      A       The other members are board members.
17  And then I have three board advisors that are nonowners that
18  advise us in specific areas.  One would be in finance, one
19  would be in operations, one would be specifically in the
20  aerospace industry.
21      Q       So these are experienced executives from
22  other companies that are giving you advice?
23      A       Every one of them are extremely
24  experienced, yes.

Page 15

1       Q       When -- when was the first time you
2   heard the name John Rowell?
3       A       It would have been after an inbound call
4   from -- I think the gentleman's name was Dean from AVI,
5   inquiring whether Skilcraft needed any services to market
6   the company for a sale.
7       Q       Was that a cold call?
8       A       It was.
9       Q       Was that pretty standard?
10      A       I get them every week, yes.
11      Q       Okay.  And about when -- if you recall,
12  about when did you get that call?  Month and year, if you
13  can remember.
14      A       It would have been in early 2017.  It
15  would have been January/February time -- mid January to
16  early February time frame.
17      Q       Okay.  And do you recall at the time
18  what Dean Berger said about John Rowell?
19      A       They were extremely excited to have John
20  Rowell represent Skilcraft because of his aerospace industry
21  background and thought that it was a perfect fit in their
22  words.  And actually at this point on the call, it just
23  wasn't Dean.  It was Ralph, whatever Ralph's last name is.
24      Q       Bellizzi?

Page 16

1       A       Yes.
2       Q       B-E-L-L-I-Z-Z-I.
3       A       Yeah.  And there was one other gentleman
4   on the phone.  I don't remember the other gentleman's name.
5       Q       That was a sales call?
6       A       It was a second call from the original
7   inbound call where they were trying to really impress upon
8   me that they could represent Skilcraft well through a sale
9   process.
10      Q       Okay.  And there is Aaron Bell.
11      A       ABI, yes.
12      Q       ABI.  Okay.  Good.  So we're all going
13  to call it -- we're going to call the plaintiff AIB --
14  Mr. Bellizzi's company ABI for this deposition.
15              Okay.  So let's go back to the first
16  call.  You get a cold call from Dean --
17      A       Yes.
18      Q       -- in January or February time frame --
19      A       Yes.
20      Q       -- of 2017?  Did he tell you at the time
21  that he was representing ABI?
22      A       He did, yes.
23      Q       Okay.  Did he say that Mr. Rowell was
24  part of the ABI team?

Page 17

1       A       He did, yes.
2       Q       Did he ever suggest that Mr. Rowell
3   worked for anyone other than ABI?
4       A       No.
5       Q       Okay.  So you have that first call.  Did
6   you do any research into ABI after that call?
7       A       I searched their website.  I had asked
8   them for some references.  So yes, I checked references on
9   companies that they had represented before.  I had asked --
10  yes, I did.
11      Q       When you checked references, what did
12  you do?
13      A       I asked them for some that were
14  aerospace specific.  I asked for some that were directly
15  involved with John Rowell.
16      Q       And you liked what you heard enough to
17  proceed with another phone call with ABI, correct?
18      A       Yes, I did.
19      Q       Okay.  And I should clarify.  I know it
20  gets a little confusing because, of course, you were
21  personally very involved in all these things.  But when I'm
22  talking about "you" --
23      A       Uh-huh.
24      Q       -- or "I" or any of those pronouns, I'm

5 (Pages 14 to 17)

CIN-TEL CORPORATION

Page 18

1   talking about Skilcraft as a company.
2        A     The company, yeah.
3        Q     If you ever come to a point where
4   there's something -- I don't think this will be the case --
5   if there's something that you know that the company doesn't
6   also know, we can talk about that.  But as CEO, I suspect
7   everything that you know is also the company's knowledge?
8        A     Yes, sir.
9        Q     Okay.  So the second phone call -- so
10  Dean calls you.  You do some research.  And then you -- how
11  does the second phone call occur?
12       A     The second phone call that -- they
13  caught me in the eleventh hour of getting ready to go to a
14  board meeting to recommend another firm to represent us
15  through the sales process.  We had already pretty much
16  whittled it down to two.  So they caught me in the eleventh
17  hour.
18       Q     Okay.
19       A     And so they were pressing hard trying to
20  justify how they could represent us better than the other
21  two firms.  And they pressed hard that John Rowell, who was
22  very experienced, and the company was very experienced in
23  representing aerospace companies.
24       Q     So who was the other company?

Page 19

1        A     Houghlan Lokey.  H-O-U-G-H-L-A-N.
2   Lokey, L-O-K-E-Y, I think it is.  I'm not exactly sure about
3   that.  But that was one of them.  That was the one we were
4   leaning toward.
5        Q     Okay.
6        A     There was one another.  I can't remember
7   the name of it.
8        Q     That's all right.  But you had gotten
9   calls from other investment banking firms before ABI, right?
10       A     Again, I get multiple calls during the
11  course of a month from firms like that, yes.
12       Q     Okay.  And I'm sorry.  Did --
13             MR. HERZIG:  Collin, are you still
14       there?
15             MR. BARNACLE:  Yes, I am.
16             MR. HERZIG:  Okay.  I thought I heard --
17       did anyone else join the line?
18             MR. BARNACLE:  No.  You know what?  That
19       was my -- that was an email coming through my
20       phone.
21             MR. HERZIG:  Sorry.  I'm hearing things.
22       All right.  If someone else does join, please let
23       us know.
24             MR. BARNACLE:  Yeah.  I'll turn the

Page 20

1   volume down.
2             MR. HERZIG:  All right.
3        Q     Okay.  So you had three potential -- so
4   in the eleventh hour suddenly you have three potential
5   companies in mind.  And eventually you decide to go with
6   ABI, correct?
7        A     So yes.
8        Q     And why did you choose ABI?
9        A     There was more research done after my
10  board meeting before we finally came to an agreement with
11  ABI.  So why did I use ABI?  We met with John.  He flew down
12  to Florida to meet with me and Jay Vierling.  And we met, we
13  talked about how ABI and John would represent Skilcraft
14  through a process.  We discussed some of the contractual
15  surroundings in representing Skilcraft and we came to a
16  verbal agreement, which later became the contract agreement.
17  John convinced us that he was the right -- him and ABI were
18  the right company for it.
19       Q     And during that conversation, did
20  Mr. Rowell ever suggest to Skilcraft that he worked for
21  anyone other than ABI?
22       A     No.
23             MR. HERZIG:  I'm going to -- we're going
24       to mark Exhibit 6, which is the complaint, which

Page 21

1   was originally filed in state court in Denver
2   County, Colorado.
3             (Whereupon, Defendant's Exhibit 6 was
4        marked for identification purposes.)
5        Q     We're going to start on -- so
6   Mr. Zurborg, feel free to -- I don't know if you've seen the
7   complaint before or not, but feel free to take a look at it.
8   I'm mostly going to ask you about a few particular
9   paragraphs.
10       A     Okay.
11       Q     But you're welcome to read the whole
12  thing.
13       A     I briefed it this morning.  So just
14  point me where you want me to focus on.
15       Q     Okay.  Sounds good.  So the Aaron Bell
16  International, ABI's main -- well, one of the claims in this
17  case, as I think you know from reading the complaint, is
18  that Mr. Rowell essentially tried to terminate the deal
19  between Skilcraft and ABI and then take it for himself.
20             Is that your general understanding as
21  part of the complaint?
22       A     I understand that to be the complaint.
23       Q     Okay.  Let's take a look at Paragraph 3,
24  which is on Page 2 of Exhibit 6 of the complaint.  It says

CIN-TEL CORPORATION

PH:  513-621-7723                              FX:  513-263-9023

---

Page 22

1  while still an ABI Employee, Defendant Rowell intentionally
2  subverted and attempted to divert the transaction that ABI
3  carefully developed with Skilcraft, LLC.
4          To your knowledge, did Mr. Rowell ever
5  attempt to subvert the transaction that ABI had carefully
6  developed with Skilcraft, LLC?
7      A    No.
8      Q    And your understanding is that that
9  transaction would have been the sale of ABI to investors,
10 correct?
11     A    The sale of Skilcraft?
12     Q    I'm sorry.  The sale of Skilcraft?
13     A    The sale of Skilcraft to investors, yes.
14     Q    Mr. Rowell never, to your knowledge,
15 attempted to subvert that transaction, correct?
16     A    That's correct.
17     Q    Okay.  And, to your knowledge, did
18 Mr. Rowell -- and, of course, I mean Skilcraft's
19 knowledge -- ever attempt to divert that transaction from
20 ABI?
21     A    No.
22     Q    It then goes on to say that Mr. Rowell
23 openly disparaged ABI.
24          Did you ever hear -- did anyone -- did

---

Page 23

1  Skilcraft ever hear Mr. Rowell disparage ABI?
2      A    No.
3      Q    So let's talk a little bit about what we
4  mean about disparaging for a minute because you were
5  answering based on your common understanding of the word,
6  which I appreciate.  In the law disparagement is a false
7  statement.
8          As far as you know, did Mr. Rowell ever
9  make a false statement about ABI --
10     A    No.
11     Q    -- published to a third party, which
12 would mean said to you, that is derogatory of ABI's general
13 business or some element of its business?
14          Did Mr. Rowell ever make a derogatory
15 statement about ABI?
16     A    No.
17     Q    To your knowledge, did Mr. Rowell ever
18 give you the impression that he intended to cause any harm
19 to ABI's pecuniary interests?
20     A    No.
21     Q    To your knowledge, did Mr. Rowell ever
22 act with malice toward ABI?
23     A    No.
24     Q    I'm going to -- so the next -- we're

---

Page 24

1  going to go back to Paragraph 3 of the complaint.
2      A    Yep.
3      Q    The next phrase says that Mr. Rowell
4  worked with a competing investment bank to usurp the
5  Skilcraft Transaction."
6          To Skilcraft's knowledge, did Mr. Rowell
7  ever work with a competing investment bank to usurp the
8  Skilcraft transaction?
9      A    No.
10     Q    The next section says that Mr. Rowell
11 tortiously interfered with ABI's contractual and perspective
12 business relationship with Skilcraft.
13          Putting aside the word "tortious" for a
14 minute, as a general matter, to your knowledge, did
15 Mr. Rowell ever interfere with ABI's contractual
16 relationship with Skilcraft?
17     A    No.
18     Q    Did it ever interfere with ABI's
19 prospective relationship with Skilcraft?
20     A    No.
21     Q    They then -- the complaint then gives an
22 example of that behavior in its view and says, "Mr. Rowell
23 described ABI to Skilcraft as 'grossly understaffed.'"
24          Did Mr. Rowell ever describe ABI as

---

Page 25

1  grossly understaffed to you?
2      A    No.
3      Q    It next says that he said that ABI
4  lacked -- this is not quoted, but just generally stated.
5  ABI lacked sufficient resources to service Skilcraft's
6  transactions.
7          Did Mr. Rowell ever say or indicate
8  anything like that to you?
9      A    No.
10     Q    It then says that ABI -- that he told
11 you that ABI did not prioritize Skilcraft's needs.
12          Did Mr. Rowell ever indicate or say
13 anything like that to you?
14     A    No.
15     Q    It then says that Mr. Rowell stated that
16 ABI was incapable of meeting Skilcraft's needs.
17          Did Mr. Rowell ever say or indicate
18 anything like that to you?
19     A    No.
20     Q    To your knowledge, did Mr. Rowell ever
21 use any confidential, proprietary or trade secret
22 information of ABI to help a company other than ABI?
23     A    No.
24     Q    Or to help himself outside of his work

---

7 (Pages 22 to 25)

CIN-TEL CORPORATION

PH:   513-621-7723                          FX:   513-263-9023

---

Page 26

1   for ABI?
2        A     No.
3        Q     So as far as Skilcraft knows, John
4   Rowell, when he was working with Skilcraft, was always
5   working for ABI; is that right?
6        A     John Rowell was ABI, yes.
7        Q     Okay.  Have you ever heard of a company
8   called First Line Advisors?
9        A     No.
10            MR. HERZIG:  So I think, Collin, this is
11        the back of that PDF.  There are two emails toward
12        the back of the PDF.  Mark this Exhibit 7.
13            (Whereupon, Defendant's Exhibit 7 was
14        marked for identification purposes.)
15        Q     So Exhibit 7 is marked Skilcraft 001257.
16   Mr. Zurborg, you understand that the Bates label means
17   Skilcraft produced this document in connection with the
18   subpoena?
19        A     Yes.
20        Q     Okay.  This appears to be an email from
21   a Patrick Vaughn at something called First Line Advisors LLC
22   to you; is that correct?
23        A     Can I have a moment to read this?
24        Q     Yes, please do.  I'm sorry.

---

Page 27

1        A     Yeah.  Okay.
2        Q     Please do.  I'm sorry.  Take all the
3   time you need.
4        A     Okay.  What was your question again,
5   please?
6        Q     So, first of all, does this appear to be
7   an email from Patrick Vaughn to you, correct?
8        A     It is.
9        Q     And it was produced by Skilcraft to
10   Mr. Rowell -- to me in connection with the subpoena,
11   correct?
12        A     It was, yes.
13        Q     And it's a business record of Skilcraft?
14        A     It is.
15        Q     Okay.  It's an email that you keep in
16   the normal course of business, right?
17        A     It is, yes.
18        Q     Do you recall getting this email?
19        A     After reading it -- I mean, I get lots
20   of emails that are various -- like this, right.  So I do
21   recall getting this specific email, yes.
22        Q     Okay.  I'm going to note a few things
23   about it.  Well, did you -- what did you do when you
24   received this email?

---

Page 28

1        A     I did what I was contractually obligated
2   to, which was try to defer it back to ABI.
3        Q     And how did you do that?
4        A     I don't recall.  I mean, I -- I don't
5   recall.
6        Q     Okay.  So if you look at the signature
7   of this person called Patrick Vaughn --
8        A     Uh-huh.
9        Q     -- it says "First Line Advisors LLC."
10        A     Uh-huh.
11        Q     And then in the website it says "First
12   Line Advisor" -- without the S -- ".com."  And then his web
13   address -- his email address uses the First Line Advisors --
14   with an S -- .com.  You'll also note in the phone number
15   that it says (781), and then a dash, which I think is an
16   unconventional way to type a phone number.  Don't you think?
17        A     Yes.
18        Q     And it's unconventional that a business
19   would have an email address that is First Line Advisors, but
20   a web address that is First Line Advisor.  Don't you think?
21        A     Yes.
22        Q     Did you ever look up First Line Advisor
23   at the time?
24        A     No.

---

Page 29

1        Q     Did you ever click on the link for First
2   Line Advisor?
3        A     No.
4        Q     Did you ever look up Patrick Vaughn to
5   find out if he was a real person?
6        A     No.
7        Q     So this email is sent to you on January
8   4th, 2018, correct?
9        A     Yes.
10        Q     It says that First Line Advisors has a
11   client who has an interest in your fabrication division.  Is
12   that -- that is not -- that's the commercial OEM division or
13   the aerospace division, if you know?
14        A     Okay.  Let me read it again.  So I
15   wouldn't know the answer to know what they were implying.
16        Q     Both divisions fabricate things?
17        A     They do, yes.
18        Q     Okay.  And you don't use the term
19   fabrication division?
20        A     No, I do not.
21        Q     Okay.  Did you ever hear Mr. Rowell use
22   the term "fabrication division"?
23        A     Absolutely not.
24        Q     Then it says, "Upon some hunting, we

---

8 (Pages 26 to 29)

CIN-TEL CORPORATION

PH:   513-621-7723                                    FX:   513-263-9023

Page 30

1   learned that you are being represented by John Rowell, and
2   therefore reached out to him."
3           As far as you knew at the time, that was
4   accurate, correct?
5       A    Yes.
6       Q    "My colleague made a couple of attempts,
7   leaving multiple voicemail messages.  No response.  I also
8   called John, and finally was able to reach him.  He informed
9   me that you may be close to" -- I assume that's finishing
10  the transaction.  "Therefore, I asked for clarity if he
11  wanted to speak further or if the deal was done.  He said he
12  would contact me the next morning but I never heard from
13  him."
14          "Based on the transaction being close to
15  the finish line, I tried calling him multiple times.  After
16  my last attempt, he sent me a text to leave him alone.
17  Based on this, I decided I would reach out to you directly
18  to see if you are interested in a potential investment
19  in/buyout of your fabrication division."
20          Do you have any reason to believe that
21  is accurate or inaccurate?
22      A    I don't.
23      Q    Did you follow up with John Rowell after
24  this to find out why he might not be contacting this First

Page 31

1   Line Advisors?
2       A    I don't recall.
3       Q    If First Line Advisors had a client that
4   was interested in a potential investment at this stage,
5   would you have entertained an offer?
6       A    No.
7       Q    Why not?
8       A    Because I had already -- we had already
9   made the decision as a company to stop the sale process of
10  the company.
11      Q    Did Mr. Rowell tell you to stop the sale
12  process?
13      A    No.
14      Q    Did ABI tell you to stop the sale
15  process?
16      A    No.
17      Q    Why did you decide to stop the sale
18  process?
19      A    Because we felt the process did not
20  reveal an offer that met our expectations.  And we felt that
21  we had exhausted the opportunities that were presented
22  through that process and we needed to get back to focusing
23  on the business.
24      Q    Do you know if Mr. Vaughn or anyone from

Page 32

1   First Line Advisors ever contacted you again?
2       A    Not to my memory, no.
3       Q    Okay.  This reads to me like First Line
4   Advisors might be a competitor of ABI or trying to be.  Is
5   that how it reads to you?
6       A    I would read it that way, yes.
7       Q    But it also reads to me like they don't
8   have a relationship with John Rowell because they can't even
9   reach him, correct?
10      A    Yes.
11      Q    And Mr. Rowell never mentioned the name
12  First Line Advisors to you while he worked for you?
13      A    No.
14      Q    Or worked for ABI?
15      A    No.
16      Q    And Mr. Rowell never gave you the
17  impression that he worked for First Line Advisors; is that
18  correct?
19      A    No.
20          MR. HERZIG:  We'll go off the record for
21  30 seconds while Mr. Zurborg gets some coffee.
22          (Whereupon, a brief recess was taken.)
23          MR. HERZIG:  Okay.  We're back on the
24  record.

Page 33

1       Q    I'm going to go back, Mr. Zurborg, to
2   Exhibit 6 for just a minute, which is the complaint.
3       A    Okay.
4       Q    Let's take a look at Paragraph 25 real
5   quick.
6       A    What page?
7       Q    Page 5, Paragraph 25.
8       A    Okay.
9       Q    Paragraph 25 says that Mr. Rowell
10  breached his transition agreement.
11          I take it you don't know anything about
12  this transition agreement, correct?
13      A    I do not.
14      Q    Did -- as far as you know, did
15  Mr. Rowell fail to take reasonable efforts to protect and
16  maintain the confidentiality of -- or -- of the very
17  existence of the Skilcraft transaction?
18      A    Ask the question again, please.
19      Q    As far as you know, did Mr. Rowell ever
20  fail to take reasonable measures to protect and maintain the
21  confidentiality of the very existence of the Skilcraft
22  transaction?
23      A    No.
24      Q    As far as you know, he kept that

9  (Pages 30 to 33)

CIN-TEL CORPORATION
PH:   513-621-7723                              FX:   513-263-9023

Page 34

1   transaction confidential?
2        A     Yes.  That's why I asked the question.
3   I wasn't sure which way -- I believe he protected the
4   confidentiality.  That would be my answer.
5        Q     As far as you know, did Mr. Rowell ever
6   openly usurp the Skilcraft transaction for his own gain?
7        A     No.
8        Q     As far as you know, did he ever divert
9   the Skilcraft transaction from ABI?
10       A     No.
11       Q     Okay.  Paragraph 26 says that Mr. Rowell
12   disparaged ABI to Skilcraft by describing them as grossly
13   understaffed.
14             You already told me that he did not do
15   that, correct?
16       A     Yes.
17       Q     That he said it lacked sufficient
18   resources to service Skilcraft's transaction.
19             You already told me didn't do that,
20   correct?
21       A     Yes.
22       Q     That ABI did not prioritize Skilcraft's
23   needs.
24             You already said he didn't do that,

Page 35

1   right?
2        A     Yes.
3        Q     And that ABI was incapable of meeting
4   Skilcraft's needs.
5             He never told you that either?
6        A     Yes.
7        Q     Is that right?
8        A     That's correct.
9        Q     Okay.  Those same comments are repeated
10   throughout the complaint and I'm not going to make you do
11   that a third time.
12       A     Okay.
13       Q     I promise.
14       A     Thank you.
15       Q     But your answer was --
16       A     No.
17             MR. BARNACLE:  Colin Barnacle.
18             MR. HERZIG:  Colin, what did you miss?
19             MR. BARNACLE:  Probably the last three
20   minutes.
21             MR. HERZIG:  Okay.  I just -- I went
22   back to the complaint and asked him about
23   Paragraphs 25 and 26.  And you'll read in the
24   transcript that his answers were the same.

Page 36

1             MR. BARNACLE:  Okay.
2             MR. HERZIG:  As they were for the
3   earlier parts of the complaint.
4             MR. BARNACLE:  Okay.
5             MR. HERZIG:  That's what transcript are
6   for.
7        Q     You mentioned before that you entered --
8   that Skilcraft entered into an agreement with ABI, correct?
9        A     Yes.
10       Q     Okay.
11             MR. HERZIG:  Okay.  We're going to mark
12   as Exhibit 8 -- I'm still on track, right?
13             THE COURT REPORTER:  Right.
14             (Whereupon, Defendant's Exhibit 8 was
15             marked for identification purposes.)
16             MR. HERZIG:  Exhibit 8 is, for the
17   record, Bates labeled RW 000011879 to 882.
18             Mr. Zurborg, please take a look at that
19   document.  Let me know when you're ready to talk about it.
20   If it helps, I'm going to ask you about Paragraph 4 and
21   Paragraph 1.3.
22       A     Okay.
23       Q     But obviously you have the right to read
24   as much as you want.

Page 37

1        A     Yes.  I'll read that.  Okay.  So I read
2   4.  What was the other one?
3        Q     1.3?
4        A     1.3.
5        Q     The first question I'm going to ask is
6   if you look at the last page, it appears to have your
7   signature on it; is that correct?
8        A     Yes, sir.
9        Q     And that's Mr. Bellizzi's signature?
10       A     Yes, I assume.
11       Q     Fair enough.  And what is this document?
12       A     This was the contract that we agreed to
13   and negotiated with John Rowell on the front end of the
14   relationship.
15       Q     And the contract is between Skilcraft
16   and ABI, correct?
17       A     Yes, sir.
18       Q     Not -- John Rowell is not a contracting
19   party, right?
20       A     I don't understand the question.
21       Q     The parties of the contract are only --
22       A     ABI and Skilcraft.
23       Q     -- ABI and Skilcraft?
24       A     Yes, that's correct.

10 (Pages 34 to 37)

CIN-TEL CORPORATION

PH:   513-621-7723                                    FX:   513-263-9023

---

Page 38

1        Q        And apparently you're a shareholder as
2   well?
3        A        That's correct.
4        Q        Okay.  So Paragraph 4, if you look down
5   the third line from the bottom there's a sentence that
6   starts, "Upon termination."
7        A        Yes.
8        Q        It says, "Upon termination of this
9   engagement, a 'Holdover Period' of eighteen (18) months will
10  commence.  If, during the term of this Agreement and the
11  Holdover Period, Client completes a Transaction with a
12  Prospect, ABI will be entitled to its fees in accordance
13  with Section 6 below."
14                What is your understanding of what that
15  holdover period means?
16       A        It means that Skilcraft LLC could -- if
17  we were sold within 18 month of us notifying them, ABI got
18  all the fees associated with -- as defined in the contract.
19       Q        So even after Skilcraft terminated its
20  relationship with ABI --
21       A        Yes.
22       Q        -- ABI still would get its fees if
23  Skilcraft sold in the next 18 months?
24       A        That's how that document's interpreted.

---

Page 39

1                 (Whereupon, a portion of the witness's
2                 testimony was stricken from the record).
3        MR. HERZIG:  Why don't we strike that.
4        THE WITNESS:  Okay.
5        MR. HERZIG:  You don't need to tell us
6   anything about what your attorneys tell us.
7        THE WITNESS:  Okay.  Sorry.
8        MR. ASAY:  Yeah.  I'll reiterate that.
9        MR. HERZIG:  We'll strike that last
10  sentence from the record.
11       Q        But you agree with my -- with what I
12  said about it?
13       A        Yes.  Yes.
14       Q        Okay.  So is Skilcraft still in that
15  holdover period?
16       A        Yes, sir.
17       Q        And is Skilcraft violating the terms of
18  the holdover period?
19       A        No, sir.
20       Q        Did Skilcraft -- has Skilcraft been
21  sold?
22       A        No.
23       Q        Are you working with anyone else on a
24  sale that would occur during the holdover period?

---

Page 40

1        A        No.
2        Q        Has Mr. Rowell contacted you about doing
3   business with Skilcraft since January 1st of 2018?
4        A        No.
5        Q        Since the end of -- since he terminated
6   your agreement with ABI, has Mr. Rowell attempted to work
7   with Skilcraft in any way?
8        A        No.
9        Q        And even if you had worked with a
10  different advisor and sold the company already, ABI still
11  would get all of the money to which it was entitled under
12  this contract; is that right?
13       A        Yes.
14       Q        Taking a look at Section 1.3 for a
15  moment, it says, "ABI agrees that the work and services
16  provided by ABI will include John Rowell as the main
17  advisor, which is understood between the parties that John
18  Rowell is personally involved in all the activities of
19  identifying, interfacing with potential inquirers, working
20  directly with Skilcraft in the preparation of sale, LOI and
21  closing process, unless there are circumstances that arise
22  that are beyond ABI's control."
23                That language isn't standard ABI
24  language, isn't it?

---

Page 41

1        A        I don't know --
2        Q        Okay.
3        A        -- if they agreed to that prior.
4        Q        Why -- was that important for Skilcraft?
5        A        It was important to us, yes.
6        Q        Why?
7        A        John had a presence here in our site.
8   He, as discussed earlier, was promoted by ABI and himself as
9   having the experience with the aerospace industry himself.
10  And we wanted to make sure that he was the -- driver of
11  the process of selling Skilcraft.
12       Q        Did that -- did your expectation about
13  Mr. Rowell turn out to be true?
14       A        Yes.
15       Q        He had the skills and experience that
16  you were looking for, correct?
17       A        Yes.
18       Q        Do you think he gave his best effort to
19  try and get a deal Skilcraft -- to create a transaction for
20  Skilcraft in his work for ABI?
21       A        Yes.
22       Q        And I think you've already told me that
23  Skilcraft -- not ABI or John Rowell or anybody else --
24  decided to stop the transaction process toward the end of

---

11 (Pages 38 to 41)

CIN-TEL CORPORATION

PH:  513-621-7723                         FX:  513-263-9023

Page 42

1   2017, correct?
2        A     That's correct.
3        Q     Okay.  You said you were on the -- on a
4   call -- Mr. Bellizzi was on the first call.  Who was on the
5   second -- what you described as the second call --
6        A     Yes.
7        Q     -- second sales call --
8        A     Yes.
9        Q     -- from ABI?  Did you interact with
10  Mr. Bellizzi after that?
11       A     No.
12       Q     Not at all?
13       A     No, not at all.
14       Q     Do you recall who else at ABI you did
15  work with besides Mr. Rowell?
16       A     A gentleman by the name of Kevin.  I
17  don't remember Kevin's last name.
18       Q     Okay.
19       A     I think that was his first name.
20       Q     And what was Kevin's role, if you
21  remember?
22       A     He supported John in the way of
23  preparation of data and information associated with the
24  deal.

Page 43

1             MR. HERZIG:  Well, let's go off the
2        record for just a minute.
3             (Off-the-record discussion.)
4             (Whereupon, Defendant's Exhibit 9 was
5             marked for identification purposes.)
6        Q     So, Mr. Zurborg, I'm handing you what's
7   Bates labeled RW000053981 to 84.  It is now Exhibit No. 9.
8   And skipping to the second page, have you seen the letter
9   attached to the email before?
10       A     Yes.
11       Q     Okay.  And who is it from?
12       A     It's from --
13       Q     What company is it from?
14       A     Whitcraft.
15       Q     Okay.  Let's -- let's use this to talk
16  briefly about how this transaction process works from the
17  time you signed that investment banking engagement in March
18  of 2017 until it was terminated.
19            MR. BARNACLE:  Hello?  Am I still
20       connected?
21            MR. HERZIG:  Yeah.  Can you hear us?
22       Colin, can you hear us?  Colin?
23            (Off-the-record discussion.)
24            MR. HERZIG:  Back on the record.

Page 44

1        Q     I was asking you about the letter at the
2   Bates label range 53982.  I forget exactly where we were, so
3   let's just -- this is from Whitcraft, correct?
4        A     Yes.
5        Q     Okay.  What I'm saying is -- let's just
6   talk a little bit about how this transaction process worked
7   from the time you signed up with ABI in March of 2017 until
8   you terminated in December of 2017.  Just describe in your
9   own words what that process was.
10       A     It started with the draft of a CIM that
11  ABI prepared.
12       Q     A confidential information memorandum?
13       A     Yes.
14       Q     So that was written --
15       A     Well, actually let me back up.  It
16  started with a teaser.
17       Q     What is that?
18       A     It was like a one-page thing that ABI
19  sent out to a group of companies to get initial interest and
20  awareness of the fact that Skilcraft was for sale.
21       Q     Okay.  And were you -- did you send it
22  out to all kinds of groups of people or particular
23  industries like private equity groups?
24       A     So --

Page 45

1        Q     Did ABI?
2        A     -- ABI did that effort, yes.
3        Q     And did they send it to private equity
4   only?
5        A     No.
6        Q     Okay.  Who else did they send it to?
7        A     They would have sent it to strategic
8   buyers like an OEM.
9        Q     Is Whitcraft one of those strategic
10  buyers?
11       A     You're slicing hairs.
12       Q     Okay.
13       A     I mean, I would consider Whitcraft an
14  OEM, but they're owned by a private equity firm.
15       Q     Fair enough.  Okay.  So it starts out
16  with a teaser.  And then the confidential information
17  memorandum; is that right?
18       A     Yes.
19       Q     Okay.  And what did Skilcraft tell ABI
20  about what it was hoping to get out of the transaction?
21       A     Well, I mean, beyond, like, financially?
22  Be a little more clear.
23       Q     Sure.
24       A     We wanted a successful sale.

WWW.CINTELCORPORATION.COM        E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

Page 46

1       Q       Okay.  And what did a successful sale
2  look like?
3       A       That met our value of the company
4  expectations.
5       Q       Okay.  I should mention that because
6  there's a protective order --
7       A       Yes.
8       Q       -- if you're concerned about talking
9  about particular financial information, we can decide to
10  mark anything that you talk about as confidential at some
11  point.
12      A       No.  My hesitation is, is I could give
13  you a whole lot more than meets --
14      Q       Okay.  Well, let's start with the
15  financial.
16      A       There's a lot more than just financial.
17      Q       So let's start with the financial terms.
18      A       Yes.
19      Q       When Skilcraft engaged ABI --
20      A       Yes.
21      Q       -- was it hoping to sell both divisions?
22      A       Yes.
23      Q       And --
24      A       Well, it was flexibility.  It could be

Page 47

1  yes or one or the other.
2       Q       Okay.
3       A       Yeah.
4       Q       What was Skilcraft's target price for
5  selling both divisions?
6       A       30 to 35.  35, I think, was for both.
7  30 was kind of like the bottom end for aerospace.
8       Q       Okay.  And ABI was engaged to solicit
9  potential buyers for both or either of the divisions?
10      A       Yes.
11      Q       Okay.  After you sent out the -- well,
12  so what other -- in addition to those financial terms, what
13  other benefits was Skilcraft hoping to receive from the
14  sale?
15      A       Well, I mean, just generally making sure
16  that it didn't end up in somebody's hands that would -- you
17  know, that the longevity of the business would be good for
18  the employees.
19      Q       Okay.
20      A       Yeah.
21      Q       2017 was a transition -- I'll use these
22  words -- was a transition year for Skilcraft; is that right?
23      A       Yes.
24      Q       Describe why.

Page 48

1       A       We had grown the aerospace business from
2  2015 through 2017 doing new product introduction on the new
3  engine program from GE.  We were doing pilot production in
4  those two periods years.  And from '16 into '17 was a
5  transition into a new contract with adjusted pricing and
6  increased volume.  So we were -- is that good enough?
7       Q       If that's your complete answer, yes.
8       A       That's my answer.  Otherwise, we'll be
9  here a long time.
10      Q       Okay.  So getting back to the sales
11  process.  First a teaser, then a confidential information
12  memorandum.  Who -- as a -- I'm not going to ask you to list
13  everybody, but as a general category, who got the CIM?
14      A       It was a list that ABI had developed and
15  had us review.
16      Q       Those are companies that had expressed
17  some interest in the Skilcraft's purchase?
18      A       Yes.
19      Q       Okay.  Do you recall how many there were
20  approximately?
21      A       So are you -- are you talking --
22      Q       That received the confidential
23  information memorandum?
24      A       Oh, one number comes to mind and this

Page 49

1  was just early in the stages.  180 something plus companies.
2       Q       Okay.
3       A       Yeah.
4       Q       And then how did that get narrowed down?
5       A       What I'll tell you is we ended up with a
6  list of IOIs, companies that got to an IOI.  ABI got it to
7  that phase.
8       Q       And what is an IOI?
9       A       An intent -- and I don't know what the
10  formal acronym stands for.  The intent to make an LOI.
11      Q       Okay.  An indication of interest?
12      A       Yeah, there you go, indication of
13  interest.
14      Q       So the companies that gave an indication
15  of interest, an IOI, what happened next for those companies?
16      A       They would have -- some of them would
17  have came and visited the company.
18      Q       Okay.  And what was the next stage after
19  the IOI in the transaction process?
20      A       So if they were interested, they would
21  have issued an LOI.
22      Q       A letter of intent?
23      A       Yes.
24      Q       Okay.  And is what we're looking at

CIN-TEL CORPORATION
PH:   513-621-7723                               FX:   513-263-9023

Page 50

1    right now, the Whitcraft letter, a letter of intent?
2         A     It is.
3         Q     Okay.  Do you recall how many letters of
4    intent the transaction received?
5         A     Letters of intent?
6         Q     Yes.
7         A     How many letters or how many companies?
8         Q     How many companies?
9         A     I recall two.
10        Q     And they are?
11        A     Whitcraft.  And I can't remember the
12   name of the group of the second company, but --
13        Q     Mill Hill?
14        A     Mill Hill, yes.
15        Q     Okay.  So taking a look at the Whitcraft
16   letter of intent on September 5th, 2017, do you recall
17   seeing this letter?
18        A     Yes.
19        Q     Okay.  And what were the basic economic
20   terms of this letter?
21        A     You just want to point to the paragraph
22   on the second page?
23        Q     The top of the second page?
24        A     Yeah.  I mean, I don't understand.

Page 51

1         Q     What was the number they wanted to buy
2    it at?
3         A     Right there, $28 million.
4         Q     Okay.  Was that an acceptable offer?
5    Did Skilcraft accept that offer?
6         A     Is this one for the aerospace only?
7         Q     If you look at the first page, the first
8    line says, "Thank you for introducing us to Skilcraft
9    Holdings' aerospace business."
10              Is that the aerospace business only?
11        A     It must, yes.
12        Q     Okay.  But Skilcraft did not take this
13   deal.  Why not?
14        A     I think we wanted to see it pushed above
15   30.
16        Q     Okay.  Did Mr. Rowell do anything to
17   steer the Whitcraft deal away from ABI?
18        A     No.
19        Q     You mentioned Mill Hill as the other --
20   as the other company that expressed -- that sent a letter of
21   intent, correct?
22        A     Yes.
23        Q     Do you recall the purchase price that
24   Mill Hill proposed?

Page 52

1         A     I don't recall specifics.  It was lower
2    than this 28 million initially.
3         Q     And then did it increase at some point?
4         A     Yes.  Yes.
5         Q     To what?
6         A     The last number I recall is 27.  And
7    there was some details associated with the offer.  That 27
8    number sticks in my head.
9         Q     Okay.  But Skilcraft decided not to take
10   that deal either; is that right?
11        A     That's correct.
12        Q     Why not?
13        A     The terms of the deal were not amiable
14   to us as owners.
15        Q     Why?
16        A     There was a large percentage of the
17   sales price that we were financing.
18        Q     Tell me what you mean.
19        A     Okay.  So out of the 27 million there
20   was 6 million we would have carried in the way of a loan
21   back to the company Mill Hill --
22        Q     Okay.
23        A     -- to buy the company.
24        Q     So the two letters of intent that you

Page 53

1    got were -- did not give you the asking price you were
2    looking for, right?
3         A     Yes.
4         Q     Okay.  Do you recall why the prices --
5    why Whitcraft or Mill Hill came in at the prices that they
6    did as opposed to getting all the way to the 30 million?
7         A     There was some concern about the
8    projected earnings that we had put out with our specific
9    customer in that business.
10        Q     So GE is a big part of what Skilcraft
11   Aerospace does, correct?
12        A     Yes.
13        Q     Okay.
14        A     Yes.
15        Q     And there was concern that with this new
16   deal with GE that Skilcraft might not perform quite as well
17   as you projected --
18        A     Yes.
19        Q     -- at the time?
20        A     Yes.
21        Q     Okay.  And are you -- is Skilcraft a
22   union shop?
23        A     It is.
24        Q     Did that cause any concern from

14 (Pages 50 to 53)

CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

Page 54

1    Whitcraft or Mill Hill?
2         A     It was identified by Whitcraft as the
3    issue.
4         Q     And, in fact, Whitcraft decided to not
5    pursue the transaction further because of the union issue;
6    is that correct?
7         A     That's how they explained it to us, yes.
8         Q     Okay.  They never said John Rowell told
9    us to wait until he went to a new company?
10        A     Yes.
11        Q     They never told you ABI -- we heard
12   ABI's no good and wait until you're working with a different
13   investment firm?
14        A     No.
15        Q     Okay.  Did Mill Hill ever say anything
16   like that about Mr. Rowell or ABI?
17        A     No.
18        Q     Okay.  Do you recall -- other than the
19   concerns about the projected performance under the new GE
20   arrangement, did Mill Hill have any other concerns?
21        A     No.
22        Q     And as far as you know, no company that
23   received a teaser or a CIM or sent back an IOI or sent back
24   a LOI ever told Skilcraft we're going to wait until John

Page 55

1    Rowell is working for a new company and then we're coming
2    back to you?  Did anyone ever tell you that?
3         A     No.
4         Q     Did John Rowell ever say, "I'm going to
5    be out of there in a hot minute; wait for me to find a new
6    company to work for"?
7         A     No.
8         Q     Do you remember getting into an
9    indication of interest from ETI?
10        A     Yes.
11        Q     Do you remember why -- do you remember
12   if they gave you any reason why they didn't send a letter of
13   intent?
14        A     I think a little bit of the same thing,
15   the forecasted earnings and the value that we wanted, the
16   mix.
17             MR. HERZIG:  All right.  This will be
18   Exhibit 10.
19             (Whereupon, Defendant's Exhibit 10 was
20   marked for identification purposes.)
21             MR. HERZIG:  Colin, this is the one
22   marked 53388.
23        Q     So this is 53388 and 89 with the first
24   letters RW.  Mr. Zurborg, let me know when you're ready to

Page 56

1    answer questions about this email string.
2         A     Okay.
3         Q     Okay.  So as with any email string, of
4    course, it starts at the bottom chronologically and it works
5    its way up.
6         A     Yeah.
7         Q     The bottom email is an email from
8    someone named Bill McLendon with a signature block at ETI
9    Tech, correct?
10        A     Yes.
11        Q     And he's sending an email to John
12   Rowell, Subject line:  Skilcraft.  And the third sentence
13   says, "Nonetheless, the business is still in the midst of
14   significant transition with more big changes just around the
15   corner.  While those changes represent important steps
16   forward for the business, they also introduce a current
17   level of uncertainty that precludes us from making an offer
18   for the business, which is near the range we previously
19   discussed.  In short, we have elected to pass on Skilcraft
20   at this time."
21             Do you see that?
22        A     Yes.
23        Q     And then Mr. Rowell forwards that to you
24   just a few minutes later, correct?

Page 57

1         A     Yes.
2         Q     And you respond half an hour later
3    approximately saying, "Thanks.  I have a board meeting next
4    week.  We will be discussing our next step relative to
5    Skilcraft;" is that right?
6         A     Yes.
7         Q     Does the ETI email, as you recall,
8    fairly encapsulate why ETI had concerns about purchasing
9    Skilcraft?
10        A     Yes.
11        Q     And did you have a board meeting the
12   next week to discuss the next steps?
13        A     I did.
14        Q     What do you remember about that board
15   meeting related to the Skilcraft transaction?
16        A     We evaluated where we were at in the
17   process, the offers that we had had on the table, and did
18   not feel like we wanted to continue moving forward.
19        Q     Did Mr. Rowell attend that board
20   meeting?
21        A     No.
22        Q     Did Mr. Rowell call into that board
23   meeting or send any information prior to the board
24   meeting --

15 (Pages 54 to 57)

CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

Page 58

1     A     No.
2     Q     -- in connection with that?
3     A     No.
4     Q     Okay.  As far as you know, as Skilcraft
5   did Mr. Rowell reach out to Mr. Vierling or any of the other
6   owners?
7     A     No.
8     Q     As far as you know, did Mr. Rowell reach
9   out to any of the board of directors or the independent
10  advisors?
11    A     No.
12    Q     So after that board meeting -- is it at
13  that board meeting that Skilcraft decides to stop looking
14  for a transaction?
15    A     It is.
16    Q     Okay.  Skilcraft did that on its own,
17  correct?  Made that decision on its own?
18    A     Yes.
19          MR. HERZIG:  Okay.  This will be
20  Exhibit 11.
21          (Whereupon, Defendant's Exhibit 11 was
22          marked for identification purposes.)
23    Q     Let me know when you're ready to answer
24  questions for about the?

Page 59

1           MR. HERZIG:  For the record, it's
2   RW00066129 to 134.  Colin, did you hear that?
3           MR. BARNACLE:  Yep.  Thank you.
4           MR. HERZIG:  Trying to -- doing my best
5   to keep you on the same page.
6           MR. BARNACLE:  Thank you.
7     A     Okay.  I'm ready.
8     Q     Great.  What is this email and
9   attachment?
10    A     This is our form notification to ABI
11  that Skilcraft no longer wished to proceed forward and
12  terminate the process.
13    Q     And just so we're clear, Project Stone
14  is the code name of the transaction that you were pursuing?
15    A     Yes.
16    Q     Okay.  And Skilcraft terminated the
17  relationship, correct?
18    A     Yes.
19    Q     Mr. Rowell did not suggest that you
20  terminate the relationship?
21    A     No.
22    Q     And the letter is from you to John
23  Rowell and Ralph Bellizzi?
24    A     That's correct.

Page 60

1     Q     Did you hear from Mr. Bellizzi after
2   this termination?
3     A     No.
4     Q     Did he send you a list of prospects
5   to -- in connection with the termination?
6     A     No.
7     Q     Okay.  When did you learn that
8   Mr. Rowell had left ABI?
9     A     It was late January or early February
10  time frame.
11    Q     Of 2018?
12    A     Yes, sir.
13    Q     Okay.  How did you learn that?
14    A     I had not received responses to this
15  email for several weeks and I wanted confirmation that it
16  was received, and reached out to John and said, "Hey, you
17  know, haven't received a confirmation.  Need a
18  confirmation."
19    Q     And what -- did Mr. Rowell -- what did
20  Mr. Rowell say?
21    A     He apologized for the lack of response.
22  Said he would take care of that and -- yeah.
23    Q     Was this a phone call?
24    A     Yes.

Page 61

1     Q     Okay.  Did he at the time indicate that
2   Skilcraft should violate its holdover period?
3     A     No.
4     Q     Did he suggest that he wanted to take
5   your -- the Skilcraft deal to a different company?
6     A     No.
7     Q     Okay.  Did he give you any indication
8   that any of the things that are alleged in the complaint
9   about Mr. Rowell regarding the Skilcraft deal are true?
10  That is, is anything that ABI said in that complaint true,
11  as far as you read, with regard to Mr. Rowell and diverting
12  business from ABI?
13    A     No.
14          MR. HERZIG:  Okay.  This is going to be
15  Exhibit 12.  We're at RW67627 and -- to 629.
16          (Whereupon, Defendant's Exhibit 12 was
17          marked for identification purposes.)
18    Q     We'll go from the bottom to the top.
19  Let us know when you're ready to talk about it.
20    A     Okay.  You need me to read the whole
21  thing or --
22    Q     Yeah.  Take -- yes.
23    A     Okay.
24    Q     I want you to -- yes.  I'll be asking

16 (Pages 58 to 61)

CIN-TEL CORPORATION

PH:  513-621-7723                              FX:  513-263-9023

---

Page 62

1  you about the whole thing.
2       A    Okay.
3       Q    So starting at the bottom, the first
4  email in this chain is on Page 2.  It's from John Zurborg to
5  John Rowell.  It's called "Project Stone Wrap Up."
6            "Last week you recommended we do a
7  Project Stone wrap up.  What would the agenda be for this?
8  If you can outline an agenda, I'd appreciate it.  At the
9  board meeting there was discussion taking 'lessons learned'
10  and building them into how we manage the business going
11  forward until we decide to go to market again."
12            That last sentence where you talk about
13  the board meeting, is that the board meeting where Skilcraft
14  decided to stop pursuing the transaction?
15       A    Yes.
16       Q    And this indicates that you then talked
17  to Mr. Rowell the week before this email about doing a wrap
18  up; is that right?
19       A    Yes.
20       Q    What -- do you recall why he recommended
21  doing a wrap up?
22       A    No.
23       Q    Okay.  Did the board discuss when it
24  would decide to go to market again?

---

Page 63

1       A    No.
2       Q    Was it a particular -- okay.  There was
3  no discussion at all?
4       A    At that point, it was about working on
5  the business going forward.
6       Q    Okay.  So there was no discussion of
7  let's just wait six months?
8       A    No.
9       Q    It was, let's get the business in a
10  position to -- to get the type of transaction we're looking
11  for?
12       A    Yes.
13       Q    Okay.  And since that time, have you put
14  a plan in place to get Skilcraft into that position?
15       A    Position to put on the market?
16       Q    Yes.
17       A    No.
18       Q    Okay.  The next line up -- the next
19  email up is from John to you a couple hours later saying
20  that -- describing the agenda for how that conversation
21  would go, correct?
22       A    Yes.
23       Q    Okay.  You responded a few minutes later
24  saying that you're good for lunch next week to discuss this?

---

Page 64

1       A    Yes.
2       Q    Okay.  And then it goes on from there.
3  Did you guys meet for breakfast on Thursday -- on the
4  following Thursday at Washington Square?
5       A    Yes.
6       Q    What did you guys discuss there?
7       A    The agenda that's down here.
8       Q    So the wrap up was just between you and
9  Mr. Rowell?
10       A    Yes.
11       Q    Okay.  And during that conversation, he
12  never said hang out for a few months until I'm with a new
13  shop and we'll get this thing done?
14       A    No.
15       Q    Okay.  As far as you knew at the time,
16  he was still employed with ABI?
17       A    Yes.
18       Q    You just mentioned you didn't know that
19  he wasn't until you had to follow up months later, correct?
20       A    That's correct.
21       Q    Okay.  And since you learned that --
22  since that time that you learned that Mr. Rowell was no
23  longer employed at ABI, have you and he had any
24  conversations about any business transactions with

---

Page 65

1  Skilcraft?
2       A    No.
3            MR. HERZIG:  All right.  This is going
4  to be Exhibit 13.
5            (Whereupon, Defendant's Exhibit 13 was
6            marked for identification purposes.)
7            MR. HERZIG:  Lucky No. 13.  That's the
8  last one I'm going to use, Colin.  That's 66097.
9       Q    So this is a few weeks after you guys
10  met.  It's an email from you to John.  "Subject:  GM of
11  Andrews."  What does that mean?
12       A    That's the general manager of Andrews
13  Laser Works, which is here in the area.  It's a competitor
14  of Skilcraft.
15       Q    Okay.  And it says, "John, I'd like to
16  ask for an introduction to Nick."
17       A    Yes.
18       Q    Who's Nick?
19       A    I don't know Nick.  Nick was the general
20  manager of Andrews.
21       Q    And why did you send this email?
22       A    I was in search of an operations manager
23  for my aerospace business.
24            MR. HERZIG:  We'll go off the record for

---

17 (Pages 62 to 65)

CIN-TEL CORPORATION

Page 66

1    just a second.
2        (Whereupon, a brief recess was taken.)
3    MR. HERZIG:  We're back on the record.
4    Q    I have one last question, Mr. Zurborg.
5  And that is just to confirm that the only reason Skilcraft
6  didn't pursue one of the transactions that ABI brought to it
7  was that you did not get the value that you were looking for
8  out of those offers; is that correct?
9    A    That is correct.
10    MR. HERZIG:  I have no further questions
11  subject to whatever Mr. Barnacle may ask.
12    MR. BARNACLE:  Understood.  I don't have
13  any questions today.  You know, obviously we're
14  subject to a scheduling order, which we have the
15  right to conduct our own 30(b)(6) deposition of
16  Skilcraft.  I don't have any questions today.
17    MR. ASAY:  I guess, for the record, then
18  I would object to having this deposition remain
19  open or to recall Skilcraft as a 30(b)(6) witness.
20  I mean, we're here today.  John's been prepared.
21  He's ready to answer questions that any of the
22  parties in this litigation may have for the
23  company.  So just state our objection for the
24  record that the deposition remain open.  We think

Page 67

1    it should be conducted today when everyone's here
2  and ready to go.
3    MR. BARNACLE:  Yeah.  Understood.  We're
4  not asking that this deposition remain open.
5  There's two separate indications of a 30(b)(6).
6  And you certainly can oppose a subpoena and notice
7  from us when that comes.
8    MR. HERZIG:  This is Aaron Herzig for
9  Mr. Rowell.  For what it's worth, Colin, I know
10  you're new in the case, but I think that's a
11  misreading of the scheduling order and what we
12  discussed with the judge.  So we will likely
13  oppose as well when the time comes and, you know,
14  we can talk about that at another time.  But just
15  to make you aware, we don't think that's how the
16  parties agreed to proceed with Skilcraft.
17    MR. BARNACLE:  Fair enough.
18    MR. HERZIG:  All right.  We're all set.
19
20
21
22
23
24

Page 68

1    A C K N O W L E D G E M E N T
2
3  STATE OF OHIO          :
4                          : SS:
    COUNTY OF HAMILTON      :
5
6    I, JOHN ZURBORG, have read the transcript
7  of my testimony given under oath on January  11, 2019.
8    Having had the opportunity to note any necessary
9  corrections of my testimony on the errata page, I hereby
10  certify that the above-mentioned transcript is a true and
11  complete record of my testimony.
12
13
14
15
16    _____
17    JOHN ZURBORG
18
19
20    (DEPOSITION CONCLUDED AT 11:38 A.M.)
21
22
23
24

Page 69

1    PLEASE USE THIS ERRATA SHEET TO MAKE ANY
   AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
2  LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
   ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
3  ON THE TRANSCRIPT.  IF NEEDED USE THE BACK OF THIS
   SHEET.  UPON COMPLETION PLEASE SIGN AND DATE THIS
4  SHEET AT THE BOTTOM.  THANK YOU.
5    _____
6    _____
7    _____
8    _____
9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24  SIGNATURE:_____DATE:_____

18 (Pages 66 to 69)

CIN-TEL CORPORATION

PH:   513-621-7723                                                    FX:   513-263-9023

Page 70

1                C E R T I F I C A T E
2     STATE OF OHIO          :
                        : SS:
3     COUNTY OF HAMILTON        :
4           I, Jennifer K. Starner, the undersigned, a duly
5     qualified and commissioned Notary Public within and for the
6     State of Ohio, do hereby certify that before giving of the
7     aforesaid deposition, the said JOHN ZURBORG was by me first
8     duly sworn to depose the truth, the whole truth and nothing
9     but the truth; that the foregoing deposition was given at
10    the said time and place and was taken in all respects
11    pursuant to Notice and agreement of counsel hereinbefore set
12    forth; that the deposition was taken in stenotypy by me and
13    transcribed into typewritten form under my supervision; that
14    the transcribed deposition is to be submitted to the witness
15    for his examination and signature, and that signature may be
16    affixed out of the presence of the Notary Public; that I am
17    neither relative, attorney, nor employee of any party or
18    their counsel and have no interest in the result of this
19    pending action.
20
21
22
23
24

Page 71

1           IN WITNESS WHEREOF, I have hereunto set my hand
2     and official seal of office at Cincinnati, Ohio, this
3     _____ day of _____, 2019.
4
5
6                    _____
7     My commission expires:      Jennifer K. Starner, RPR
        March 7, 2019            Notary Public
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

19 (Pages 70 to 71)

## A

**a.m** 1:15 2:17 68:20
**Aaron** 1:4 2:4 3:8 5:7 16:10 21:15 67:8
**ABI** 16:11,12,14,21,24 17:3,6,17 19:9 20:6,8,11,11,13,17,21 21:19 22:1,2,5,9,20,23 23:1,9,15 23:22 24:23,24 25:3,5,10,11,16 25:22,22 26:1,5,6 28:2 31:14 32:4,14 34:9,12,22 35:3 36:8 37:16,22,23 38:12,17,20,22 40:6 40:10,15,16,23 41:8,20,23 42:9 42:14 44:7,11,18 45:1,2,19 46:19 47:8 48:14 49:6 51:17 54:11,16 59:10 60:8 61:10,12 64:16,23 66:6
**ABI's** 21:16 23:12,19 24:11,15,18 40:22 54:12
**able** 30:8
**above-mentioned** 68:10
**Absolutely** 29:23
**accept** 51:5
**acceptable** 51:4
**accurate** 30:4,21
**acquired** 11:6,11
**acronym** 49:10
**act** 23:22
**action** 70:19
**activities** 40:18
**addition** 47:12
**address** 28:13,13,19,20
**adjusted** 48:5
**advice** 14:22
**advise** 14:18
**advisor** 28:12,20,22 29:2 40:10,17
**advisors** 14:17 26:8,21 28:9,13,19 29:10 31:1,3 32:1,4,12,17 58:10
**aerospace** 12:21,23 13:8 14:20 15:20 17:14 18:23 29:13 41:9 47:7 48:1 51:6,9,10 53:11 65:23
**affixed** 4:12 70:16
**aforesaid** 70:7
**age** 5:2
**agenda** 14:11 62:7,8 63:20 64:7

**agree** 39:11
**agreed** 37:12 41:3 67:16
**agreement** 20:10,16,16 33:10,12 36:8 38:10 40:6 70:11
**agrees** 40:15
**aherzig@taftlaw.com** 3:11
**AIB** 16:13
**alleged** 61:8
**amiable** 52:13
**Andrews** 65:11,12,20
**answer** 6:3,5,7,10,13,15 8:17 29:15 34:4 35:15 48:7,8 56:1 58:23 66:21
**answering** 23:5
**answers** 35:24
**anybody** 41:23
**apologized** 60:21
**apparently** 38:1
**appear** 27:6
**APPEARANCES** 3:1
**appears** 26:20 37:6
**appreciate** 23:6 62:8
**approximately** 48:20 57:3
**area** 65:13
**areas** 14:18
**arrangement** 54:20
**Asay** 3:13 6:18 7:4 39:8 66:17
**aside** 8:21 24:13
**asked** 7:24 11:16 17:7,9,13,14 30:10 34:2 35:22
**asking** 44:1 53:1 61:24 67:4
**Ass** 13:5
**associate's** 9:7
**associated** 38:18 42:23 52:7
**associates** 11:14
**assume** 30:9 37:10
**attached** 43:9
**attachment** 59:9
**attempt** 22:5,19 30:16
**attempted** 22:2,15 40:6
**attempts** 30:6
**attend** 57:19
**attorney** 70:17
**attorneys** 39:6

**ATTORNEYS'** 1:11 2:11
**available** 6:8
**AVI** 15:4
**aware** 67:15
**awareness** 44:20

## B

**B** 8:9,9
**B-E-L-L-I-Z-Z-I** 16:2
**bachelor's** 9:9,11
**back** 10:18 11:16 12:6 16:15 24:1 26:11,12 28:2 31:22 32:23 33:1 35:22 43:24 44:15 48:10 52:21 54:23,23 55:2 66:3 69:3
**background** 15:21
**bank** 24:4,7
**banking** 19:9 43:17
**Barnacle** 3:3 7:12 19:15,18,24 35:17,17,19 36:1,4 43:19 59:3,6 66:11,12 67:3,17
**based** 23:5 30:14,17
**basic** 50:19
**basically** 10:8
**basis** 14:1
**Bates** 26:16 36:17 43:7 44:2
**behalf** 3:2,7,12 8:5
**behavior** 24:22
**believe** 30:20 34:3
**Bell** 1:4 2:4 16:10 21:15
**Bellizzi** 15:24 42:4,10 59:23 60:1
**Bellizzi's** 16:14 37:9
**benefits** 47:13
**Berding** 12:5
**Berger** 15:18
**best** 5:21 7:6 8:13 41:18 59:4
**better** 18:20
**beyond** 40:22 45:21
**big** 13:4 53:10 56:14
**Bill** 56:8
**bit** 23:3 44:6 55:14
**block** 56:8
**board** 14:2,4,7,8,9,10,11,12,14,16 14:17 18:14 20:10 57:3,11,14,19 57:22,23 58:9,12,13 62:9,13,13

CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

62:23

**bottom** 38:5 47:7 56:4,7 61:18 62:3 69:4

**bought** 11:13,24

**breached** 33:10

**break** 6:7,10

**breakfast** 64:3

**brief** 32:22 66:2 69:2

**briefed** 21:13

**briefly** 43:16

**brought** 66:6

**Buffalo** 9:9

**building** 12:12 62:10

**business** 10:15 11:12,14,23 12:2 12:17,22,23 23:13,13 24:12 27:13,16 28:18 31:23 40:3 47:17 48:1 51:9,10 53:9 56:13,16,18 61:12 62:10 63:5,9 64:24 65:23

**buy** 51:1 52:23

**buyers** 45:8,10 47:9

———————————————
C

**C** 68:1 70:1,1

**call** 12:20 14:10 15:3,7,12,22 16:5 16:6,7,13,13,16,16 17:5,6,17 18:9,11,12 42:4,4,5,7 57:22 60:23

**called** 4:4 7:17 26:8,21 28:7 30:8 62:5

**calling** 30:15

**calls** 18:10 19:9,10

**care** 60:22

**carefully** 22:3,5

**carried** 52:20

**case** 1:6 2:6 18:4 21:17 67:10

**categories** 13:2

**category** 48:13

**caught** 18:13,16

**cause** 23:18 53:24

**Center** 3:14

**CEO** 11:18,18 12:5,6,10 18:6

**certainly** 67:6

**certified** 5:3

**certify** 68:10 70:6

**chain** 62:4

**chair** 14:12,13

**chairman** 14:2

**changes** 56:14,15

**checked** 17:8,11

**Chemed** 3:14

**choose** 20:8

**chronologically** 56:4

**CIM** 44:10 48:13 54:23

**Cincinnati** 2:17 3:10,15 9:6,6,12 12:19 71:2

**circumstances** 40:21

**Civil** 2:15 4:6

**claims** 21:16

**clarify** 17:19

**clarity** 30:10

**clear** 45:22 59:13

**click** 29:1

**client** 29:11 31:3 38:11

**close** 30:9,14

**closing** 40:21

**code** 59:14

**coffee** 32:21

**cold** 15:7 16:16

**Colin** 3:3 35:17,18 43:22,22 55:21 59:2 65:8 67:9

**colleague** 30:6

**college** 8:22 9:1,3,3,4,6

**Collin** 7:6 19:13 26:10

**Colorado** 1:2,5 2:2,5,15 3:5 4:6 21:2

**com** 28:12,14

**come** 11:16 18:3

**comes** 48:24 67:7,13

**coming** 19:19 55:1

**commence** 38:10

**comments** 35:9

**commercial** 12:20,23 13:4 29:12

**commission** 71:7

**commissioned** 70:5

**common** 23:5

**companies** 13:4,8 14:22 17:9 18:23 20:5 44:19 48:16 49:1,6 49:14,15 50:7,8

**company** 7:23 10:1,2,5,9,18,20 11:1,3,4,6,9,11,17,24 12:7,14,18 12:19 13:18,18,24 15:6 16:14 18:1,2,5,22,24 20:18 25:22 26:7 31:9,10 40:10 43:13 46:3 49:17 50:12 51:20 52:21,23 54:9,22 55:1,6 61:5 66:23

**company's** 18:7

**competing** 24:4,7

**competitor** 32:4 65:13

**complaint** 20:24 21:7,17,21,22,24 24:1,21 33:2 35:10,22 36:3 61:8 61:10

**complete** 48:7 68:11

**completes** 38:11

**COMPLETION** 69:3

**components** 13:9

**concern** 53:7,15,24

**concerned** 46:8

**concerns** 54:19,20 57:8

**CONCLUDED** 68:20

**conduct** 66:15

**conducted** 67:1

**confidential** 1:11 2:11 25:21 34:1 44:12 45:16 46:10 48:11,22

**confidentiality** 33:16,21 34:4

**confirm** 8:5 66:5

**confirmation** 60:15,17,18

**confusing** 17:20

**connected** 43:20

**connection** 26:17 27:10 58:2 60:5

**consider** 45:13

**contact** 30:12

**contacted** 32:1 40:2

**contacting** 30:24

**continue** 6:14 57:18

**contract** 20:16 37:12,15,21 38:18 40:12 48:5

**contracting** 37:18

**contractual** 20:14 24:11,15

**contractually** 28:1

**control** 40:22

**conversation** 20:19 63:20 64:11

**conversations** 64:24

CIN-TEL CORPORATION

PH:  513-621-7723                                        FX:  513-263-9023

Page 74

convinced 20:17
COO 12:4
copy 7:16
Corey 3:13
corey.asay@dinsmore.com 3:16
corner 56:15
corporate 5:12 13:13
corporation 1:5 2:5 13:6
correct 5:13 6:19 7:21,22 17:17
  20:6 22:10,15,16 26:22 27:7,11
  29:8 30:4 32:9,18 33:12 34:15
  34:20 35:8 36:8 37:7,16,24 38:3
  41:16 42:1,2 44:3 51:21 52:11
  53:11 54:6 56:9,24 58:17 59:17
  59:24 63:21 64:19,20 66:8,9
corrections 68:9 69:1,2
counsel 4:2 70:11,18
County 1:2 2:2 21:2 68:4 70:3
couple 30:6 63:19
course 17:20 19:11 22:18 27:16
  56:4
court 1:1 2:1 4:8 5:20 6:1 21:1
  36:13
create 41:19
Creation 11:4,6
Cross-Examination 2:14 4:4 5:4
current 11:18 56:16
currently 12:8
customer 53:9
cutbacks 10:13

**D**

D 13:5 68:1
dash 28:15
data 42:23
DATE 69:3,24
day 71:3
day-to-day 14:1
deal 21:18 30:11 41:19 42:24
  51:13,17 52:10,13 53:16 61:5,9
Dean 15:4,18,23 16:16 18:10
December 44:8
decide 20:5 31:17 46:9 62:11,24
decided 30:17 41:24 52:9 54:4

62:14
decides 58:13
decision 31:9 58:17
defendant 1:9 2:9,14 3:7 4:5 5:8
  22:1
Defendant's 6:22 7:13 21:3 26:13
  36:14 43:4 55:19 58:21 61:16
  65:5
defer 28:2
defined 38:18
degrees 9:7
Denver 1:2 2:2 3:5 21:1
Deponent 1:13
depose 70:8
deposed 5:15
deposition 2:13 4:3,7,8,10 16:14
  66:15,18,24 67:4 68:20 70:7,9
  70:12,14
derogatory 23:12,14
describe 12:15 24:24 44:8 47:24
described 24:23 42:5
describing 34:12 63:20
DESCRIPTION 69:2
details 52:7
developed 22:3,6 48:14
development 10:24 11:23 12:2
different 40:10 54:12 61:5
Dinsmore 3:13 6:18
directly 17:14 30:17 40:20
director 10:1
directors 14:4 58:9
discuss 57:12 62:23 63:24 64:6
discussed 20:14 41:8 56:19 67:12
discussing 57:4
discussion 43:3,23 62:9 63:3,6
disparage 23:1
disparaged 22:23 34:12
disparagement 23:6
disparaging 23:4
distributed 13:22
DISTRICT 1:1 2:1
divert 22:2,19 34:8
diverting 61:11
division 29:11,12,13,19,22 30:19

divisions 13:11 29:16 46:21 47:5,9
document 7:9 26:17 36:19 37:11
document's 38:24
documents 7:7,10 8:10,11,14,18
doing 12:4 40:2 48:2,3 59:4 62:17
  62:21
draft 44:10
driver 41:10
duly 5:2 70:4,8

**E**

E 68:1,1,1 70:1,1
earlier 36:3 41:8
early 11:15 15:14,16 49:1 60:9
earnings 53:8 55:15
East 3:14
economic 50:19
education 8:22,23
effort 41:18 45:2
efforts 33:15
eighteen 38:9
either 35:5 47:9 52:10
elected 56:19
Electric 13:5
electrical 9:11
element 23:13
eleventh 18:13,16 20:4
email 19:19 26:20 27:7,15,18,21
  27:24 28:13,19 29:7 43:9 56:1,3
  56:7,7,11 57:7 59:8 60:15 62:4
  62:17 63:19 65:10,21
emails 26:11 27:20
employed 64:16,23
employee 22:1 70:17
employees 47:18
encapsulate 57:8
ended 49:5
engaged 46:19 47:8
engagement 38:9 43:17
engine 13:9 48:3
engineering 9:11
entered 12:21 36:7,8
entertained 31:5
entitled 38:12 40:11

CIN-TEL CORPORATION

PH:   513-621-7723                                             FX:   513-263-9023

Page 75

entrepreneurism 9:14
equity 44:23 45:3,14
errata 68:9 69:1
ERROR 69:2
Esquire 3:3,8,13
essentially 21:18
ETI 55:9 56:8 57:7,8
evaluated 57:16
eventually 20:5
everybody 48:13
everyone's 67:1
exactly 7:8 19:2 44:2
examination 4:11 70:15
examined 5:3
example 24:22
examples 13:1
excited 15:19
executive 11:5,5
executives 14:21
exhausted 31:21
Exhibit 6:22 7:5,9,13 20:24 21:3
  21:24 26:12,13,15 33:2 36:12,14
  36:16 43:4,7 55:18,19 58:20,21
  61:15,16 65:4,5
Exhibits 7:2
existence 33:17,21
expectation 41:12
expectations 31:20 46:4
experience 41:9,15
experienced 14:21,24 18:22,22
expires 71:7
explained 54:7
expressed 48:16 51:20
extremely 14:23 15:19
eye 10:16,16
EYES 1:11 2:11

F

F 70:1
fabricate 29:16
fabrication 12:18 29:11,19,22
  30:19
fabricator 12:17
fact 44:20 54:4

fail 33:15,20
Fair 37:11 45:15 67:17
fairly 57:8
false 23:6,9
family 10:15,21
family-owned 10:15
Fan 13:5
far 10:16 23:8 26:3 30:3 33:14,19
  33:24 34:5,8 54:22 58:4,8 61:11
  64:15
February 15:16 16:18 60:9
feel 21:6,7 57:18
fees 38:12,18,22
felt 31:19,20
Fifth 3:14
filed 21:1
finally 20:10 30:8
finance 14:18
financial 10:18 46:9,15,16,17
  47:12
financially 45:21
financing 52:17
find 29:5 30:24 55:5
fine 6:5
finish 30:15
finished 9:11
finishing 30:9
firm 6:18 18:14 45:14 54:13
firms 18:21 19:9,11
first 7:9 9:23 10:4 15:1 16:15 17:5
  26:8,21 27:6 28:9,11,13,19,20
  28:22 29:1,10 30:24 31:3 32:1,3
  32:12,17 37:5 42:4,19 48:11
  51:7,7 55:23 62:3 70:7
fit 15:21
five 13:18
flew 20:11
flexibility 46:24
flip 8:8
Florida 20:12
focus 21:14
focusing 31:22
folks 5:24
follow 30:23 64:19

following 64:4
follows 5:3
forecasted 55:15
foregoing 70:9
forget 44:2
form 59:10 70:13
formal 49:10
forth 70:12
forward 56:16 57:18 59:11 62:11
  63:5
forwards 56:23
four-year 11:16
frame 15:16 16:18 60:10
free 21:6,7
front 37:13
full-blown 12:12
full-time 9:10
further 30:11 54:5 66:10

G

G 68:1
gain 34:6
GE 13:8 48:3 53:10,16 54:19
general 5:19 10:4,6 21:20 23:12
  24:14 48:13 65:12,19
generally 25:4 47:15
gentleman 16:3 42:16
gentleman's 15:4 16:4
gentlemen 11:13
getting 18:13 27:18,21 48:10 53:6
  55:8
give 6:6 7:5 13:1 23:18 46:12 53:1
  61:7
given 68:7 70:9
gives 24:21
giving 14:22 70:6
GM 65:10
go 5:19 6:10 7:8 9:4,12 10:19
  16:15 18:13 20:5 24:1 32:20
  33:1 43:1 49:12 61:18 62:11,24
  63:21 65:24 67:2
goal 10:1
goes 22:22 64:2
going 7:9 11:15 16:12,13 20:23,23

21:5,8 23:24 24:1 27:22 33:1 35:10 36:11,20 37:5 48:12 54:24 55:4 61:14 62:10 63:5 65:3,8
**good** 5:6 10:18 16:12 21:15 47:17 48:6 54:12 63:24
**gotten** 19:8
**Great** 5:15 6:5,17,21 8:17 9:15 59:8
**greater** 12:18
**grew** 11:2
**grossly** 24:23 25:1 34:12
**group** 13:4 44:19 50:12
**groups** 44:22,23
**grow** 10:1 11:17 12:13
**grown** 48:1
**guess** 7:2 14:2 66:17
**guidelines** 5:19
**guys** 64:3,6 65:9

---

**H**

**H-O-U-G-H-L-A-N** 19:1
**hairs** 45:11
**half** 12:6 57:2
**HAMILTON** 68:4 70:3
**hand** 71:1
**handed** 7:16
**handing** 43:6
**hands** 47:16
**hang** 64:12
**happened** 49:15
**hard** 18:19,21
**harm** 23:18
**head** 6:2 52:8
**hear** 6:1,12 22:24 23:1 29:21 43:21,22 59:2 60:1
**heard** 15:2 17:16 19:16 26:7 30:12 54:11
**hearing** 19:21
**Hello** 43:19
**help** 11:17 25:22,24
**helps** 36:20
**hereinafter** 5:2
**hereinbefore** 70:11
**hereunto** 71:1

**Herzig** 3:8 5:5,7 7:1,15 19:13,16 19:21 20:2,23 26:10 32:20,23 35:18,21 36:2,5,11,16 39:3,5,9 43:1,21,24 55:17,21 58:19 59:1 59:4 61:14 65:3,7,24 66:3,10 67:8,8,18
**hesitation** 46:12
**Hey** 60:16
**Hill** 50:13,14 51:19,24 52:21 53:5 54:1,15,20
**history** 9:5,21
**hit** 10:14
**hold** 12:1,8
**Holdings'** 51:9
**holdover** 38:9,11,15 39:15,18,24 61:2
**Hollister** 2:16 3:8
**hope** 5:22
**hoping** 45:20 46:21 47:13
**hot** 55:5
**Houghlan** 19:1
**hour** 18:13,17 20:4 57:2
**hours** 63:19
**hunting** 29:24

---

**I**

**identification** 6:23 7:14 21:4 26:14 36:15 43:5 55:20 58:22 61:17 65:6
**identified** 54:2
**identifying** 40:19
**implying** 29:15
**important** 41:4,5 56:15
**impress** 16:7
**impression** 23:18 32:17
**in/buyout** 30:19
**inaccurate** 30:21
**inbound** 15:3 16:7
**incapable** 25:16 35:3
**include** 40:16
**increase** 52:3
**increased** 48:6
**independent** 58:9
**indicate** 25:7,12,17 61:1

**indicates** 62:16
**indication** 49:11,12,14 55:9 61:7
**indications** 67:5
**individual** 1:8 2:8
**individuals** 13:22
**industries** 44:23
**industry** 13:2 14:20 15:20 41:9
**information** 25:22 42:23 44:12 45:16 46:9 48:11,23 57:23
**informed** 30:8
**initial** 44:19
**initially** 52:2
**inquirers** 40:19
**inquiring** 15:5
**instructs** 6:13
**intended** 23:18
**intent** 49:9,10,22 50:1,4,5,16 51:21 52:24 55:13
**intentionally** 22:1
**interact** 42:9
**interest** 29:11 44:19 48:17 49:11 49:13,15 55:9 70:18
**interested** 30:18 31:4 49:20
**interests** 23:19
**interfacing** 40:19
**interfere** 24:15,18
**interfered** 24:11
**interim** 12:3
**International** 1:4 2:4 21:16
**interpreted** 38:24
**introduce** 56:16
**introducing** 51:8
**introduction** 48:2 65:16
**investment** 19:9 24:4,7 30:18 31:4 43:17 54:13
**investors** 22:9,13
**involved** 17:15,21 40:18
**IOI** 49:6,8,15,19 54:23
**IOIs** 49:6
**issue** 54:3,5
**issued** 49:21
**items** 8:6

---

**J**

CIN-TEL CORPORATION

PH:  513-621-7723                                                    FX:  513-263-9023

Page 77

**J** 3:13
**J-O-H-N** 5:10
**January** 1:14 2:17 15:15 16:18
    29:7 40:3 60:9 68:7
**January/February** 15:15
**Jay** 13:17 20:12
**Jennifer** 1:22 2:18 4:9 70:4 71:7
**jet** 13:9
**Jim** 12:5
**John** 1:7,13 2:7,13 3:19 4:3 5:1,7
    5:10 15:2,18,19 17:15 18:21
    20:11,13,17 26:3,6 30:1,8,23
    32:8 37:13,18 40:16,17 41:7,23
    42:22 54:8,24 55:4 56:11 59:22
    60:16 62:4,5 63:19 65:10,15
    68:6,17 70:7
**John's** 66:20
**join** 19:17,22
**joined** 9:24 12:19
**judge** 67:12
**justify** 18:20

---
**K**
---

**K** 1:22 2:18 4:9 68:1 70:4 71:7
**keep** 6:2 27:15 59:5
**Kentucky** 11:1,11 13:6
**kept** 33:24
**Kevin** 42:16
**Kevin's** 42:17,20
**kind** 9:21 47:7
**kinds** 44:22
**knew** 30:3 64:15
**know** 6:8 10:19 17:19 18:5,6,7
    19:18,23 21:6,17 23:8 29:13,15
    29:15 31:24 33:11,14,19,24 34:5
    34:8 36:19 41:1 47:17 49:9
    54:22 55:24 58:4,8,23 60:17
    61:19 64:18 65:19 66:13 67:9,13
**knowledge** 7:23 8:13 18:7 22:4,14
    22:17,19 23:17,21 24:6,14 25:20
**knows** 26:3

---
**L**
---

**L** 4:1 68:1

**L-O-K-E-Y** 19:2
**label** 26:16 44:2
**labeled** 36:17 43:7
**lack** 60:21
**lacked** 25:4,5 34:17
**language** 40:23,24
**large** 52:16
**Laser** 65:13
**late** 60:9
**law** 6:18 23:6
**lawful** 5:2
**lawyer** 5:7,18 6:13
**leaning** 19:4
**learn** 60:7,13
**learned** 30:1 64:21,22
**learned'** 62:9
**leave** 30:16
**leaving** 30:7
**left** 9:10 10:2,4,5,10,20 60:8
**lessons** 62:9
**let's** 16:15 21:23 23:3 33:4 43:1,15
    43:15 44:3,5 46:14,17 63:7,9
**letter** 43:8 44:1 49:22 50:1,1,16
    50:17,20 51:20 55:12 59:22
**letters** 50:3,5,7 52:24 55:24
**level** 56:17
**Lexington** 11:1,11 13:6
**liked** 17:16
**line** 19:17 26:8,21 28:9,12,13,19
    28:20,22 29:2,10 30:15 31:1,3
    32:1,3,12,17 38:5 51:8 56:12
    63:18 69:2
**link** 29:1
**list** 8:9 48:12,14 49:6 60:4
**listed** 8:6
**LISTING** 69:1
**litigation** 66:22
**little** 17:20 23:3 44:6 45:22 55:14
**Littler** 3:3
**LLC** 13:15 14:5 22:3,6 26:21 28:9
    38:16
**loan** 52:20
**LOI** 40:20 49:10,21 54:24
**Lokey** 19:1,2

**long** 9:5,15 12:1 48:9
**longer** 59:11 64:23
**longevity** 47:17
**longstanding** 12:18
**look** 8:4 21:7,23 28:6,22 29:4 33:4
    36:18 37:6 38:4 40:14 46:2
    50:15 51:7
**looking** 11:12 41:16 49:24 53:2
    58:13 63:10 66:7
**loss** 12:12
**lot** 46:13,16
**lots** 27:19
**lower** 52:1
**Lucky** 65:7
**lunch** 63:24

---
**M**
---

**M** 3:8 68:1
**main** 21:16 40:16
**maintain** 33:16,20
**majority** 13:17
**making** 47:15 56:17
**malice** 23:22
**manage** 62:10
**manager** 10:5,7 65:12,20,22
**March** 43:17 44:7 71:7
**mark** 7:2,9 20:24 26:12 36:11
    46:10
**marked** 6:23 7:14 21:4 26:14,15
    36:15 43:5 55:20,22 58:22 61:17
    65:6
**market** 12:21 15:5 62:11,24 63:15
**MARKS** 69:2
**matter** 5:8 24:14
**MBA** 9:13
**McLendon** 56:8
**mean** 14:1 22:18 23:4,12 27:19
    28:4 45:13,21 47:15 50:24 52:18
    65:11 66:20
**means** 7:18,20 26:16 38:15,16
**measures** 33:20
**meet** 20:12 64:3
**meeting** 18:14 20:10 25:16 35:3
    57:3,11,15,20,23,24 58:12,13

---

CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

62:9,13,13
meetings 14:10,11
meets 46:13
member 14:9
members 14:15,16,16
memorandum 44:12 45:17 48:12
    48:23
memory 32:2
Mendelson,P.C 3:3
mention 46:5
mentioned 32:11 36:7 51:19 64:18
messages 30:7
met 20:11,12 31:20 46:3 65:10
metal 12:16
mid 15:15
midst 56:13
Mill 50:13,14 51:19,24 52:21 53:5
    54:1,15,20
million 11:3 51:3 52:2,19,20 53:6
mind 20:5 48:24
mine 11:14
minute 23:4 24:14 33:2 43:2 55:5
minutes 35:20 56:24 63:23
misreading 67:11
mix 55:16
moment 26:23 40:15
money 40:11
month 15:12 19:11 38:17
months 12:4 38:9,23 63:7 64:12
    64:19
morning 5:6 7:7 21:13 30:12
moving 57:18
multiple 19:10 30:7,15

### N

N 4:1 68:1,1
name 5:6,9,10,11 11:1,4 15:2,4,23
    16:4 19:7 32:11 42:16,17,19
    50:12 59:14
named 56:8
narrowed 49:4
near 56:18
necessary 10:17 68:8
need 6:7 27:3 39:5 60:17 61:20

needed 10:16,19 15:5 31:22 69:3
needs 25:11,16 34:23 35:4
negotiated 37:13
neither 70:17
never 22:14 30:12 32:11,16 35:5
    54:8,11 64:12
new 48:2,2,5 53:15 54:9,19 55:1,5
    64:12 67:10
Nick 65:16,18,19,19
night 9:8,13
nine 12:4
Nods 6:2
nonowners 14:17
normal 27:16
Notary 2:18 4:13 70:5,16 71:7
note 27:22 28:14 68:8
notice 2:15 4:6 67:6 70:11
notification 59:10
notifying 38:17
number 28:14,16 48:24 51:1 52:6
    52:8 69:1,2

### O

O 4:1 68:1
oath 68:7
object 66:18
objection 66:23
objections 6:12,14
objectives 12:14
obligated 28:1
obviously 36:23 66:13
occur 18:11 39:24
OEM 29:12 45:8,14
OEMs 12:20,24 13:2,7
Off-the-record 43:3,23
offer 31:5,20 51:4,5 52:7 56:17
offers 57:17 66:8
office 71:2
offices 2:15
official 14:3 71:2
Oh 10:3 48:24
Ohio 2:17,19 3:10,15 68:3 70:2,6
    71:2
okay 6:4,5,11 7:1,12,20 8:3,20 9:1

9:5,20 10:10,10 12:1 13:10,13
    13:16,20,23 14:7 15:11,17 16:10
    16:12,15,23 17:5,19 18:9,18
    19:5,12,16 20:3 21:10,15,23
    22:17 26:7,20 27:1,4,15,22 28:6
    29:14,18,21 32:3,23 33:3,8
    34:11 35:9,12,21 36:1,4,10,11
    36:22 37:1 38:4 39:4,7,14 41:2
    42:3,18 43:11,15 44:5,21 45:6
    45:12,15,19 46:1,5,14 47:2,8,11
    47:19 48:10,19 49:2,11,18,24
    50:3,15,19 51:4,12,16 52:9,19
    52:22 53:4,13,21 54:8,15,18
    56:2,3 58:4,16,19 59:7,16 60:7
    60:13 61:1,7,14,20,23 62:2,23
    63:2,6,13,18,23 64:2,11,15,21
    65:15
one-page 44:18
open 66:19,24 67:4
openly 22:23 34:6
operations 10:9 13:10 14:19 65:22
opportunities 31:21
opportunity 68:8
oppose 67:6,13
opposed 53:6
order 7:8 46:6 66:14 67:11
orders 7:3
original 16:6
originally 21:1
outline 62:8
outside 25:24
oversee 10:8 13:10
owned 45:14
owner 11:19,20,23 13:17
owners 12:14 13:18 14:14 52:14
    58:6
ownership 13:24
owns 13:16,19

### P

P 4:1
page 8:4,8 21:24 33:6,7 37:6 43:8
    50:22,23 51:7 59:5 62:4 68:9
    69:1

CIN-TEL CORPORATION

PH:   513-621-7723                                    FX:   513-263-9023

Page  79

**paragraph** 21:23 24:1 33:4,7,9
  34:11 36:20,21 38:4 50:21
**paragraphs** 21:9 35:23
**part** 11:2 16:24 21:21 53:10
**particular** 13:2,2 21:8 44:22 46:9
  63:2
**parties** 4:3 37:21 40:17 66:22
  67:16
**parts** 36:3
**party** 23:11 37:19 70:17
**pass** 56:19
**Patrick** 26:21 27:7 28:7 29:4
**PDF** 26:11,12
**pecuniary** 23:19
**pending** 6:9 70:19
**people** 44:22
**percent** 13:19,21
**percentage** 52:16
**perfect** 15:21
**perform** 53:16
**performance** 54:19
**period** 38:11,15 39:15,18,24 61:2
**Period'** 38:9
**periods** 48:4
**person** 28:7 29:5
**personally** 10:19 17:21 40:18
**perspective** 24:11
**phase** 49:7
**phone** 6:1 16:4 17:17 18:9,11,12
  19:20 28:14,16 60:23
**phrase** 24:3
**pilot** 48:3
**place** 4:5,7 12:13 63:14 70:10
**plaintiff** 1:6 2:6 3:2 16:13
**plan** 63:14
**please** 6:1 19:22 26:24 27:2,5
  33:18 36:18 69:1,2,3
**plus** 49:1
**point** 15:22 18:3 21:14 46:11
  50:21 52:3 63:4
**portion** 39:1
**position** 10:18 14:8,9 63:10,14,15
**potential** 20:3,4 30:18 31:4 40:19
  47:9

**precision** 12:16
**precludes** 56:17
**preparation** 40:20 42:23
**prepared** 8:5,17 44:11 66:20
**presence** 4:10,12 41:7 70:16
**present** 3:18
**presented** 31:21
**president** 10:24 11:5
**president/CEO** 14:10
**pressed** 18:21
**pressing** 18:19
**pretty** 15:9 18:15
**previous** 11:14
**previously** 56:18
**price** 47:4 51:23 52:17 53:1
**prices** 53:4,5
**pricing** 48:5
**primarily** 12:19
**prior** 41:3 57:23
**prioritize** 25:11 34:22
**private** 44:23 45:3,14
**Probably** 35:19
**procedure** 2:15 4:6
**proceed** 17:17 59:11 67:16
**proceeded** 9:7,12
**process** 16:9 18:15 20:14 31:9,12
  31:15,18,19,22 40:21 41:11,24
  43:16 44:6,9 48:11 49:19 57:17
  59:12
**produce** 8:10,11,14
**produced** 26:17 27:9
**product** 48:2
**production** 48:3
**profit** 12:12
**program** 48:3
**Project** 59:13 62:5,7
**projected** 53:8,17 54:19
**promise** 35:13
**promoted** 41:8
**pronouns** 17:24
**proposed** 51:24
**proprietary** 25:21
**Prospect** 38:12
**prospective** 24:19

**prospects** 60:4
**protect** 33:15,20
**protected** 34:3
**protective** 7:3 46:6
**provided** 40:16
**Public** 2:18 4:13 70:5,16 71:7
**published** 23:11
**pull** 10:17
**purchase** 11:12 48:17 51:23
**purchasing** 57:8
**purposes** 6:24 7:14 21:4 26:14
  36:15 43:5 55:20 58:22 61:17
  65:6
**pursuant** 2:14 4:5 70:11
**pursue** 9:9,13 54:5 66:6
**pursuing** 59:14 62:14
**pushed** 51:14
**put** 8:20 53:8 63:13,15
**Putting** 24:13

|  | **Q** |  |
|---|---|---|

**qualified** 70:5
**quasi** 14:2
**question** 6:6,9 27:4 33:18 34:2
  37:5,20 66:4
**questions** 8:18 56:1 58:24 66:10
  66:13,16,21
**quick** 8:4 33:5
**quite** 53:16
**quoted** 25:4

|  | **R** |  |
|---|---|---|

**R** 70:1
**Ralph** 15:23 59:23
**Ralph's** 15:23
**range** 44:2 56:18
**reach** 30:8,17 32:9 58:5,8
**reached** 30:2 60:16
**read** 21:11 26:23 29:14 32:6 35:23
  36:23 37:1,1 61:11,20 68:6
**reading** 21:17 27:19
**reads** 32:3,5,7
**ready** 18:13 36:19 55:24 58:23
  59:7 61:19 66:21 67:2

CIN-TEL CORPORATION

PH:   513-621-7723                                              FX:   513-263-9023

Page 80

**real** 29:5 33:4
**really** 16:7
**reason** 30:20 55:12 66:5
**reasonable** 33:15,20
**recall** 15:11,17 27:18,21 28:4,5
  31:2 42:14 48:19 50:3,9,16
  51:23 52:1,6 53:4 54:18 57:7
  62:20 66:19
**receive** 47:13
**received** 7:7 27:24 48:22 50:4
  54:23 60:14,16,17
**recess** 32:22 66:2
**recession** 10:3,11
**recommend** 18:14
**recommended** 62:6,20
**record** 5:9 6:14 7:1 27:13 32:20
  32:24 36:17 39:2,10 43:2,24
  59:1 65:24 66:3,17,24 68:11
**recorded** 4:8 6:3
**references** 17:8,8,11
**regard** 7:24 61:11
**regarding** 61:9
**regional** 12:18
**reiterate** 39:8
**related** 57:15
**relationship** 24:12,16,19 32:8
  37:14 38:20 59:17,20
**relative** 57:4 70:17
**relevant** 8:14
**remain** 66:18,24 67:4
**remember** 15:13 16:4 19:6 42:17
  42:21 50:11 55:8,11,11 57:14
**repeated** 35:9
**Reported** 1:22
**reporter** 4:8 5:20 6:1 36:13
**represent** 15:20 16:8 18:14,20
  20:13 56:15
**representative** 5:13 7:21
**represented** 6:17 17:9 30:1
**representing** 16:21 18:23 20:15
**requested** 8:10
**research** 17:6 18:10 20:9
**resources** 25:5 34:18
**respective** 4:3

**respects** 70:10
**respond** 57:2
**responded** 63:23
**response** 8:11 30:7 60:21
**responses** 60:14
**responsibilities** 12:10
**restrooms** 6:8
**result** 70:18
**retire** 11:15 12:6
**return** 11:12
**returned** 9:10 10:3,21 11:7
**reveal** 31:20
**review** 48:15
**right** 5:18 7:11 8:1 13:19,22 19:8
  19:9,22 20:2,17,18 26:5 27:16
  27:20 35:1,7 36:12,13,23 37:19
  40:12 45:17 47:22 50:1 51:3
  52:10 53:2 55:17 57:5 62:18
  65:3 66:15 67:18
**role** 10:6 13:23 14:3,11 42:20
**Rolls** 13:8
**Rowell** 1:7 2:7 3:19 5:7 7:3 15:2
  15:18,20 16:23 17:2,15 18:21
  20:20 21:18 22:1,4,14,18,22
  23:1,8,14,17,21 24:3,6,10,15,22
  24:24 25:7,12,15,17,20 26:4,6
  27:10 29:21 30:1,23 31:11 32:8
  32:11,16 33:9,15,19 34:5,11
  37:13,18 40:2,6,16,18 41:13,23
  42:15 51:16 54:8,16 55:1,4
  56:12,23 57:19,22 58:5,8 59:19
  59:23 60:8,19,20 61:9,11 62:5
  62:17 64:9,22 67:9
**Royce** 13:8
**RPR** 1:22 2:18 4:9 71:7
**Rule** 7:17
**Rules** 2:15 4:6
**RW** 36:17 55:24
**RW000053981** 43:7
**RW00066129** 59:2
**RW67627** 61:15

---
**S**
---

**S** 4:1,1 28:12,14

**sacrifices** 10:17
**sale** 15:6 16:8 22:9,11,12,13 31:9
  31:11,14,17 39:24 40:20 44:20
  45:24 46:1 47:14
**sales** 16:5 18:15 42:7 48:10 52:17
**saying** 44:5 57:3 63:19,24
**says** 21:24 24:3,10,22 25:3,10,15
  28:9,11,15 29:10,24 33:9 34:11
  38:8 40:15 51:8 56:13 65:15
**Schedule** 8:1,4,9,9
**scheduling** 66:14 67:11
**Schneider** 13:5
**school** 9:8,10,13
**science** 9:9,11
**seal** 71:2
**search** 65:22
**searched** 17:7
**second** 9:18 16:6 18:9,11,12 42:5
  42:5,7 43:8 50:12,22,23 66:1
**seconds** 32:21
**secret** 25:21
**section** 24:10 38:13 40:14
**secure** 10:20
**see** 10:16 30:18 51:14 56:21
**seeing** 50:17
**seen** 21:6 43:8
**sell** 46:21
**selling** 41:11 47:5
**send** 44:21 45:3,6 55:12 57:23
  60:4 65:21
**sending** 56:11
**sense** 6:15
**sent** 29:7 30:16 44:19 45:7 47:11
  51:20 54:23,23
**sentence** 38:5 39:10 56:12 62:12
**separate** 12:22 67:5
**September** 50:16
**service** 13:4,7,8 25:5 34:18
**serviced** 12:19
**services** 15:5 40:15
**set** 12:14 14:10 67:18 70:11 71:1
**shakes** 6:2
**shareholder** 38:1
**shares** 11:24 13:19

CIN-TEL CORPORATION

PH:   513-621-7723                              FX:   513-263-9023

Page 81

**sheet** 12:16 69:1,3,4
**Shohl** 3:13
**shop** 53:22 64:13
**short** 56:19
**side** 13:4,7,8
**SIGN** 69:3
**signature** 4:11,12 28:6 37:7,9 56:8
    69:24 70:15,15
**signed** 7:3 43:17 44:7
**significant** 56:14
**sir** 18:8 37:8,17 39:16,19 60:12
**site** 41:7
**six** 8:6 12:4 63:7
**Sixteenth** 3:4
**Skilcraft** 5:13 7:11,21 8:6,10,11
    8:14 9:16,17,18,19,21,24 10:4
    11:7,13 12:11,15,16 13:14 15:5
    15:20 16:8 18:1 20:13,15,20
    21:19 22:3,6,11,12,13 23:1 24:5
    24:8,12,16,19,23 26:3,4,15,17
    27:9,13 33:17,21 34:6,9,12 36:8
    37:15,22,23 38:16,19,23 39:14
    39:17,20,20 40:3,7,20 41:4,11
    41:19,20,23 44:20 45:19 46:19
    47:13,22 51:5,8,12 52:9 53:10
    53:16,21 54:24 56:12,19 57:5,9
    57:15 58:4,13,16 59:11,16 61:2
    61:5,9 62:13 63:14 65:1,14 66:5
    66:16,19 67:16
**Skilcraft's** 22:18 24:6 25:5,11,16
    34:18,22 35:4 47:4 48:17
**skills** 41:15
**skipping** 43:8
**slicing** 45:11
**slowly** 5:22
**SMC** 11:1,11
**sold** 10:21 11:3,9 38:17,23 39:21
    40:10
**solicit** 47:8
**somebody's** 47:16
**sorry** 19:12,21 22:12 26:24 27:2
    39:7
**Sounds** 21:15
**speak** 30:11

**specific** 14:18 17:14 27:21 53:8
**specifically** 14:19
**specifics** 52:1
**spell** 5:8
**spent** 11:10
**Square** 13:5 64:4
**SS** 68:3 70:2
**stage** 31:4 49:18
**stages** 49:1
**standard** 15:9 40:23
**stands** 49:10
**Starner** 1:22 2:18 4:9 7:4 70:4
    71:7
**start** 8:21 21:5 46:14,17
**started** 12:22 44:10,16
**starting** 62:3
**starts** 38:6 45:15 56:4
**state** 2:19 5:8 21:1 66:23 68:3
    70:2,6
**stated** 25:4,15
**statement** 23:7,9,15
**steer** 51:17
**stenotypy** 4:8 70:12
**step** 57:4
**steps** 56:15 57:12
**Stettinius** 2:16 3:8
**sticks** 52:8
**stint** 9:18,23
**stints** 9:21
**stipulated** 4:2
**Stone** 59:13 62:5,7
**stop** 31:9,11,14,17 41:24 58:13
    62:14
**strategic** 45:7,9
**strategy** 12:13
**Street** 2:16 3:4,9,14
**stricken** 39:2
**strike** 39:3,9
**string** 56:1,3
**structure** 13:14
**subject** 56:12 65:10 66:11,14
**submitted** 4:11 70:14
**subpoena** 7:10,17,17 8:1,4,11
    26:18 27:10 67:6

**subvert** 22:5,15
**subverted** 22:2
**succeed** 11:17
**successful** 45:24 46:1
**successfully** 10:2 11:2,3
**suddenly** 20:4
**sufficient** 25:5 34:17
**suggest** 17:2 20:20 59:19 61:4
**Suite** 2:16 3:4,9
**supervision** 70:13
**supported** 42:22
**sure** 5:10 7:7 9:23,23 12:13 19:2
    34:3 41:10 45:23 47:15
**surroundings** 20:15
**suspect** 18:6
**sworn** 5:2 70:8

**T**

**T** 4:1,1 68:1 70:1,1
**table** 57:17
**Taft** 2:16 3:8
**take** 5:21 8:4 9:20 21:7,19,23 27:2
    33:4,11,15,20 36:18 51:12 52:9
    60:22 61:4,22
**taken** 2:13 4:5 32:22 66:2 70:10
    70:12
**talk** 5:21,22,23 18:6 23:3 36:19
    43:15 44:6 46:10 61:19 62:12
    67:14
**talked** 20:13 62:16
**talking** 17:22 18:1 46:8 48:21
**target** 47:4
**team** 11:2,5 12:13 16:24
**teaser** 44:16 45:16 48:11 54:23
**Tech** 56:9
**Technical** 9:6
**Technology** 11:4,6
**TELEPHONE** 3:2
**tell** 16:20 31:11,14 39:5,6 45:19
    49:5 52:18 55:2
**telling** 8:21
**ten** 13:21
**term** 29:18,22 38:10
**terminate** 21:18 59:12,20

CIN-TEL CORPORATION

PH:   513-621-7723                                                     FX:   513-263-9023

Page 82

**terminated** 38:19 40:5 43:18 44:8
59:16
**termination** 38:6,8 60:2,5
**terms** 39:17 46:17 47:12 50:20
52:13
**testified** 5:3
**testify** 8:5
**testimony** 7:10 39:2 68:7,9,11
**text** 30:16
**Thank** 7:15 8:20 35:14 51:8 59:3
59:6 69:4
**Thanks** 57:3
**thing** 6:8 21:12 44:18 55:14 61:21
62:1 64:13
**things** 12:20 17:21 19:21 27:22
29:16 61:8
**think** 15:4 18:4 19:2 21:17 26:10
28:15,16,20 41:18,22 42:19 47:6
51:14 55:14 66:24 67:10,15
**third** 23:11 35:11 38:5 56:12
**thought** 15:21 19:16
**three** 8:9,14 11:10,16 13:22 14:17
20:3,4 35:19
**Thursday** 64:3,4
**time** 4:5,7 6:7,12,13 9:18 10:4,18
10:21 11:18 12:5 15:1,15,16,17
16:18,20 27:3 28:23 30:3 35:11
43:17 44:7 48:9 53:19 56:20
60:10 61:1 63:13 64:15,22 67:13
67:14 70:10
**times** 10:14 30:15
**title** 11:21,22 12:2,3,8
**titles** 9:22
**today** 5:12 6:18 7:21 8:18 66:13
66:16,20 67:1
**told** 25:10 34:14,19 35:5 41:22
54:8,11,24
**top** 50:23 61:18
**topics** 7:24 8:15
**tortious** 24:13
**tortiously** 24:11
**tough** 10:14
**track** 36:12
**trade** 25:21

**Trane** 13:5
**transaction** 22:2,5,9,15,19 24:5,8
30:10,14 33:17,22 34:1,6,9,18
38:11 41:19,24 43:16 44:6 45:20
49:19 50:4 54:5 57:15 58:14
59:14 62:14 63:10
**transactions** 25:6 64:24 66:6
**transcribed** 4:9 70:13,14
**transcript** 35:24 36:5 68:6,10 69:3
**transition** 12:5 33:10,12 47:21,22
48:5 56:14
**tried** 21:18 30:15
**true** 41:13 61:9,10 68:10
**truth** 70:8,8,9
**try** 5:21,22 6:2 28:2 41:19
**trying** 5:20 6:1 16:7 18:19 32:4
59:4
**turn** 8:3 19:24 41:13
**two** 9:7 10:22 12:22 18:16,21
26:11 48:4 50:9 52:24 67:5
**type** 13:6 28:16 63:10
**types** 8:9
**typewritten** 70:13

**U**

**U** 4:1
**Uh-huh** 17:23 28:8,10
**uncertainty** 56:17
**unconventional** 28:16,18
**undersigned** 70:4
**understaffed** 25:1 34:13
**understaffed.'** 24:23
**understand** 7:18 21:22 26:16
37:20 50:24
**understanding** 21:20 22:8 23:5
38:14
**understood** 40:17 66:12 67:3
**union** 53:22 54:5
**unit** 12:22
**units** 12:23
**University** 9:9,12,13
**use** 20:11 25:21 29:18,21 43:15
47:21 65:8 69:1,3
**uses** 28:13

**usurp** 24:4,7 34:6

**V**

**value** 46:3 55:15 66:7
**various** 27:20
**Vaughn** 26:21 27:7 28:7 29:4
31:24
**verbal** 20:16
**vice** 10:24 11:5
**Vierling** 13:17,23 14:12 20:12
58:5
**view** 24:22
**violate** 61:2
**violating** 39:17
**visited** 49:17
**voice** 6:2
**voicemail** 30:7
**volume** 20:1 48:6
**voluntarily** 59:17
**VP** 11:22 12:2
**vs-** 1:6 2:6

**W**

**W** 68:1
**wait** 6:6 54:9,12,24 55:5 63:7
**walk** 9:22
**Walnut** 2:16 3:9
**want** 21:14 36:24 50:21 61:24
**wanted** 11:12 30:11 41:10 45:24
51:1,14 55:15 57:18 60:15 61:4
**Washington** 64:4
**wasn't** 15:23 34:3 64:19
**way** 28:16 32:6 34:3 40:7 42:22
52:20 53:6 56:5
**we'll** 7:2 32:20 39:9 48:8 61:18
64:13 65:24
**we're** 16:12,13 20:23 21:5 23:24
32:23 36:11 49:24 54:24 55:1
59:13 61:15 63:10 66:3,13,20
67:3,18
**we've** 12:22
**web** 28:12,20
**website** 17:7 28:11
**week** 15:10 57:4,12 62:6,17 63:24

CIN-TEL CORPORATION

PH:   513-621-7723

FX:   513-263-9023

Page 83

**weeks** 60:15 65:9
**welcome** 21:11
**went** 9:6,8 35:21 54:9
**weren't** 10:17
**WHEREOF** 71:1
**Whitcraft** 43:14 44:3 45:9,13 50:1 50:11,15 51:17 53:5 54:1,2,4
**whittled** 18:16
**willing** 10:17
**window** 11:16
**wished** 59:11
**witness** 2:13 3:12 4:4,10,11 39:4,7 66:19 70:14 71:1
**witness's** 39:1
**word** 23:5 24:13
**words** 15:22 44:9 47:22
**work** 9:7,21 24:7 25:24 40:6,15 41:20 42:15 55:6
**worked** 9:15 17:3 20:20 24:4 32:12,14,17 40:9 44:6
**workforce** 9:8
**working** 26:4,5 39:23 40:19 54:12 55:1 63:4
**works** 43:16 56:4 65:13
**worth** 67:9
**wouldn't** 29:15
**wrap** 62:5,7,17,21 64:8
**written** 44:14

**X**

**Xavier** 9:13

**Y**

**yeah** 9:2 10:14 11:10 13:3 16:3 18:2 19:24 27:1 39:8 43:21 47:3 47:20 49:3,12 50:24 56:6 60:22 61:22 67:3
**year** 15:12 47:22
**years** 9:8 11:10 48:4
**Yep** 24:2 59:3

**Z**

**Z-U-R-B-O-R-G** 5:11
**Zurborg** 1:13 2:13 4:3 5:1,6,10 7:4,16 21:6 26:16 32:21 33:1

36:18 43:6 55:24 62:4 66:4 68:6 68:17 70:7

**0**

**000011879** 36:17
**001257** 26:15

**1**

**1** 5:20 6:22 7:2
**1.3** 36:21 37:3,4 40:14
**1:18-CV-01015-RBJ** 1:6 2:6
**10** 8:8 55:18,19
**10:00** 1:15 2:17
**11** 1:14 2:17 58:20,21 68:7
**11:38** 68:20
**12** 61:15,16
**13** 65:4,5,7
**134** 59:2
**16** 48:4
**17** 48:4
**18** 11:3 38:9,17,23
**180** 49:1
**1800** 3:9
**1900** 3:4,14
**1965** 12:17
**1st** 40:3

**2**

**2** 5:24 21:24 62:4
**2002** 9:24 10:3,4,23
**2004** 11:14
**2010** 9:19 10:3,21,23 11:9,20
**2012** 12:3,6
**2015** 48:2
**2017** 15:14 16:20 42:1 43:18 44:7 44:8 47:21 48:2 50:16
**2018** 29:8 40:3 60:11
**2019** 1:14 2:17 68:7 71:3,7
**25** 33:4,7,9 35:23
**255** 3:14
**26** 34:11 35:23
**27** 52:6,7,19
**28** 51:3 52:2

**3**

**3** 21:23 24:1
**30** 32:21 47:6,7 51:15 53:6
**30(b)(6)** 7:17 66:15,19 67:5
**303** 3:5
**35** 47:6,6
**381-2838** 3:10

**4**

**4** 6:23 7:2 36:20 37:2 38:4
**425** 2:16 3:9
**45202-3172** 3:15
**45202-3957** 3:10
**4th** 29:8

**5**

**5** 7:5,9,13 33:7
**513** 3:10,15
**53388** 55:22,23
**53982** 44:2
**5th** 50:16

**6**

**6** 20:24 21:3,24 33:2 38:13 52:20
**60** 13:19
**629** 61:15
**629-6200** 3:5
**66097** 65:8

**7**

**7** 26:12,13,15 71:7
**70** 11:3
**781** 28:15

**8**

**8** 36:12,14,16
**800** 3:4
**80202** 3:5
**84** 43:7
**882** 36:17
**89** 55:23

**9**

**9** 8:4 43:4,7
**90s** 11:15
**977-8200** 3:15

CIN-TEL CORPORATION

PH:   513-621-7723                                                FX:   513-263-9023

Page 84

**99** 9:24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC.,
a Colorado corporation,

       Plaintiff,

v.

JOHN ROWELL,

       Defendant.

---

**EXHIBIT A TO PROTECTIVE ORDER**

---

I, John Rowell (please print), the undersigned, hereby acknowledge that I have read the Protective Order entered by the Court in the above-captioned civil action. I understand the terms and conditions of such Protective Order governing the restricted use of confidential materials and that confidential materials I obtain from the parties are provided to me for the sole purpose of this action and may not be used for any purpose other than for this action. I hereby agree to keep all such information and materials strictly and absolutely confidential, and in all other respects to be bound by the terms of the Protective Order.

_1-11-18_
Date

_[signature]_
Signature

DEFENDANT'S
EXHIBIT
JFS  7/11/9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC.,
a Colorado corporation,

   Plaintiff,

v.

JOHN ROWELL,

   Defendant.

---

## EXHIBIT A TO PROTECTIVE ORDER

 I, _J. Corey Asay_ (please print), the undersigned, hereby acknowledge that I have read the Protective Order entered by the Court in the above-captioned civil action. I understand the terms and conditions of such Protective Order governing the restricted use of confidential materials and that confidential materials I obtain from the parties are provided to me for the sole purpose of this action and may not be used for any purpose other than for this action. I hereby agree to keep all such information and materials strictly and absolutely confidential, and in all other respects to be bound by the terms of the Protective Order.

_1/11/19_
Date

_J. Corey Asay_
Signature   _Counsel for Skitcraft LLC_

**DEFENDANT'S
EXHIBIT**
PENGAD 800-631-6989
_3_
_JC5   7/11/19_

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC.,
a Colorado corporation,

        Plaintiff,

v.

JOHN ROWELL,

        Defendant.

---

### EXHIBIT A TO PROTECTIVE ORDER

---

I, ___John M. Zurborg___ (please print), the undersigned, hereby
acknowledge that I have read the Protective Order entered by the Court in the above-captioned
civil action. I understand the terms and conditions of such Protective Order governing the
restricted use of confidential materials and that confidential materials I obtain from the parties
are provided to me for the sole purpose of this action and may not be used for any purpose other
than for this action. I hereby agree to keep all such information and materials strictly and
absolutely confidential, and in all other respects to be bound by the terms of the Protective Order.

___1/11/19___
Date

___(signature)___
Signature



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC.,
a Colorado corporation,

          Plaintiff,

v.

JOHN ROWELL,

          Defendant.

---

### EXHIBIT A TO PROTECTIVE ORDER

---

I, _Jennifer K. Starne_ (please print), the undersigned, hereby

acknowledge that I have read the Protective Order entered by the Court in the above-captioned

civil action. I understand the terms and conditions of such Protective Order governing the

restricted use of confidential materials and that confidential materials I obtain from the parties

are provided to me for the sole purpose of this action and may not be used for any purpose other

than for this action. I hereby agree to keep all such information and materials strictly and

absolutely confidential, and in all other respects to be bound by the terms of the Protective Order.

_7/11/19_

Date

_Jennifer K. Starner_

Signature



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 3:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC., a Colorado corporation,

    Plaintiff,

v.

JOHN ROWELL, an individual,

    Defendant.

---

## SUBPOENA FOR ORAL EXAMINATION OF 30(b)(6) DEPONENT AND SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS IN A CIVIL ACTION

---

    PLEASE TAKE NOTICE that Defendant, John Rowell, by and through his undersigned counsel, hereby notices the deposition of Skilcraft LLC ("Skilcraft"), 1973 International Way, Hebron, KY 41048, via stenographic means for the purposes of discovery, for use at trial, and/or for any other appropriate purpose pursuant to Rule 30 of the Federal Rules of Civil Procedure, before a Notary Public authorized by law to administer oaths, on January 11, 2019 at 9:00 am at the offices of Taft Stettinius & Hollister LLP, 425 Walnut St, Cincinnati, OH 45202.  Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Skilcraft shall designate and prepare one or more officers, directors, managing agents, or other representatives who will consent to testify on its behalf and who is knowledgeable as to each of the matters/topics listed in Schedule A.



DEFENDANT'S EXHIBIT

5

PENGAD 800-631-6989

This representative must also bring with him or her to the deposition the documents, electronically stored information, or objects listed in Schedule B, and must permit inspection, copying, testing, or sampling of the material.

The following excerpts of Federal Rule of Civil Procedure 45 outline the rights and duties of an entity responding to a subpoena:

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show

3

that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

Dated: November 30, 2018

/s/ Aaron Herzig
Aaron Herzig, # 79371
Medora Akers, #96419
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Telephone: (513) 381-2838
Fax: (513) 381-0205
aherzig@taftlaw.com
makers@taftlaw.com

Michael R. Greco, #48320
Kevin J. Burns, #44527
Fisher & Phillips LLP
1801 California Street, Suite 2700
Denver, Colorado 80202
Tel: (303) 218-3650
Fax: (303) 218-3651
mgreco@fisherphillips.com
kburns@fisherphillips.com

*Attorneys for Defendant-Counterclaim
Plaintiff John Rowell*

## INSTRUCTIONS AND DEFINITIONS FOR SCHEDULES A AND B

The following instructions and definitions apply to Schedules A and B of this Subpoena:

1.      "You," "your" or "ABI" means Aaron, Bell International, Inc., including its parent(s), subsidiary(ies), affiliates, successors, assigns, agents, current employees, and former employees.

2.      "Skilcraft" means Skilcraft LLC.

3.      The words "persons" as used herein refers to all individuals and entities, including, without limiting the generality of the foregoing, all natural persons, governmental agencies and subdivisions thereof, political subdivisions, sole proprietorships, limited liability companies, associations, companies, partnerships, joint ventures, corporations, trusts, estates, and all other business, legal, governmental or artificial entities.

4.      "Identify" when used with respect to a person means to describe with sufficient particularity (a) the person's full name; (b) the person's current or last known address; (c) the person's current or last known telephone number; and (d) the person's current or last known employer.

5.      "Identify" when used with respect to a document is a request for each document to be described with specificity and particularity, giving: (a) its location; (b) the name and title of the person in charge of its custody or maintenance; (c) its date of origin; (d) its author; (e) its length; (f) its purpose; and (g) a summary of its contents. In lieu of identifying a particular document, the person(s) answering these Requests may attach the document to the response to these Requests.

6.      The term "documents" means any and all writings as defined by Federal Rule of
Civil Procedure 34(a), and includes, but is not limited to any printed, typewritten, encoded,
photocopies, photographed, recorded and handwritten matter of whatever character including,
but not limited to the following: correspondence, notes, contracts, agreements, lists, memoranda,
minutes, charts, graphs, drawings, photographs, certificates, records, ledgers, instruments,
publications, registers, reports, books, pamphlets, summaries, diaries, drafts, calendars,
communications, telegrams, teletypes, guidelines, rules, instant messages, text messages, emails
and instructions. The term "document" also means and includes electronically stored
information, computer stored or computer generated data, computer readable media of any type
whatsoever, including that stored on disks, hard drives, networks, flash drives, external hard
drives, back-up tapes and printers including back-up or temporary copies of data.

7.      If a document has been prepared in several copies, or additional copies have been
made and the copies are not identical (or by reason or subsequent modifications, are no longer
identical), each nonidentical copy is a separate "document."

8.      The singular includes the plural and vice versa; the words "and" and "or" shall be
both conjunctive and disjunctive; the word "all" means "any and all" and the word "any" means
"any and all"; the word "including" means "including without limitation."

9.      The terms "relating to" or which "relate to" any given matter mean to constitute,
contain, discuss, embody, comment upon, identify, refer to, concern, or are otherwise pertinent to
the matter.

10.      The responding party should provide all information and documents available to it
including information and documents in the possession of its attorneys, agents, or other persons

7

acting on its behalf. If the responding party cannot respond to any Request in full after exercising due diligence to secure the information or documents, it should so state and respond to the extent possible, specifying any inability to respond to the remainder, and disclosing any available information or knowledge concerning any portion to which cannot be fully responded.

11.     In the event that an objection is made to any of the Requests, you must state your objection with specificity sufficient to permit the Court to determine its merit. Respond separately and fully to every Request or portion thereof to which no objection is made.

12.     Each Request shall be deemed continuing so as to require prompt supplemental responses if the responding party obtains or discovers additional information responsive to these requests between the time of initial response and the time of trial.

13.     No statement or inference contained in any request herein shall constitute a representation or admission by Mr. Rowell of any fact or condition.

8

## Schedule A

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Skilcraft, through one or more of its officers, directors, managing agents or other designated person who consents to testify on its behalf, is obligated to testify concerning information known or reasonably available to it concerning the following matters:

1.     Skilcraft's selection and retention of Aaron, Bell International, Inc. ("ABI") to perform investment banking services on its behalf.

2.     The relationship between (i) Skilcraft, or any person employed by, or related to, Skilcraft, or any agent of Skilcraft and (ii) Mr. Rowell, ABI, or any person employed by, or related to, ABI, or any agent of ABI during the course of ABI's retention by Skilcraft.

3.     John Rowell ("Mr. Rowell") and/or ABI's performance during his/its retention by Skilcraft.

4.     Any communications, written or oral, between (i) Skilcraft, or any person employed by, or related to, Skilcraft, or any agent of Skilcraft and (ii) Mr. Rowell, ABI, or any person employed by, or related to, ABI, or any agent of ABI during the course of ABI's retention by Skilcraft.

5.     Skilcraft's decision to terminate its investment banking relationship with ABI.

6.     Any communications, written or oral, between (i) Skilcraft, or any person employed by, or related to, Skilcraft, or any agent of Skilcraft and (ii) Mr. Rowell, ABI, or any person employed by, or related to, ABI, or any agent of ABI, following the termination of the investment banking agreement between ABI and Skilcraft.

## Schedule B

Pursuant to Federal Rule of Civil Procedure 45, please produce the following categories of documents and electronically stored information for inspection:

1.      Any and all communications or documents between Mr. Rowell and Skilcraft from January 1, 2017 to the present, including, but not limited to, all correspondence, interview notes, transcripts, reports, studies, analyses, recaps, excel documents, data sheets or compilations, and invoices.

2.      Any and all communications or documents between (i) ABI, any person employed by, or related to, ABI, or any agent of ABI and (ii) Skilcraft from January 1, 2017 to the present, including, but not limited to, all correspondence, interview notes, transcripts, reports, studies, analyses, recaps, excel documents, data sheets or compilations, and invoices.

3.      Any and all communications or documents possessed by Skilcraft pertaining, or in reference, to (i) John Rowell, (ii) the proposed sale of Skilcraft by ABI and/or John Rowell, or (iii) ABI, any person employed by, or related to, ABI, or any agent of ABI.

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br><br>Court Address:<br><br>1437 Bannock Street<br>Denver, CO 80202<br>Phone: (720) 865-8301 | DATE FILED: March 30, 2018 2:56 PM<br>FILING ID: D005E16790B06<br>CASE NUMBER: 2018CV31128 |
| Plaintiff:<br><br>    AARON, BELL INTERNATIONAL, INC., a<br>    Colorado corporation,<br><br>v.<br><br>Defendant:<br><br>    JOHN ROWELL, an individual. | ▲ **COURT USE ONLY** ▲ |
| | Case Number: |
| **Attorneys for Plaintiff Aaron, Bell International, Inc.:**<br><br>Name:     Danielle L. Kitson, #34159<br>           Stephen E. Baumann II, #43532<br>Address:  LITTLER MENDELSON, P.C.<br>           1900 Sixteenth Street, Suite 800<br>           Denver, CO 80202<br>Phone:    303.629.6200<br>Facsimile: 303.629.0200<br>Email:    dkitson@littler.com; sbaumann@littler.com | |
| **PLAINTIFF AARON, BELL INTERNATIONAL, INC.'S COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** | |

Plaintiff Aaron, Bell International, Inc. ("ABI") brings this Complaint against Defendant John Rowell, and states and alleges as follows:

## INTRODUCTION

1.    Since 1989, ABI has provided more than 1,200 companies with investment banking consultation on strategic mergers, acquisitions, recapitalization, reorganization, and business valuation in the United States and abroad. ABI uses proprietary techniques to assess core company strengths and underdeveloped value drivers to create unique strategies for its clients to enhance growth and increase business valuation.



2.      Defendant John Rowell was previously employed by ABI as an Executive Vice President and Chief Operating Officer until approximately January 12, 2018, when ABI terminated Defendant Rowell's Transition Employment Agreement for cause (the "Transition Agreement"). A true and correct copy of the Transition Agreement is attached as Exhibit 1.

3.      While still an ABI employee, Defendant Rowell intentionally subverted and attempted to divert the transaction that ABI carefully developed with Skilcraft LLC—the very existence of which is confidential, proprietary, and trade secret information—openly disparaged ABI, worked with a competing investment bank to usurp the Skilcraft transaction, and tortiously interfered with ABI's contractual and prospective business relationship with Skilcraft. As just one example, Defendant Rowell described ABI to Skilcraft as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs.

4.      As such, Defendant Rowell is currently in clear violation of his Transition Employment Agreement and Colorado law. ABI seeks all damages for the loss of the Skilcraft transaction resulting from these breaches.

## PARTIES

5.      Plaintiff ABI is a Colorado corporation with a principal place of business located at 9101 East Kenyon Avenue, Suite 2300, in the City and County of Denver, Colorado.

6.      Defendant John Rowell is an individual who, upon information and belief, currently resides at 6274 Blackheath Circle, Mason, Ohio 45040.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the subject matter of this civil dispute regarding whether Defendant Rowell has breached his obligations under his Transition Employment Agreement, the Colorado Uniform Trade Secrets Act, and the other Colorado statutes and common law duties alleged below.

8.      This Court has personal jurisdiction over Defendant Rowell under section 13-1-124, C.R.S., because Defendant Rowell transacted business in this state and committed tortious acts in this state, as described more fully below.

2

9.     Venue is appropriate in this Court under C.R.C.P. 98 because the torts committed by Defendant were committed in Denver, Colorado, where Defendant Rowell's employment with ABI was based.

## FACTUAL BACKGROUND

10.     As alleged above, ABI has investment banking consultation on strategic mergers, acquisitions, recapitalization, reorganization, and business valuation in the United States and abroad using proprietary techniques to assess core company strengths and underdeveloped value drivers to create unique strategies for its clients to enhance growth and increase business valuation.

11.     Defendant John Rowell was previously employed by ABI as an Executive Vice President and Chief Operating Officer until approximately January 12, 2018, when ABI terminated Defendant Rowell's Transition Employment Agreement for cause (the "Transition Agreement"). A true and correct copy of the Transition Agreement is attached as Exhibit 1.

12.     Section III.H. of Defendant Rowell's Agreement, captioned "Confidential Information and Competition," states:

> **Employee's right to receive the benefits of this Agreement is contingent upon Employee's compliance with the terms following Confidentiality protections, which shall survive the end of Employee's employment and be in full force and effect for two (2) years following the Resignation Date:**
>
>> **Employee will hold in strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not an employee of ABI or to any employee of ABI that does not have access to said Confidential Information, without express written permission from ABI's President. Confidential Information shall mean any trade secrets or ABI proprietary information, including, but not limited to techniques, processes, operating methods, cost, pricing, financial data, business plans and proposals, customer lists, data and information that ABI receives in confidence from any other party, or any other secret or confidential matters of ABI.**
>
> **Employee agrees that he shall not, during the continuance of this Agreement and within two (2) years after the termination of this Agreement use his position at ABI and/or knowledge gained in his position at ABI to 1) benefit himself or other third party to the detriment of ABI 2) divert or attempt to divert from ABI any business that ABI has, to the knowledge of Employee, enjoyed from any other individuals or entities and/or 3) solicit or induce any**

3

**employee or ABI to cease employment with ABI. Employee shall not use his knowledge of the ABI marketing pipeline to solicit individuals or entities**.

Ex. 1, § III.H. (emphasis added).

13.     Section    III.K.    of   Defendant    Rowell's    Agreement,    captioned    "Non-Disparagement," is clear that "**Employee agrees not to disparage ABI Entities's products, abilities, or services.**" *Id.* § III.K. (emphasis added).

14.     ABI has learned that Defendant Rowell, while still working as an employee of ABI under his Agreement, intentionally subverted and attempted to divert the transaction that ABI carefully developed with Skilcraft LLC—the very existence of which is confidential, proprietary, and trade secret information—openly disparaged ABI, worked with a competing investment bank to usurp the Skilcraft transaction, and tortiously interfered with ABI's contractual and prospective business relationship with Skilcraft.    As just one example, Defendant Rowell described ABI to Skilcraft as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs.

15.     In fact, on January 2, 2018, while still within the terms of the Transition Agreement, ABI intercepted an email sent from Patrick Vaughan at First Line Advisors, which offered its securities through Cresap, Inc. Mr. Vaughan thanked Mr. Rowell for taking the time to speak with him "today re: Skilcraft," and offered to discuss "potential next steps" with Mr. Vaughan's colleague, Alison Kennedy.

16.     Defendant Rowell's conduct caused Skilcraft to cancel its Investment Banking Agreement with ABI.

17.     As such, Defendant Rowell is in direct and ongoing violation of Sections III.H. and III.K. of his Agreement, as well as numerous Colorado statutory and common law duties.

18.     The restrictions in the Agreement are reasonable, and the potential harm resulting from Defendant Rowell's theft and retention of ABI's confidential, proprietary, and/or trade secret materials, his continued breach of his obligations, and his misappropriation (or threatened misappropriation), of ABI's materials are not difficult to envision, as Defendant Rowell has already used this information to scuttle ABI's transaction with Skilcraft in violation of his Transition Agreement.

19.     In order to guard the secrecy of its confidential business information, including its pending transactions, its strategic partners, its pricing information, its proprietary techniques to assess core company strengths and underdeveloped value drivers, and other highly sensitive information, ABI requires its employees to execute confidentiality agreements, such as Defendant Rowell's Transition Agreement, which prohibited the misuse and disclosure of ABI's confidential business information, as well as its retention when an employee departs from ABI.

These confidentiality agreements ensure that ABI's confidential information remains in-house and is not shared outside ABI. ABI permits access to its confidential information only through secure connections and only with individualized login and password information, and restricts access to certain employees on a need-to-know basis.

20. Until Defendant Rowell's theft and retention of these materials, ABI's confidential business information and trade secrets, including the very existence of the Skilcraft transaction, ABI's strategic partners, its pricing information, its proprietary techniques to assess core company strengths and underdeveloped value drivers, and other highly sensitive information, has not been shared outside ABI.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

21. ABI restates and incorporates by reference the allegations contained in all previous paragraphs of its Complaint.

22. ABI and Defendant Rowell entered into the Transition Employment Agreement on or about September 12, 2017.

23. Under Colorado law, Defendant Rowell's signature and ongoing employment constituted sufficient assent and consideration to the terms of the Transition Agreement.

24. ABI fully performed its obligations under the Transition Agreement.

25. Defendant Rowell breached his obligations under Section III.H. of his Transition Agreement by failing to take reasonable measures to protect and maintain the confidentiality of the very existence of the Skilcraft transaction, by openly usurping the Skilcraft transaction for Defendant Rowell's own gain, and by diverting the Skilcraft transaction from ABI.

26. Defendant Rowell also breached his obligations under Section III.K. by disparaging ABI to Skilcraft when Defendant Rowell described ABI as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs.

27. Defendant Rowell also breached his obligations under Section III.L. in failing to return all of ABI's information received from ABI, on behalf of ABI, or while working for ABI that related to ABI's business immediately upon notice that ABI was terminating the Transition Agreement on January 12, 2018.

28. ABI is also entitled to recover actual and consequential losses in an amount to be proven at trial as a result of Defendant Rowell's breach of his Transition Agreement, including

5

the value of the Skilcraft transaction lost because of Defendant Rowell's violations, as well as prejudgment and post-judgment interest, and all other appropriate equitable and legal relief.

## SECOND CLAIM FOR RELIEF
### Misappropriation of Trade Secrets
### (§ 7-74-101, C.R.S., *et seq.*)

29.    ABI restates and incorporates by reference the allegations contained in all previous paragraphs of its Complaint.

30.    ABI is the owner of certain trade secrets and confidential business information relating to, *inter alia,* its pending transactions, its strategic partners, its pricing information, its proprietary techniques to assess core company strengths and underdeveloped value drivers, and other highly sensitive information, financial information, business opportunities for new or developing businesses, sales data, processes, marketing techniques, and pricing policies, including the very existence of the Skilcraft transaction. Such information constitutes trade secret information within the meaning of section 7-24-102(4), C.R.S.

31.    ABI has gone to great effort and expense to develop and maintain such trade secrets, and such information is protected from disclosure by the Colorado Uniform Trade Secrets Act. ABI's pending transactions, its strategic partners, its pricing information, its proprietary techniques to assess core company strengths and underdeveloped value drivers, and other highly sensitive information, financial information, business opportunities for new or developing businesses, sales data, processes, marketing techniques, and pricing policies, including the very existence of the Skilcraft transaction, contain non-public information compiled through countless man-hours over years of effort that cannot be recreated without significant time and expense. The Skilcraft transaction, alone, represents a loss of approximately $982,125.00 based on the estimated fee for the transaction, the cost of the man-hours for lead development, preparation of presentation materials, preparing the data room, contacting and managing potential buyers, and paying Defendant Rowell's portion of the progress payments.

32.    Defendant Rowell understood that certain trade secrets and confidential information belonging to ABI would be made available to him to enable him to perform his responsibilities for ABI. Defendant Rowell further understood his obligation to maintain the confidentiality of ABI's trade secrets and other confidential information, and that ABI had a legitimate business interest to keep that information confidential.

33.    ABI took reasonable and considerable efforts to maintain the confidentiality and secrecy of its trade secrets and confidential information. Among other things, ABI restricts access to certain employees on a need-to-know basis, requires employees who access its trade secrets to sign confidentiality agreements, and mandates that the information only be accessed through secure connections and only with individualized login and password information.

34. The trade secret information misappropriated by Defendant Rowell has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use, including through requiring employees to sign confidentiality agreements like Defendant Rowell's Transition Agreement referenced above, and other policies and materials regarding use of confidential, proprietary, and/or trade secret information.

35. Defendant Rowell has misappropriated or threatened to misappropriate, and unless restrained, will continue to misappropriate or threaten to misappropriate, ABI's trade secrets and confidential information for the purpose of using and exploiting them for his own interests or the interests of his employer, without license or permission from ABI. This includes, without limitation, all of the conduct alleged above with respect to improper use of trade secret information related to the Skilcraft transaction.

36. Defendant Rowell's misappropriation of ABI's trade secrets is attended by circumstances of fraud, malice, or willful and wanton disregard of ABI's rights, as indicated by his brazen violations of his Transition Agreement in soliciting First Line Advisors to usurp the Skilcraft transaction and in disparaging ABI to Skilcraft.

37. Defendant Rowell's misappropriation of ABI's confidential and proprietary trade secrets has caused, and will continue to cause, ABI irreparable injury in remaining outside of ABI's possession, custody, or control under threat of distribution to other third parties unless Defendant Rowell is permanently enjoined by the Court, and ABI has no adequate remedy at law.

38. Defendant Rowell's misappropriation of the confidential and trade secret information of ABI constitutes a serious breach of the Colorado Uniform Trade Secrets Act, entitling ABI to injunctive relief.

39. ABI is also entitled to actual and consequential damages, including the reasonable price or royalties realized by Defendant Rowell resulting from his misappropriation of trade secret and damages for unjust enrichment, in an amount in excess of the jurisdictional minimum. Furthermore, ABI is entitled to costs, including witness fees, attorneys' fees, prejudgment and post-judgment interest, and other appropriate relief.

### THIRD CLAIM FOR RELIEF
**Commercial Disparagement**

40. ABI restates and incorporates by reference the allegations contained in all previous paragraphs of its Complaint.

41. Defendant Rowell made several false statements to Skilcraft, a third party. Among other things, Defendant Rowell falsely described ABI to Skilcraft as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated

that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs.

42.     Defendant Rowell's statements were derogatory to ABI's business or the quality of the business.

43.     Defendant Rowell intended to cause harm to ABI's pecuniary interest through the loss of the Skilcraft transaction, or knew or should have known his conduct was likely to do so.

44.     Defendant Rowell did so with malice in that he specifically intended to usurp the Skilcraft transaction for his own benefit, as indicated by his contact with First Line Advisors.

45.     Defendant Rowell caused special damages in the amount of $982,125.00, which includes the estimated fee for the lost Skilcraft transaction, coupled with the cost of the man-hours for lead development, preparation of presentation materials, preparing the data room, contacting and managing potential buyers, and paying Defendant Rowell's portion of the progress payments, all of which are directly attributable to Defendant Rowell's conduct.

46.     By virtue of the foregoing, ABI has been damaged in an amount to be determined at trial, including witness fees, prejudgment and post-judgment interest, and other appropriate relief.

## FOURTH CLAIM FOR RELIEF
### Breach of Duty of Loyalty

47.     ABI restates and incorporates by reference the allegations contained in all previous paragraphs of its Complaint.

48.     Defendant Rowell owed a common law duty of loyalty to ABI while he remained an employee of ABI.

49.     By engaging in the conduct described above, Defendant Rowell breached his common law duty of loyalty to ABI. Among other things, Defendant Rowell intentionally subverted and attempted to divert the transaction that ABI carefully developed with Skilcraft LLC—the very existence of which is confidential, proprietary, and trade secret information—openly disparaged ABI, worked with a competing investment bank to usurp the Skilcraft transaction, and tortiously · interfered with ABI's contractual and prospective business relationship with Skilcraft. As just one example, Defendant Rowell described ABI to Skilcraft as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs

50.     Defendant Rowell's conduct was and is willful, malicious, and intentional, and in wanton disregard of ABI's rights. Defendant Rowell's conduct has caused monetary damages to

8

ABI in the amount of the loss of the Skilcraft transaction, the attorneys' fees and other costs expended in attempting to retrieve ABI's confidential and proprietary information, and the amount of all remuneration paid to Defendant Rowell during his periods of disloyalty.

51.     As a result of Defendant Rowell's breach of the duty of loyalty, ABI is entitled to actual and consequential damages, to include disgorgement of Defendant Rowell's remuneration paid to him by ABI during his periods of disloyalty, as well as costs, including attorneys' fees, prejudgment and post-judgment interest, and other appropriate equitable and legal relief as determined by the Court.

## FIFTH CLAIM FOR RELIEF
### Intentional Interference with Contracts and Prospective Business Advantage

52.     ABI restates and incorporates by reference the allegations contained in all previous paragraphs of its Complaint.

53.     ABI had an existing or prospective contractual relationship with Skilcraft and other ABI customers.

54.     Defendant Rowell had knowledge of these existing or potential contracts through his work on the Skilcraft transaction before illegally usurping it for himself with the help of First Line Advisors.

55.     ABI had a legitimate expectation that its current employee and Executive Vice President/Chief Operating Officer would not interfere with its existing contracts or prospective business advantage with Skilcraft or others using ABI's information developed for ABI.

56.     Defendant Rowell has engaged in wrongful acts that tortiously interfered with ABI's existing contracts and prospective business advantage, as set forth more fully above. ABI is informed and believes that Defendant Rowell used ABI's trade secrets and confidential information to target Skilcraft, as well as other contracts or prospective contracts with ABI's customers, given his contact with First Line Advisors and disparagement of ABI to Skilcraft. Such actions were wrongful in that Defendant Rowell targeted Skilcraft and others with the clear aim to cause them to contract with Defendant Rowell instead of ABI.

57.     Defendant Rowell intentionally and improperly induced Skilcraft and others to breach existing contracts or to refuse to enter into future contracts with ABI. Such intent and improper conduct is supported by, among other things, Defendant Rowell's use of ABI's confidential and trade secret information and open disparagement of ABI to Skilcraft while still an ABI employee.

58.     As a result of Defendant Rowell's tortious and willful actions, ABI has suffered, and continues to suffer, damages.

59.     ABI is entitled to actual and consequential damages in an amount to be determined at trial, such as current and future damages and losses that ABI has or will have in the future based on Defendant Rowell's improper interference with ABI's existing contracts and prospective business, including, but not limited to, the value of the Skilcraft transaction or other ABI customers.  ABI is also entitled to its costs, including witness fees, prejudgment and post-judgment interest, and other appropriate equitable and legal relief.

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment

60.     ABI restates and incorporates by reference the allegations contained in all previous paragraphs of its Complaint.

61.     Defendant Rowell has obtained a benefit from ABI at ABI's expense through improper and unlawful means; namely, the proceeds of the ill-gotten contracts or prospective contracts with Skilcraft and others.

62.     Defendant Rowell's retention of the benefit under the circumstances without paying for it would be unjust.

63.     ABI is entitled to damages restoring the benefit to ABI, including disgorgement of all profits from the contracts or prospective contracts with Skilcraft and other clients or prospective clients of ABI.

## PRAYER FOR RELIEF

WHEREFORE, ABI respectfully requests the following relief:

A.     An order permanently enjoining Defendant Rowell from continuing to violate his obligations in his Transition Employment Agreement;

B.     An order permanently enjoining Defendant Rowell from retaining or using ABI's confidential, proprietary, and/or trade secret information;

C.     An order permanently enjoining Defendant Rowell from soliciting ABI's customers or prospective customers;

D.     An order requiring Defendant Rowell to disgorge all profits from Skilcraft and any other client of ABI's improperly taken by Defendant Rowell;

E.     An award of damages against Defendant Rowell in an amount to be proven at trial, including pre- and post-judgment interest as permitted by law;

F.     An award of ABI's attorneys' fees and costs; and

G.    An award to ABI of such other relief as the Court deems appropriate.

Dated this 30th day of March, 2018

/s/Stephen E. Baumann II
Danielle L. Kitson, No. 34159
Stephen E. Baumann II, No. 43532

**ATTORNEYS FOR PLAINTIFF,
AARON, BELL INTERNATIONAL,
INC.**

Plaintiff's Address
9100 E. Kenyon Avenue, Suite 2300
Denver, CO 80237

From:       pvaughan@firstlineadvisors.com
Sent:       Thu 1/04/2018 8:44 PM (GMT-00:00)
To:         John Zurborg
Cc:
Bcc:
Subject:    Fabrication Division

John,

We have a client who has an interest in your fabrication division. Upon some hunting, we learned that
you are being represented by John Rowell, and therefore reached out to him. My colleague made a
couple of attempts, leaving multiple voicemail messages. No response. I also called John, and finally was
able to reach him. He informed me that you may be 'close' to flishing the transaction, therefore I asked
for clarity if he wanted to speak further or if the deal was done. He said he would contact me the next
morning but I never heard from him.  Based on the transaction being close to the finish line, I tried
calling him multiple times.  After my last attempt, he sent me a text to leave him alone.  Based on this, I
decided I would reach out to you directly to see if you are interested in a potential investment in/buyout
of your fabrication division.

Please let me know if there is room to get a seat at the table or if you already have decided on the right
partner.

Thank you very much in advance for reading my email, and I look forward to hearing from you.


Best,
Patrick

Patrick Vaughan
SVP Business Development
**First Line Advisors LLC**
www.firstlineadvisor.com
Phone:  (781)-492-2503
Email:  pvaughan@firstlineadvisors.com


*First Line Advisors LLC is a Massachusetts limited liability company and I am a Registered Representative. Securities are offered
through Cresap Incorporated, a U.S. FINRA registered broker-dealer, located in Radnor, PA (610-341-1320). Cresap Inc. is
registered with the Securities and Exchange Commission and is a member of FINRA, SIPC and MSRB.*

*The information contained in this email is confidential and solely for the intended addressee(s). Unauthorized copying, disclosures,
modifications, and/or distribution of this email may be unlawful. If you have received this email in error, please notify the sender
immediately and delete it from your system. Cresap Inc. may monitor email communications in accordance with applicable laws and
regulations.*





# INVESTMENT BANKING ENGAGEMENT

This Engagement is being entered into between Aaron, Bell International, Inc. 9101 E. Kenyon Ave., Suite 2300, Denver, CO 80237, StillPoint Capital, LLC, 13051 West Linebaugh Ave., Tampa, FL 33626, an SEC Registered broker-dealer and member of the Financial Industry Regulatory Authority, (collectively, "ABI") and Skilcraft LLC, 5184 Limaburg Rd. P.O. Box 896 Burlington, KY 41005 and its owners, shareholders and assigns in interest as well as any other party acting upon instructions from, or on behalf of, Shareholders (collectively, "Client").  ABI and Client are collectively "Parties".

**1. SCOPE AND DUTIES. Client engages ABI to represent Client** exclusively and provide comprehensive investment banking services for the purpose of successfully completing a recapitalization, merger, acquisition, purchase of the company's stock or assets, or other financial restructuring (collectively, "Transaction") and **on terms approved by the Client**. Any party introduced by ABI or by the Client for the purpose of entering into such a Transaction will be referred to as "Prospect". Client will pre-approve all potential strategic buyer prospects before they are contacted by ABI.

1.1 ABI agrees to keep all information conveyed to it, whether verbal or in writing, as confidential.  ABI agrees to obtain Confidentiality Agreements from all Prospects prior to divulging confidential information.

1.2 ABI agrees to provide written or verbal reports as preferred by Client. These reports will set forth the status of marketing materials, Prospects contacted, status of negotiations with Prospects and such other information that the parties consider significant.  ABI may include an affiliate in servicing this Engagement.  Any fees due Affiliate are paid by ABI.

1.3 ABI agrees that the work and services provided by ABI will include John Rowell as the main advisor (which is understood between the parties that John Rowell is personally involved in all activities of identifying / interfacing with potential acquirers, working directly with Skilcraft through the preparation and sale, LOI, and closing process) unless there are circumstances that arise that are beyond ABI control.

**2. INFORMATION AND DATA.** Based on information provided by client, ABI will draft marketing materials and documents for this Transaction which will be submitted to the Client for review, revision and approval prior to distribution.

2.1. Client will cooperate fully with ABI to negotiate a successful Transaction.  Client will timely furnish ABI with complete, accurate, and not misleading business information as required for this transaction.  Client will promptly inform ABI of any Prospects contacting Client and direct the Prospect to contact ABI.  Client will promptly inform ABI of any material change to Client's Transaction objectives and business operating performance.  Client recognizes that any inaccurate or misleading information supplied to Prospect could result in a reduction in value, termination of the Transaction, and a possible legal action by Prospect after Closing.  By executing this Engagement, Client is representing and warranting that it has the legal right and authority to enter into this Engagement.

**3. NON-CIRCUMVENTION.** Client will not circumvent this Engagement and will refer to ABI all parties who express an interest in a Transaction during the term of this Engagement.

**4. TERM AND TERMINATION.** This Engagement will be in effect for twelve (12) months commencing on the Effective Date.  After twelve (12) months, either Party may terminate this engagement upon thirty (30) days written notice.  Prior to 12 months, this Engagement will not terminate until (1) a Transaction is consummated or (2) negotiations are terminated with all Prospects introduced during the term of the contract, or unless (3) Client wishes to pursue termination of ABI for gross negligence.  If Client suspects gross negligence Client will deliver written notice to ABI about such issue.  ABI will have 30 days to cure the issue to Client's satisfaction before Client may trigger the Dispute Resolution process in Section 11 below.  Upon termination of this Engagement, a "Holdover Period" of eighteen (18) months will commence.  If, during the term of this Agreement and the Holdover Period, Client completes a Transaction with a Prospect, ABI will be entitled to its fees in accordance with section 6 below.  ABI will provide Client with a list of all Prospects to be considered

DEFENDANT'S EXHIBIT
PENGAD 800-631-6989
S
RS  7/11/19

1 | Page
Skilcraft LLC

CONFIDENTIAL

RW000018879

Confidential



for the Holdover Period. Client shall provide ABI with a complete executed copy of the closing documents for a Transaction to which this Engagement applies.

**5. TRANSACTION VALUE.** "Transaction Value" is the total consideration of all economic benefits to be received directly or indirectly by Client as a result of this Transaction, including, but not limited to: cash, cash equivalents, notes made to Client or successor beneficiaries, financial institution or other long term liabilities assumed by the acquirer, assets transferred, leased, or retained by Client, earn-outs, royalties, real and intellectual property sold or leased, employment, consulting, or management agreements , non-competition agreements, and fair market value of other assets that are received in exchange for Client's assets. The value of any asset tendered to Client as compensation as a result of the Transaction shall be included in the consideration for determining the Success Fee due ABI by utilizing its fair market value. If payments are made that increase pre-existing employment, consulting or management agreements by more than 20%, then the increase only from pre-existing amount shall contribute to Transaction Value.

**6. FEES.** Client agrees to pay fees to ABI for services during this Engagement or the Holdover Period. ABI's fee will be based on the total consideration received by the Client for the Transaction calculated as follows:

6.1 SUCCESS FEE. Upon concluding a Transaction covered by this Engagement, Client agrees to pay ABI a fee ("Success Fee"), which will be:

6.1.1 Two hundred thousand dollars ($200,000) for Transaction services, plus three percent (3%) of the Total Transaction Value, plus:

6.1.2 BONUS. ABI may receive a bonus if Client receives a premium value. The total Success Fee for the portion of the Transaction Value amount exceeding the amounts set forth below shall be ten percent (10%);

    a)   $30 million, if only the aerospace related piece of the company is sold, or
    b)   $35 million if the entire company is sold.

    Real Estate value will NOT be included in the Bonus calculation.

6.1.3 REAL ESTATE. ABI will receive a fee equal to four percent (4%) of the total real estate value for all real estate transactions (lease (capped at total of three years lease payment) and/or sale) concluded as part of this Transaction. Client agrees to take any other actions reasonably required by ABI to comply with applicable Real Estate Law.

For example if the business (without any real estate included) is sold for $30 million the fee would equal $200,000 plus $900,000 (3% x $30million) for a total of $1,100,000 less fees already paid in 6.2 and 6.3.

6.2 ADVISORY SERVICES. Client agrees to make the following "Advisory Progress Payments" in a timely manner for services rendered:

| | |
|---|---|
| 6.2.1. After Client's review and approval of ABI's strategic research, Prospect list to include strategic and institutional contacts, and establish data room. | $ 10,000 |
| 6.2.2. Upon ABI completion and Client approval of confidential (coded) Executive and Financial Summaries. | $ 10,000 |
| 6.2.3. Upon ABI completion and Client approval of a Confidential Information Memorandum. | $ 10,000 |
| 6.2.4. Upon Client and Prospect meeting, negotiating, and signing a Letter of Intent or agreement to proceed in good faith with due diligence to Closing. | $ 20,000 |

CONFIDENTIAL

RW000018880

Confidential



6.3 CLIENT CREDIT AND PRE-APPROVED EXPENSES. All Client payments to ABI will reduce the Success Fee due ABI at closing. No expenses shall be incurred unless approved by Client in advance. Reimbursement due ABI for pre-approved expenses will be deducted from an expense advance of $2,500, due upon receipt of invoice. Client hereby approves virtual data room expenses of $250.00 per month. Client agrees to restore the expense advance upon receipt of an email invoice from ABI. All payments are due upon receipt of invoice and shall be made by a no fee electronic funds transfer (EFT) into an account designated by ABI.

6.4 Client agrees that the closing agent or attorney concluding this Transaction will provide ABI with payment of the amounts due ABI at closing in full, by bank wire transfer from proceeds due Client on the day of closing and will be paid in full without discount for the efforts of Client or any other person. Client shall provide ABI with a copy of all completed and executed Transaction documents. ABI shall be entitled to payment of the Success Fee on the Transaction Value as it is received by Client; specifically, any part of the Transaction Value that is contingent, including any amount payable under an earn-out arrangement shall only be due and owing upon Client's being entitled to payment of any such contingent amounts. ABI will be entitled to receive at closing any Success Fee due on any holdback held in escrow amount up to 5% of the Transaction Value. The balance of any Success Fees due to ABI from any holdback in escrow in excess of 5% of the Transaction Value will be payable to ABI as Client receives it, (at the original holdback amount).

**7. SECURITIES TRANSACTION.** Client acknowledges that this transaction may be structured as the sale of stock or other transaction subject to federal and state securities laws. In such event, federal and state securities laws will apply to the transaction, and it may become necessary that the transaction be handled through a securities broker/dealer licensed with the United States Securities and Exchange Commission, state securities regulators, and the Financial Industry Regulatory Authority (FINRA).Client further acknowledges that this Engagement will automatically, with no further action required by either Client or ABI, be assigned to StillPoint Capital, LLC ("SPC") if the transaction is (i) structured as a stock sale or otherwise deemed to constitute a security under Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange Act") and (ii) required to be conducted under the supervision of a broker-dealer registered pursuant to Section 15(b) of the Exchange Act.

If it is deemed required as a part of the transaction to be conducted as a stock sale, then due diligence will be performed to meet the standards required.

**8. NOTICES.** All notices to be given to the parties hereto shall be properly given if sent by fax transmission, personal service, or certified mail addressed to the parties at their respective addresses. Notice shall be effective on the date sent and receipt confirmed.

To Skilcraft LLC:
John Zurborg
CEO Skilcrfat
5184 Limaburg Rd. P.O. Box 896
Burlington, KY 41005

To ABI:
Ralph Bellizzi
President
9101 East Kenyon Ave, Suite #2300
Denver, CO 80237

**9. COOPERATION.** The Parties make no representation that a Transaction will result from this Engagement. Client will engage appropriate professionals for legal and tax opinions for their Transaction. Client will introduce ABI to Client's legal and accounting professionals upon request of ABI, and will direct these professionals to provide ABI with updates on Company legal and accounting status as required by ABI during the term of this Engagement.

**10. INDEMNIFICATION.** Except to the extent attributable to gross negligence or willful misconduct by ABI, Client agrees to indemnify and hold harmless ABI, its employees, and agents against any liability, claim or expense attributable to the acts or failure to act of the Client arising out of or in connection with this Engagement or the services of ABI.

**11. DISPUTE RESOLUTION.** Any controversy or breach of this engagement will be resolved by arbitration, held in Boone County, Kentucky and governed by the laws of the Commonwealth of Kentucky. The accusing party will provide a written list of issues in dispute, delivered by certified U.S. Mail to the other party. If a satisfactory solution is not agreed upon within 30 days of the receipt of issues, the arbitration shall be dismissed without prejudice and the Parties will be entitled to seek resolution in court. The prevailing party shall be reimbursed for all costs incurred including costs of litigation or arbitration together with reasonable attorney's fees (interest to accrue at 10%).

**12. SEVERABILITY.** The invalidity or unenforceability of any particular provision of this Engagement in whole or in part will not affect any other provision.

Confidential



**13. ENTIRE AGREEMENT.** This Engagement is the entire Agreement between the Parties and any modification of this Engagement shall not be binding unless agreed to in writing by the Parties.

**14. COUNTERPARTS.** This Engagement may be executed by each Party separately, and when so executed, the combined copies will be deemed to be a complete Engagement between the Parties.

Accepted and agreed to this _3/27_ day of _March_, 2017.

**Aaron, Bell International, Inc.**          **Skilcraft LLC:**

_____          _____

Ralph Bellizzi, President.                    John Zurborg, CEO

**StillPoint Capital, LLC**
13051 W. Linebaugh Ave., Ste 101, Tampa, FL  33626
p.813-891-9100 f. 888-475-3088

_____
Signature

_____
Name, Title

_____
Date

| | |
|---|---|
| **From:** | Colin Cooper <CCooper@whitcraftgroup.com> |
| **Sent:** | Wednesday, September 06, 2017 10:04 AM |
| **To:** | John Rowell |
| **Cc:** | Joe Maisto; Blitzer, Noah |
| **Subject:** | Skilcraft LOI |
| **Attachments:** | Skilcrraft LOI.pdf |

John-

Attached please find our executed LOI. We are excited for this opportunity and we look forward to getting this transaction completed. Please feel free to call with any questions that might arise.

Best

-Colin

---

## WHITCRAFT GROUP  *  PARTNERS IN AEROSPACE

• Berkshire Manufactured Products Inc. • Connecticut Tool & Manufacturing LLC • Whitcraft LLC •

This e-mail and any attachment is intended only for the exclusive and confidential use of the addressee(s). If you are not the intended recipient, any use, interference with, disclosure or copying of this material is unauthorized and prohibited. If you have received this message in error, please notify the sender by return e-mail immediately and delete the message from your computer without making any copies.



1

RW000053981

   

September 5, 2017

Mr. John Rowell
EVP and COO
Aaron, Bell International, Inc.
9101 E. Kenyon Ave, Suite 2300
Denver, CO 80237

Dear Mr. Rowell:

Thank you again for introducing us to Skilcraft Holding's Aerospace business ("Skilcraft Aero" or the "Company"). We enjoyed our meeting with Jay Vierling and John Zurborg on July 21, 2017. Additionally, we appreciate the time the Aaron, Bell team and management have spent answering our questions and helping us better understand the business and its opportunities. As described below, we support management's vision for the Company and believe partnering with the management team represents a special opportunity to participate in, and help, Skilcraft achieve its goals.

Under the leadership of Jay and John, the team has done an outstanding job of taking the necessary actions to execute an operational and financial start-up of this aerospace business. We are impressed with management's knowledge, capabilities and accomplishments to date and this very much drives our enthusiasm about bringing Skilcraft Aero into the Whitcraft family of companies. The Company appears well-positioned for growth as the senior team has done an outstanding job of developing a leading supplier of brackets on the fastest selling large commercial aerospace engine in the world.

We are confident that Whitcraft can supplement Skilcraft Aero with resources required to execute its strategy going forward. Whitcraft, with the support of Greenbriar Equity Group ("Greenbriar") and Whitcraft's financing partners, is particularly well qualified to efficiently consummate a transaction to acquire Skilcraft Aero.

We are pleased to have this opportunity to submit this letter of intent ("LOI") to acquire Skilcraft Holding's Aerospace business. We believe the Company is an excellent fit with our existing aerospace businesses and meets our acquisition criteria of aligning with our core competency (sheet metal forming and fabrication) and our major market (aerospace, with a focus on the engine sector).

RW000053982

Mr. Rowell
September 5, 2017
Page 2 of 3

## Value and Form of Consideration

Based on our due diligence to date, we have refined our view on value and we propose to acquire specified assets, contracts, employees and personal property of Seller (excluding cash), tangible and intangible, that are used in or relate to Seller's business or that are necessary to operating Seller's business along with any ordinary course operating accounts payable and accrued expenses of the Company for a total value of $28 million in an all-cash transaction assuming a cash-free, debt-free balance sheet. Our proposal assumes that (i) all existing indebtedness of the Company will be retired at closing; (ii) diligence will support the forecast provided to us; (iii) the Company will be operated in the ordinary course prior to closing; (iv) the Company will have appropriate working capital and net tangible asset levels at closing; (v) a transition services agreement will be put in place to ensure an orderly separation; (vi) an employment agreement with John Zurborg, and any other key employees as reasonably determined by both parties, will be put in place (vii) the Company's customers will agree to assign its current aerospace contracts and LTA's to the successor company upon similar terms and conditions and (viii) each of the parties will bear its own expenses in connection with the transaction.

## Approvals / Sources of Financing

This proposal has been fully reviewed by Whitcraft's senior management and Greenbriar Directors. Greenbriar is the controlling shareholder of Whitcraft and manages a committed capital fund that does not require any form of shareholder or other corporate approval to complete the proposed transaction.

Whitcraft's existing lender, Golub Capital, has been working alongside our team and is excited to support Whitcraft in this acquisition. We will finance this transaction through a combination of operating cash flow at Whitcraft, Whitcraft's existing credit facilities which include a committed acquisition facility, and additional equity from Greenbriar.

## Due Diligence and Timing

Whitcraft and Greenbriar are highly familiar with the Company's products, capabilities, and customers. We have completed much of our due diligence to date and we are prepared to devote the necessary resources to expeditiously complete our remaining due diligence and negotiate definitive transaction documentation. To reach a definitive transaction we would expect to i) receive the remainder of our currently outstanding due diligence information requests; ii) a follow-up visit the Company's facility to review the forecast and headcount required to run the standalone business; and iii) complete some limited confirmatory legal, tax, environmental and IT due diligence. We also will need to work with the Company to prepare a summary quality-of-earnings report to facilitate accessing our existing committed acquisition credit facility. We believe these workstreams can all be completed promptly and concurrently with negotiation of definitive documentation.

## Exclusivity

Given the significant commitment of time and resources required to quickly and efficiently complete our remaining due diligence of the Company, we require a period of 75 days of exclusivity to complete our due diligence and reach a definitive agreement. During the exclusivity period, the Company and its stockholders, directors, officers, employees, representatives, agents and advisors shall negotiate exclusively with Whitcraft to complete the transaction. The Company will not, and will cause each of its stockholders, directors, officers, employees, representatives, agents and advisors not to, directly or indirectly, solicit proposals or indications of interest from, enter into negotiations with, provide confidential information to, or approve a transaction with any other person, firm, or entity regarding the acquisition or investment in the Company (whether by merger, consolidation, sale of stock or

Mr. Rowell
September 5, 2017
Page 3 of 3

assets or otherwise).  Upon execution of this letter, the Company will, and the Company shall cause its stockholders, directors, officers, employees, representatives, agents and advisors to, terminate all discussions with any other party regarding a potential transaction or investment.

Conditions
This letter of intent does not constitute any obligation on behalf of Whitcraft or Greenbriar to acquire, or otherwise engage in any transaction with, the Company. Such obligation will only be evidenced by a definitive written agreement providing for such acquisition or transaction. The existence and terms of this letter of intent may not be disclosed to any third party without Greenbriar's prior consent.

We are genuinely enthusiastic about the opportunity to invest in the Company and believe that the Company would be an attractive and strategic addition to Whitcraft. We are prepared to move quickly and we thank you for your consideration and look forward to hearing from you shortly.

Sincerely,

WHITCRAFT HOLDINGS, INC.                    SKILCRAFT HOLDING, LLC

Colin Cooper                                                        Jay Vierling
CEO

RW000053984

| | |
|---|---|
| **From:** | John Zurborg <jzurborg@skilcraft.com> |
| **Sent:** | Friday, November 10, 2017 4:52 PM |
| **To:** | John Rowell |
| **Subject:** | RE: Skilcraft |

John

Thanks. I have a board meeting next week. we will be discussing our next step relative to Skilcraft.


Thanks

John Zurborg
859-816-1645

**From:** John Rowell [mailto:jrowell@aaron-bell.com]
**Sent:** Friday, November 10, 2017 4:14 PM
**To:** John Zurborg <jzurborg@skilcraft.com>
**Subject:** Fwd: Skilcraft


Sent from my iPhone

Begin forwarded message:

> **From:** "Bill McLendon" <bmclendon@etitechinc.com>
> **Date:** November 10, 2017 at 4:03:32 PM EST
> **To:** "John Rowell" <jrowell@aaron-bell.com>
> **Cc:** <jhartman@etitechinc.com>
> **Subject: Skilcraft**
>
> John,
>
> Our team spent a great deal of time looking at Skilcraft from all angles.   As you know, there are a many of aspects of the company we like very much, beginning with John and Chuck.  Nonetheless, the business is still in the midst of significant transition, with more big changes just around the corner.  While those changes represent important steps forward for the business, they also introduce a current level of uncertainty that precludes us from making an offer for the business which is near the range we previously discussed.
>
> In short, we have elected to pass on Skilcraft at this time.  When Skilcraft has another year of GE experience in the new facility, plus a strategic agreement with another key OEM underway, the situation will be quite different.  At that time, we would gladly entertain the prospect of re-engaging should the opportunity present itself .
>
> We wish you all the best with this process.  Please pass our thanks again to John and Jay.

**DEFENDANT'S EXHIBIT**
10
JKS 11/1/9
FBNGAD 800-631-6989

1

RW000053388

Kind Regards,

Bill

Bill McLendon
President and CEO
ETI Tech, LLC
o: 937.832.4200
c: 864.567.2481
bmclendon@etitechinc.com
www.etitechinc.com



2

CONFIDENTIAL

RW000053389

**From:**          John Zurborg <jzurborg@skilcraft.com>
**Sent:**          Tuesday, December 05, 2017 4:03 PM
**To:**            John Rowell; Ralph Bellizzi
**Cc:**            Chuck Horning; shendrix@hendrixcpas.com; Jay, Vierling
**Subject:**       Notification of Skilcraft LLC Aaron Bell Termination
**Attachments:**   Aaron Bell Termination Letter 12 5 2017.pdf

**Importance:**    High


John and Ralph

Please see the attached termination letter for Project Stone.
Please confirm receipt of this notification as required in the Investing Banking Agreement section 4.


Sincerely,

John M. Zurborg
Skilcraft LLC
President & CEO
5184 Limaburg Rd.
Burlington, KY 41005
Phone Mobile: 859-816-1645
Office: 859-372-8662
Email: jzurborg@skilcraft.com
Web: www.skilcraft.com

1



CONFIDENTIAL



December 5, 2017

Mr. John Rowell
Mr. Ralph Bellizzi
Aaron, Bell Incorporated
9101 East Kenyon Ave, Suite #2300
Denver, CO 80237

Dear John and Ralph:

This letter serves as termination as required in Section 4, Term and Termination, of the attached Investing Banking Agreement signed between Skilcraft LLC and Aaron Bell.

The termination is for "2 Negotiations are terminated with all Prospects introduced during the term of the contract".


We appreciate the efforts put forth to represent Skilcraft LLC through Project Stone.

Sincerely,

John M. Zurborg
President & CEO

RW000066130



# INVESTMENT BANKING ENGAGEMENT

This Engagement is being entered into between Aaron, Bell International, Inc. 9101 E. Kenyon Ave., Suite 2300, Denver, CO 80237, StillPoint Capital, LLC, 13051 West Linebaugh Ave., Tampa, FL 33626, an SEC Registered broker-dealer and member of the Financial Industry Regulatory Authority, (collectively, "ABI") and Skilcraft LLC, 5184 Limaburg Rd. P.O. Box 896 Burlington, KY 41005 and its owners, shareholders and assigns in interest as well as any other party acting upon instructions from, or on behalf of, Shareholders (collectively, "Client"). ABI and Client are collectively "Parties".

**1.  SCOPE AND DUTIES.  Client engages ABI to represent Client** exclusively and provide comprehensive investment banking services for the purpose of successfully completing a recapitalization, merger, acquisition, purchase of the company's stock or assets, or other financial restructuring (collectively, "Transaction") and **on terms approved by the Client.** Any party introduced by ABI or by the Client for the purpose of entering into such a Transaction will be referred to as "Prospect". Client will pre-approve all potential strategic buyer prospects before they are contacted by ABI.

1.1 ABI agrees to keep all information conveyed to it, whether verbal or in writing, as confidential.  ABI agrees to obtain Confidentiality Agreements from all Prospects prior to divulging confidential information.

1.2 ABI agrees to provide written or verbal reports as preferred by Client. These reports will set forth the status of marketing materials, Prospects contacted, status of negotiations with Prospects and such other information that the parties consider significant.  ABI may include an affiliate in servicing this Engagement.  Any fees due Affiliate are paid by ABI.

1.3 ABI agrees that the work and services provided by ABI will include John Rowell as the main advisor (which is understood between the parties that John Rowell is personally involved in all activities of identifying / interfacing with potential acquirers, working directly with Skilcraft through the preparation and sale, LOI, and closing process) unless there are circumstances that arise that are beyond ABI control.

**2.  INFORMATION AND DATA.**  Based on information provided by client, ABI will draft marketing materials and documents for this Transaction which will be submitted to the Client for review, revision and approval prior to distribution.

2.1. Client will cooperate fully with ABI to negotiate a successful Transaction.  Client will timely furnish ABI with complete, accurate, and not misleading business information as required for this transaction.  Client will promptly inform ABI of any Prospects contacting Client and direct the Prospect to contact ABI.  Client will promptly inform ABI of any material change to Client's Transaction objectives and business operating performance.  Client recognizes that any inaccurate or misleading information supplied to Prospect could result in a reduction in value, termination of the Transaction, and a possible legal action by Prospect after Closing.  By executing this Engagement, Client is representing and warranting that it has the legal right and authority to enter into this Engagement.

**3. NON-CIRCUMVENTION.**  Client will not circumvent this Engagement and will refer to ABI all parties who express an interest in a Transaction during the term of this Engagement.

**4. TERM AND TERMINATION.**  This Engagement will be in effect for twelve (12) months commencing on the Effective Date.  After twelve (12) months, either Party may terminate this engagement upon thirty (30) days written notice.  Prior to 12 months, this Engagement will not terminate until (1) a Transaction is consummated or (2) negotiations are terminated with all Prospects introduced during the term of the contract, or unless (3) Client wishes to pursue termination of ABI for gross negligence.  If Client suspects gross negligence Client will deliver written notice to ABI about such issue. ABI will have 30 days to cure the issue to Client's satisfaction before Client may trigger the Dispute Resolution process in Section 11 below.  Upon termination of this Engagement, a "Holdover Period" of eighteen (18) months will commence. If, during the term of this Agreement and the Holdover Period, Client completes a Transaction with a Prospect, ABI will be entitled to its fees in accordance with section 6 below.  ABI will provide Client with a list of all Prospects to be considered

---

CONFIDENTIAL

RW000066131

Confidential



for the Holdover Period.  Client shall provide ABI with a complete executed copy of the closing documents for a Transaction to which this Engagement applies.

**5. TRANSACTION VALUE.**  "Transaction Value" is the total consideration of all economic benefits to be received directly or indirectly by Client as a result of this Transaction, including, but not limited to: cash, cash equivalents, notes made to Client or successor beneficiaries, financial institution or other long term liabilities assumed by the acquirer, assets transferred, leased, or retained by Client, earn-outs, royalties, real and intellectual property sold or leased, employment, consulting, or management agreements , non-competition agreements, and fair market value of other assets that are received in exchange for Client's assets.  The value of any asset tendered to Client as compensation as a result of the Transaction shall be included in the consideration for determining the Success Fee due ABI by utilizing its fair market value.  If payments are made that increase pre-existing employment, consulting or management agreements by more than 20%, then the increase only from pre-existing amount shall contribute to Transaction Value.

**6. FEES.**  Client agrees to pay fees to ABI for services during this Engagement or the Holdover Period.  ABI's fee will be based on the total consideration received by the Client for the Transaction calculated as follows:

6.1 SUCCESS FEE. Upon concluding a Transaction covered by this Engagement, Client agrees to pay ABI a fee ("Success Fee"), which will be:

6.1.1 Two hundred thousand dollars ($200,000) for Transaction services, plus three percent (3%) of the Total Transaction Value, plus:

6.1.2 BONUS.  ABI may receive a bonus if Client receives a premium value. The total Success Fee for the portion of the Transaction Value amount exceeding the amounts set forth below shall be ten percent (10%);

   a)   $30 million, if only the aerospace related piece of the company is sold, or
   b)   $35 million if the entire company is sold.

   Real Estate value will NOT be included in the Bonus calculation.

6.1.3 REAL ESTATE. ABI will receive a fee equal to four percent (4%) of the total real estate value for all real estate transactions (lease (capped at total of three years lease payment) and/or sale) concluded as part of this Transaction. Client agrees to take any other actions reasonably required by ABI to comply with applicable Real Estate Law.

For example if the business (without any real estate included) is sold for $30 million the fee would equal $200,000 plus $900,000 (3% x $30million) for a total of $1,100,000 less fees already paid in 6.2 and 6.3.

6.2 ADVISORY SERVICES. Client agrees to make the following "Advisory Progress Payments" in a timely manner for services rendered:

| | |
|---|---|
| 6.2.1. After Client's review and approval of ABI's strategic research, Prospect list to include strategic and institutional contacts, and establish data room. | $ 10,000 |
| 6.2.2. Upon ABI completion and Client approval of confidential (coded) Executive and Financial Summaries. | $ 10,000 |
| 6.2.3. Upon ABI completion and Client approval of a Confidential Information Memorandum. | $ 10,000 |
| 6.2.4. Upon Client and Prospect meeting, negotiating, and signing a Letter of Intent or agreement to proceed in good faith with due diligence to Closing. | $ 20,000 |

CONFIDENTIAL

RW000066132

Confidential



6.3 CLIENT CREDIT AND PRE-APPROVED EXPENSES. All Client payments to ABI will reduce the Success Fee due ABI at closing.  No expenses shall be incurred unless approved by Client in advance. Reimbursement due ABI for pre-approved expenses will be deducted from an expense advance of $2,500, due upon receipt of invoice.  Client hereby approves virtual data room expenses of $250.00 per month.  Client agrees to restore the expense advance upon receipt of an email invoice from ABI.  All payments are due upon receipt of invoice and shall be made by a no fee electronic funds transfer (EFT) into an account designated by ABI.

6.4 Client agrees that the closing agent or attorney concluding this Transaction will provide ABI with payment of the amounts due ABI at closing in full, by bank wire transfer from proceeds due Client on the day of closing and will be paid in full without discount for the efforts of Client or any other person.  Client shall provide ABI with a copy of all completed and executed Transaction documents.  ABI shall be entitled to payment of the Success Fee on the Transaction Value as it is received by Client; specifically, any part of the Transaction Value that is contingent, including any amount payable under an earn-out arrangement shall only be due and owing upon Client's being entitled to payment of any such contingent amounts.  ABI will be entitled to receive at closing any Success Fee due on any holdback held in escrow amount up to 5% of the Transaction Value.  The balance of any Success Fees due to ABI from any holdback in escrow in excess of 5% of the Transaction Value will be payable to ABI as Client receives it, (at the original holdback amount).

**7. SECURITIES TRANSACTION.**   Client acknowledges that this transaction may be structured as the sale of stock or other transaction subject to federal and state securities laws.  In such event, federal and state securities laws will apply to the transaction, and it may become necessary that the transaction be handled through a securities broker/dealer licensed with the United States Securities and Exchange Commission, state securities regulators, and the Financial Industry Regulatory Authority (FINRA).Client further acknowledges that this Engagement will automatically, with no further action required by either Client or ABI, be assigned to StillPoint Capital, LLC ("SPC") if the transaction is (i) structured as a stock sale or otherwise deemed to constitute a security under Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange Act") and (ii) required to be conducted under the supervision of a broker-dealer registered pursuant to Section 15(b) of the  Exchange Act.

If it is deemed required as a part of the transaction to be conducted as a stock sale, then due diligence will be performed to meet the standards required.

**8. NOTICES.**  All notices to be given to the parties hereto shall be properly given if sent by fax transmission, personal service, or certified mail addressed to the parties at their respective addresses.  Notice shall be effective on the date sent and receipt confirmed.

| | |
|---|---|
| To Skilcraft LLC: | To ABI: |
| John Zurborg | Ralph Bellizzi |
| CEO Skilcrfat | President |
| 5184 Limaburg Rd. P.O. Box 896 | 9101 East Kenyon Ave, Suite #2300 |
| Burlington, KY 41005 | Denver, CO 80237 |

**9. COOPERATION.**   The Parties make no representation that a Transaction will result from this Engagement.  Client will engage appropriate professionals for legal and tax opinions for their Transaction.  Client will introduce ABI to Client's legal and accounting professionals upon request of ABI, and will direct these professionals to provide ABI with updates on Company legal and accounting status as required by ABI during the term of this Engagement.

**10. INDEMNIFICATION.**   Except to the extent attributable to gross negligence or willful misconduct by ABI, Client agrees to indemnify and hold harmless ABI, its employees, and agents against any liability, claim or expense attributable to the acts or failure to act of the Client arising out of or in connection with this Engagement or the services of ABI.

**11. DISPUTE RESOLUTION.**   Any controversy or breach of this engagement will be resolved by arbitration, held in Boone County, Kentucky and governed by the laws of the Commonwealth of Kentucky.  The accusing party will provide a written list of issues in dispute, delivered by certified U.S. Mail to the other party.  If a satisfactory solution is not agreed upon within 30 days of the receipt of issues, the arbitration shall be dismissed without prejudice and the Parties will be entitled to seek resolution in court.  The prevailing party shall be reimbursed for all costs incurred including costs of litigation or arbitration together with reasonable attorney's fees (interest to accrue at 10%).

**12. SEVERABILITY.**  The invalidity or unenforceability of any particular provision of this Engagement in whole or in part will not affect any other provision.

Confidential



**13. ENTIRE AGREEMENT.** This Engagement is the entire Agreement between the Parties and any modification of this Engagement shall not be binding unless agreed to in writing by the Parties.

**14. COUNTERPARTS.** This Engagement may be executed by each Party separately, and when so executed, the combined copies will be deemed to be a complete Engagement between the Parties.

Accepted and agreed to this _2/27_ day of _March_, 2017.

**Aaron, Bell International, Inc.**                    **Skilcraft LLC:**

_____              _____

Ralph Bellizzi, President.                             John Zurborg, CEO

**StillPoint Capital, LLC**
13051 W. Linebaugh Ave., Ste 101, Tampa, FL  33626
p.813-891-9100 f. 888-475-3088

_____
Signature

_____
Name, Title

_____
Date

Aaron, Bell International, Inc.

RW000066134

**From:**          John Zurborg <jzurborg@skilcraft.com>
**Sent:**          Monday, November 27, 2017 11:27 AM
**To:**            John Rowell
**Subject:**       RE: Project Stone Wrap UP

Washington Square, Burlington, 7:15.
See you there


Thanks

John Zurborg
859-816-1645

**From:** John Rowell [mailto:jrowell@aaron-bell.com]
**Sent:** Monday, November 27, 2017 11:16 AM
**To:** John Zurborg <jzurborg@skilcraft.com>
**Subject:** RE: Project Stone Wrap UP

Yes,

Where / what time?

John.

**From:** John Zurborg [mailto:jzurborg@skilcraft.com]
**Sent:** Monday, November 27, 2017 10:52 AM
**To:** John Rowell <jrowell@aaron-bell.com>
**Subject:** RE: Project Stone Wrap UP

John

I have an appointment Thursday. I can meet for breakfast if that works on Thursday?


Thanks

John Zurborg
859-816-1645

**From:** John Rowell [mailto:jrowell@aaron-bell.com]
**Sent:** Monday, November 27, 2017 10:50 AM
**To:** John Zurborg <jzurborg@skilcraft.com>
**Subject:** RE: Project Stone Wrap UP

John,

1



CONFIDENTIAL                    RW000067627

This Thursday?

You name the time and place.

John.

**From:** John Zurborg [mailto:jzurborg@skilcraft.com]
**Sent:** Monday, November 27, 2017 10:43 AM
**To:** John Rowell <jrowell@aaron-bell.com>
**Subject:** RE: Project Stone Wrap UP

John
I'm good for meeting for a lunch in the next week to discuss the below.


Thanks

John Zurborg
859-816-1645

**From:** John Rowell [mailto:jrowell@aaron-bell.com]
**Sent:** Monday, November 27, 2017 10:40 AM
**To:** John Zurborg <jzurborg@skilcraft.com>
**Subject:** RE: Project Stone Wrap UP

John,

I thought'd we could chat about ..

-   Status ... what is your firm action plan from / after the board meeting
    o   Business level to be achieved before remarketing
-   What if opportunistic buyers emerge?
-   Feedback between you/me ... what worked / didn't work

Doesn't need to be too formal, maybe I can meet you for lunch.

John.


**From:** John Zurborg [mailto:jzurborg@skilcraft.com]
**Sent:** Monday, November 27, 2017 8:53 AM
**To:** John Rowell <jrowell@aaron-bell.com>
**Subject:** Project Stone Wrap UP

John

Last week you recommended we do a project stone wrap up.
What would the agenda be for this? If you can outline an agenda I'd appreciate it.
At the board meeting there was discussion of taking "lessons learned" and building them into how we manage the business going forward until we decide to go to market again.

2

RW000067628

I would appreciate this process.

Thanks and have a great day!

Sincerely,

John M. Zurborg
Skilcraft LLC
President & CEO
5184 Limaburg Rd.
Burlington, KY 41005
Phone Mobile: 859-816-1645
Office: 859-372-8662
Email: jzurborg@skilcraft.com
Web:  www.skilcraft.com

3

CONFIDENTIAL

RW000067629

**From:** John Zurborg <jzurborg@skilcraft.com>
**Sent:** Monday, December 11, 2017 2:53 PM
**To:** John Rowell
**Subject:** GM of Andrews

John

I'd like to ask for an introduction to Nick.
Thanks

Sincerely,

John M. Zurborg
Skilcraft LLC
President & CEO
5184 Limaburg Rd.
Burlington, KY 41005
Phone Mobile: 859-816-1645
Office: 859-372-8662
Email: jzurborg@skilcraft.com
Web: www.skilcraft.com

1



RW000066097

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC.,
a Colorado corporation,

               Plaintiff,

v.

JOHN ROWELL,

               Defendant.

---

## PROTECTIVE ORDER

---

Under Federal Rule of Civil Procedure 26 and this Court's Practice Standards with respect to protective orders, upon a showing of good cause in support of the entry of a protective order to protect the discovery and dissemination of confidential, proprietary, and trade-secret information or information that will improperly annoy, embarrass, or oppress any party, witness, or person providing discovery in this case, this Protective Order shall govern the handling of discovery documents and information, which shall consist of documents (as defined in Federal Rule of Civil Procedure 34(a)(1)), including electronically stored information, depositions, deposition exhibits, interrogatory answers, admissions, and any other materials produced, given, or exchanged by and among the parties and any nonparties in connection with this action (collectively "Information"), and it is hereby ordered that:

    1.     Information designated as "Confidential" or "Attorneys' Eyes Only" shall be used solely for purposes of preparation and trial of this action and any related proceeding (inclusive of appellate proceedings) (the "Litigation") and for no other purpose, including without limitation

any commercial or business purpose, absent the prior written consent of the designating party, or leave of the Court.

2.  The term "Producing Party" shall mean any party or nonparty who produces or discloses Information in the Litigation. The term "Receiving Party" shall mean any person to whom Information is produced or disclosed in the Litigation.

3.  Information may be designated "Confidential" by a Producing Party's counsel if there is a good-faith basis to believe the Information reflects, refers to, or evidences common-law or statutory privacy or confidentiality interests, such as a trade secret or other confidential or proprietary research, development, or commercial information.

4.  Information that qualifies for designation as "Confidential" may be designated by a party's counsel as "Attorneys' Eyes Only" if the designating party in good-faith deems the Information to be particularly sensitive, so that even its limited disclosure could cause the designating party harm due to the protected or particularly sensitive nature of the Information.

5.  All documents, electronically stored information, and tangible items designated "Confidential" or "Attorneys' Eyes Only" shall include a conspicuous stamp on each page or separate item by the Producing Party of "Confidential" or "Attorneys' Eyes Only." The designation shall be made at the time of delivery of the Information to the Receiving Party or as provided in Paragraph 14. Where a Receiving Party designates Information as "Confidential" or "Attorneys' Eyes Only," the Receiving Party will notify the other parties to the Litigation of the designation within 14 days of receiving the documents. In that instance, the Receiving Party will also within 14 days re-produce replacement pages of the designated documents with the appropriate confidentiality stamps.

6.    "Confidential" or "Attorneys' Eyes Only" designations shall be limited to specific

Information that qualifies under the appropriate standards. To the extent it is practical to do so,

the designating party must designate for protection only those parts of documents or oral or

written communications that qualify—so that other portions of the documents or

communications for which protection is not warranted are not swept within the ambit of this

Order.

7.    "Confidential" Information, including any summaries or reproductions of the

Information, shall be inspected or disclosed solely to the following:

a.    The parties' outside counsel and in-house counsel, and employees of

said counsel who are assisting in the conduct of the Litigation;

b.    the parties;

c.    experts retained to testify at trial or consultants retained or engaged by

the parties in preparation for trial (collectively "Consultants") and

persons in their employ who are assisting in the conduct of this

Litigation;

d.    the Court and its personnel, including any appellate court;

e.    court reporters, stenographic reporters, or video operators engaged by a

party for purposes of the Litigation;

f.    outside photocopying, translation, document management, and exhibit

preparation, trial services, or other professional vendors the parties

engage for purposes of the Litigation;

g.    witnesses in the Litigation to whom disclosure is reasonably necessary;

h.    persons who either prepared or previously received or had lawful access to the Information, provided that preparation or previous receipt of the Information is indicated on the Information or is otherwise established in discovery; and

i.    any other person agreed to in writing by the Producing Party.

8.    "Attorneys' Eyes Only" Information, including any summaries or reproductions of the Information, shall be inspected or disclosed solely to the following:

a.    The parties' outside counsel and employees of said outside counsel who are assisting in the conduct of the Litigation;

b.    Consultants as defined above, and persons in their employ who are assisting in the conduct of this Litigation, who are not directors, officers, shareholders, or employees of the Receiving Party, and are not expected to become directors, officers, shareholders, or employees of the Receiving Party;

c.    the Court and its personnel, including any appellate court;

d.    court reporters, stenographic reporters, or video operators engaged by a party for purposes of the Litigation;

e.    outside photocopying, translation, document management, and exhibit preparation, trial services, or other professional vendors the parties engage for purposes of the Litigation;

f.    persons who either prepared or previously received the Information, provided that preparation or previous receipt of the Information is indicated on the Information or is otherwise established in discovery; such

4

persons may only view the Information in the presence of outside counsel, and shall not retain any copies of the Information, which shall be retained solely by outside counsel of the Receiving Party; and

g.      any other person agreed to in writing by the Producing Party.

9.      Prior to disclosing any "Confidential" or "Attorneys' Eyes Only" Information to any Consultant, witness, or other person agreed to in writing by the Producing Party, counsel shall provide such person with a copy of this Protective Order and obtain from such person a signed Exhibit A stating that he or she has read this Protective Order and agrees to be bound by its provisions. All such signed copies of Exhibit A shall be retained by counsel for the duration of this Litigation and shall be subject to *in camera* review by the Court if good cause for review is demonstrated by the party alleging a breach of the Protective Order.

10.      Notwithstanding the foregoing, this Protective Order shall not (a) prevent any designating party from using or disclosing its own "Confidential" or "Attorneys' Eyes Only" Information as it deems appropriate; or (b) preclude or limit any party from the lawful use of any Information lawfully obtained from a source other than the designating party.

11.      Whenever a deposition involves "Confidential" or "Attorneys' Eyes Only" Information, the deposition transcript or portions thereof shall be designated as "Confidential" or "Attorneys' Eyes Only" and shall be subject to the provisions of this Protective Order. Such designations shall be made on the record during the deposition whenever possible, but a party may designate portions of depositions as "Confidential" or "Attorneys' Eyes Only" after transcription, provided that written notice of the designation is given to all counsel of record within 14 days after notice by the court reporter of the completion of the transcript, during which period of time the transcription shall be treated as "Confidential."

12. Any documents that contain information designated "Confidential" or "Attorneys' Eyes Only" by any party shall not be filed with the Court by any Receiving Party unless the Receiving Party has previously conferred with the Producing Party regarding the filing of such documents and the Producing Party has agreed to any necessary redactions to protect the Producing Party's confidential, proprietary, or trade-secret information. If the parties cannot agree to appropriate redactions, the party who intends to file the document must the document(s) under restricted access Level 1 according to D.C.COLO.LCiv 7.2. Under D.C.COLO.LCivR 7.2(e), such documents shall retain a Level 1 restriction for 14 days, during which time the Producing Party may file a motion to restrict access according to according to D.C.COLO.LCiv 7.2.

13. Any party may object to the designation of particular "Confidential" or "Attorneys' Eyes Only" Information by giving written notice to the designating party within 21 days of the receipt of the designated Information. The written notice shall specifically identify the Information to which the objection is made. If the parties cannot resolve the objection within 14 days after notice is received, the designating party may file an appropriate motion requesting that the Court determine whether the disputed Information should be subject to the terms of this Protective Order. The burden in such an application to the Court is on the designating party to demonstrate good cause why the Information is properly designated as "Confidential" or "Attorneys' Eyes Only." If such a motion is filed, the disputed Information shall be treated as "Confidential" or "Attorneys' Eyes Only" under the terms of this Protective Order until the Court rules on the motion.

14. If at any time prior to the trial of this action a party realizes that previously undesignated Information should be designated as "Confidential" or "Attorneys' Eyes Only," the party may so designate by advising all other parties in writing. The designated Information will

thereafter be treated as "Confidential" or "Attorneys' Eyes Only" pursuant to this Protective Order. Upon receipt of such designation in writing, each party shall take reasonable and appropriate action to notify any and all recipients of such Information regarding its protected status, and shall retrieve the newly designated Information from any person who is not permitted by this Protective Order to have such Information.

15.     Pursuant to Federal Rule of Evidence 502, which is incorporated by reference, if any party or nonparty inadvertently produces or provides Information that it believes is subject to a claim of attorney-client privilege, work product, or any other legally recognized privilege, the Producing Party may give written notice that the Information is subject to a claim of privilege and request that the Information be returned to the Producing Party. Each Receiving Party shall return the Information to the Producing Party, or confirm in writing destruction (or, for outside counsel, confidential, attorneys'-eyes-only archiving that removes the Information from further review or use in the litigation) of all electronic or paper copies of the Information, within 14 days. The return of the Information by a Receiving Party shall not constitute an admission or concession, or permit any inference, that the Information is properly subject to a claim of privilege. If a Receiving Party returning such Information does not agree with the privilege designation, the Receiving Party must notify the Producing Party in writing within seven days of returning the Information to the Producing Party, setting forth the reason for its belief that the Information is not privileged, and the parties shall meet and confer regarding the dispute within three days of the notification. If the dispute cannot be resolved between the parties, the Producing Party shall move the Court, within 14 days of the completion of such meet-and-confer efforts, to rule on the Information's status and shall produce a copy of the

Information to the Court for *in camera* inspection. No waiver shall be deemed to have occurred pending the Court's ruling on the Receiving Party's motion.

16.     If "Confidential" or "Attorneys' Eyes Only" Information is disclosed to any person other than in a manner authorized by this Protective Order, the party or person responsible for the disclosure shall, upon discovery, immediately inform the designating party, and shall work in good faith to retrieve the Information. This paragraph shall not limit the rights and remedies of the designating party.

17.     This Protective Order shall not prevent any Producing Party or Receiving Party from applying to the Court for further or other protective orders or for modification of this Protective Order, or from agreeing to modification of this Protective Order. Any agreed to modification shall be in writing, and signed by counsel on behalf of the parties.

18.     In the event additional parties join or are joined in this action, or additional or different counsel enter an appearance, they shall also be subject to the terms of this Protective Order.

19.     Within 60 days after the final termination of the Litigation, including all appeals, unless other arrangements are agreed upon in writing, each document and all copies thereof which that have been designated as "Confidential" or "Attorneys' Eyes Only" shall be returned to the party that designated it as such, or the parties may elect to destroy "Confidential" or "Attorneys' Eyes Only" documents. Where the parties agree to destroy "Confidential" or "Attorneys' Eyes Only" Information, counsel for the Receiving Party destroying such Information shall confirm the destruction in writing. However, each law firm representing a party or a witness may retain copies of all court pleadings and briefs containing "Confidential" or "Attorneys' Eyes Only" Information, copies of correspondence, copies of all transcripts

8

containing the Information, and copies of documents incorporating or referring to the Information which are inextricably intermingled with the work product of that party's counsel. All documents retained by counsel shall remain subject to this Protective Order. The Court shall retain jurisdiction to enforce this Protective Order after the termination of the Litigation.

20.　　If a Receiving Party or Consultant in possession of Confidential or Attorneys' Eyes Only Information receives a subpoena from a nonparty to the Litigation seeking production or other disclosure of the Information, written notice shall be given to counsel for the Producing Party by the earlier of seven days after such receipt or seven days before response to the subpoena is due, identifying the Information sought and providing the Producing Party a copy of the subpoena. Where possible, at least seven days' notice before production or other disclosure shall be given. In no event, absent Court order, shall production or disclosure be made before notice is given. This Protective Order shall not be construed as requiring the Receiving Party to seek relief from the subpoena or to challenge or appeal any order of a court of competent jurisdiction requiring production of the Information at issue.

21.　　The fact of designation of any Information by any party as "Confidential" or "Attorneys' Eyes Only" shall not be deemed an admission for purposes of this Litigation, and shall not constitute admissible evidence at trial.

22.　　This Protective Order may be modified by the Court at any time for good cause shown following notice to all parties and an opportunity for them to be heard.

DATED:　___October 16,_____, 2018.

BY THE COURT

R. Brooke Jackson
U.S. District Court Judge

9

# Exhibit B

| | |
|---|---|
| **From:** | Aguilar, Arlene <aaguilar@littler.com> |
| **Sent:** | Wednesday, January 10, 2018 6:02 PM |
| **To:** | johnrowell@embarqmail.com |
| **Cc:** | Kitson, Danielle L.; Baumann, Stephen E.; Grabowski, Douglas P. |
| **Subject:** | Breach of Legal Obligations to Aaron, Bell International, Inc. |
| **Attachments:** | 2018.01.10 John Rowell.pdf; John Rowell Transition Employment Agreement.pdf |

Please see the attached letter.  A hard copy will follow via FEDEX.  Thank you.

**Arlene Aguilar,** Legal Secretary
303.362.2857 direct   303.942.3961 fax   aaguilar@littler.com
1900 Sixteenth Street, Suite 800 | Denver, CO 80202-5835

 | littler.com
**Employment & Labor Law Solutions Worldwide**

--------------------------
This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

1

RW000030994



Littler Mendelson, P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202

Danielle Kitson
303.362.2872 direct
303.629.6200 main
303.362.5608 fax
dkitson@littler.com

January 10, 2018

**VIA ELECTRONIC MAIL AND FEDEX**

John Rowell
6274 Blackheath Circle
Mason, OH 45040
jrowell@aaron-bell.com

Re:   **Breaches of Your Legal Obligations to ABI and Your Transition Employment Agreement and Release of All Claims**

Dear Mr. Rowell:

Our firm represents Aaron, Bell International, Inc. ("ABI") with respect to your ongoing breaches of your Transition Employment Agreement and Release of All Claims dated September 12, 2017 (the "Agreement"). I have enclosed a copy of the Agreement to remind you of your obligations.

ABI has become aware that, during the term of your Agreement, you have intentionally subverted and attempted to divert the transaction that ABI carefully developed with Skilcraft LLC—the very existence of which is confidential, proprietary, and trade secret information—openly disparaged and defamed ABI, worked with a competing investment bank to usurp the Skilcraft transaction, and tortiously interfered with ABI's contractual and prospective business relationship with Skilcraft.

**As such, you are in immediate and continuing breach of your Agreement, the federal Defend Trade Secrets Act, the Colorado Uniform Trade Secrets Act, and numerous other federal and state laws.** <u>**ABI is exercising its prerogative to terminate your Agreement for "Cause" under paragraph III.B.**</u> **Under your Agreement and** <u>**applicable federal and state law, you must immediately cease use and transmission**</u> <u>**of all ABI documents or other information in your possession, custody, or control**</u>**. Any further use or transmission of such documents or information to a third party, will subject to you additional legal liability.** <u>**Please contact me no later than 5:00**</u> <u>**pm MDT on Friday, January 12, 2018, to discuss the forensic imaging of your laptop**</u> <u>**computer, telephone, and any other electronic storage devices containing ABI**</u> <u>**information, the safe return of all ABI documents and electronically stored**</u> <u>**information, and your repayment of all commissions, compensation, and other**</u> <u>**damages to ABI caused by your breach of contract and tortious conduct**</u>**.**

RW000030995

John Rowell
January 10, 2018
Page 2

If you do not contact me before that time, ABI will be forced to pursue all remedies available to it to protect its confidential, proprietary, and trade secret information, to recover any damages incurred to date, and to prevent any further damage to its business. Among other things, ABI will seek emergency relief from a court to ensure return of its property, including seeking immediate orders of possession to be executed by law enforcement under 18 U.S.C. § 1836(b) and C.R.C.P. 104.

Further, I wish to remind you of your immediate and continuing obligations to return all of ABI's property and to preserve all documents, electronically stored information ("ESI"), and tangible things in your possession, custody, or control that may relate any way to your previous work with ABI or any of your communications with or regarding Skilcraft.

## I.  ABI is immediately terminating your Agreement for "Cause."

Section III.B. of your Agreement provides:

> At all times until the Resignation Date, Employee's employment may be terminated by ABI at any time for Cause.

"Cause" is defined by Section II.C. of your Agreement to mean, among other things: (1) "misconduct, including embezzlement or fraud"; (2) "willful and material violations of ABI's policies"; and (3) "material breach of this Agreement."

Because ABI has learned that you engaged in misconduct that violated your legal obligations to ABI, violated ABI's policies, and breached your Agreement, ABI is terminating your Agreement effective January 10, 2018. Among other things, ABI has learned that you have stolen ABI's confidential, proprietary, and trade secret information with respect to Skilcraft, openly disparaged ABI's business and capabilities and defamed ABI, and tortiously interfered with ABI's current or prospective contracts. As just one example, ABI is aware that you described ABI to Skilcraft as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs. ABI reasonably believes that you did so with the intent that Skilcraft terminate its Investment Banking Engagement Agreement with ABI, in order to move the transaction with you after you left ABI.

In doing so, you have also violated Section III.H. of your Agreement, captioned "Confidential Information and Competition," as well as Section III.K., captioned "Non-Disparagement." Separate from the violations of your legal obligations and ABI's policies referenced below, these breaches of your Agreement provide immediate cause to terminate your Agreement.

Section III.H. of your Agreement provided:

RW000030996

John Rowell
January 10, 2018
Page 3

**Employee's right to receive the benefits of this Agreement is contingent upon Employee's compliance with the terms following Confidentiality protections, which shall survive the end of Employee's employment and be in full force and effect for two (2) years following the Resignation Date:**

> **Employee will hold in strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not an employee of ABI or to any employee of ABI that does not have access to said Confidential Information, without express written permission from ABI's President. Confidential Information shall mean any trade secrets or ABI proprietary information, including, but not limited to techniques, processes, operating methods, cost, pricing, financial data, business plans and proposals, customer lists, data and information that ABI receives in confidence from any other party, or any other secret or confidential matters of ABI.**
>
> **Employee agrees that he shall not, during the continuance of this Agreement and within two (2) years after the termination of this Agreement use his position at ABI and /or knowledge gained in his position at ABI to 1) benefit himself or other third party to the detriment of ABI 2) divert or attempt to divert from ABI any business that ABI has, to the knowledge of Employee, enjoyed from any other individuals or entities** and/or 3) solicit or induce any employee or ABI to cease employment with ABI.  Employee shall not use his knowledge of the ABI marketing pipeline to solicit individuals or entities.

(emphasis added).  Your use of confidential, proprietary, and trade secret information about the very existence of the transaction with Skilcraft for your own benefit violates this provision.

Furthermore, Section III.K., captioned "Non-Disparagement," is clear that "**Employee agrees not to disparage ABI Entities's products, abilities, or services**" (emphasis added).  Your clear disparagement of ABI and its capabilities to Skilcraft directly violates this provision.

Therefore, given these breaches, ABI is terminating your Agreement for "Cause" effective January 10, 2018.  Because the Agreement is being terminated for "Cause," you will not be entitled to any of the Severance Benefits referenced in Section III.C. and Exhibit A to your Agreement.  Furthermore, as discussed below, ABI will seek the return of all commissions and other compensation received by you from ABI since March 26, 2017, the date of ABI's agreement with Skilcraft.

John Rowell
January 10, 2018
Page 4

**II.    You must immediately return all of ABI's documents, ESI, and tangible things
in your possession, custody, or control, including all external storage devices
containing such materials, and submit to a forensic examination of your
laptop and external storage devices.**

Given the termination of your Agreement, **you must immediately return all information
that you received from ABI Entities, or that you received on behalf of ABI Entities, or
that you created while working for ABI, which relates to ABI Entities' business**. This
requirement includes all information that is in your possession, custody or control, and includes
both paper documents and electronically stored information. By way of example only, the
information you must return includes code, data, programs, databases, printed materials,
customer lists, mailing lists, account information, samples, prototypes, price lists and pricing
information. You must also return all physical property belonging to ABI Entities, inclusive of
any USB storage devices, computing devices, keys, key cards, and any other tangible or
intangible property.

**Please contact me by 5:00 pm MST on Friday, January 12, 2018, to arrange for the
return all such materials without altering their contents**. If you do not contact me on
or before this date, ABI will seek all appropriate remedies to ensure the prompt return of its
property, including seeking immediate injunctive relief from the Court, as detailed below.

**III.    Your ongoing violations of your legal obligations to ABI**.

In addition to the breaches of your contractual obligations to ABI under the terms of your
Agreement, you have also breached numerous legal obligations under federal and state law. If
ABI is forced to institute litigation to resolve these issues, it will seek relief under each of the
following causes of action, among others.

**A.    Violation of the Federal Defend Trade Secrets Act and the Colorado
Uniform Trade Secrets Act.**

Both the federal Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Act prohibit
your unauthorized use or disclosure of ABI's trade secrets. *See* 18 U.S.C. § 1836; Colo. Rev.
Stat. § 7-74-102.[1]  Among other things, ABI's customer or client information, including the very
existence of transactions like those with Skilcraft, clearly constitute trade secrets under 18
U.S.C. § 1839(3) and Colorado Revised Statutes section 7-74-102(4). *See Hertz v. Luzenac
Grp.*, 576 F.3d 1103, 1109 (10th Cir. 2009) (quoting *Network Telecomms., Inc. v. Boor-
Crepeau*, 790 P.2d 901, 903 (Colo. App. 1990)); *Christou v. Beatport, LLC*, 849 F. Supp. 2d
1055, 1075-76 (D. Colo. 2012) (concluding that password-protected MySpace contacts could be
a trade secret under Colorado law).

---

[1] Because ABI is based in Colorado, Colorado law will apply to this dispute. *See, e.g., First W. Capital
Mgmt. Co. v. Malamed,* No. 16-cv-1961-WJM-MJW, 2016 WL 8358549, at *10 (D. Colo. Sept. 30, 2016).

John Rowell
January 10, 2018
Page 5

Under federal law, "trade secrets" include "all forms and types of financial, ***business***, scientific, technical, economic, or engineering information, ***including patterns***, ***plans***, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing . . . ."   18 U.S.C. § 1839(3) (emphasis added).

Likewise, under Colorado law, "trade secrets" include "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, ***confidential business or financial information***, ***listing of names***, ***addresses***, or ***telephone numbers***, or other information relating to any business or profession ***which is secret and of value***."   Colo. Rev. Stat. § 7-74-102(4) (emphasis added).

Section 7-74-103 of the Colorado Revised Statutes provides that "[t]emporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret."   *See also* 18 U.S.C. § 1839(b)(3)(A)(1).   Thus, an actual misappropriation of trade secrets need not occur for ABI to obtain an injunction to stop your misappropriation of its trade secrets.   Instead, only a "threatened misappropriation" is required to support injunctive relief.

Similarly, damages are available to ABI for your actual misappropriation of its trade secrets. Those damages are the greater of ABI's lost profits or your (or your employer's) profits on any revenue earned through your misappropriation of ABI's trade secrets.   *See* Colo. Rev. Stat. § 7-74-104 ("Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.");   *see also* 18 U.S.C. § 1839(b)(3)(B).   Under section 7-74-105 of the Colorado Revised Statutes, ABI will also be entitled to its attorneys' fees as a prevailing party in the event that your misappropriation of its trade secrets is found to be willful.

Please be advised that any transmission of ABI's proprietary or trade secret information to any other party constitutes an additional violation of federal and state law.   *See* 18 U.S.C. § 1836(b); Colo. Rev. Stat. § 7-74-102(2).   Both you **and** the receiving party would be subject to additional equitable remedies and damages based on your unlawful transmission to any such person.   18 U.S.C. § 1836(b); Colo. Rev. Stat. §§ 7-74-103, -104.

**As stated above, you must contact me at 303.362.2872 before 5:00 pm MDT on January 12, 2018, to secure return of ABI's proprietary and trade secret information.**   If you fail to do so, ABI will seek immediate judicial relief requiring you to return such property to prevent the propagation or dissemination of the trade secrets at issue.   *See* 18 U.S.C. § 1836(b);   *see also* C.R.C.P. 104.   ABI will have no choice but to conclude that you

RW000030999

John Rowell
January 10, 2018
Page 6

intend to evade, avoid, or otherwise not comply with your legal obligations, thereby requiring an order by a court enforceable by the U.S. Marshal or local Sheriff to recover ABI's property and information. *See* 18 U.S.C. § 1836(b); *see also* C.R.C.P. 104(i).

### B.    Violations of your common law obligations to ABI.

You have also violated several common law duties that you owe to ABI.  Under the common law, "[a] former director breaches his or her fiduciary duty if he or she engages in transactions that had their inception before the termination of the fiduciary relationship or that were based on information obtained during that relationship." *T.A. Pelsue Co. v. Grand Enters., Inc.*, 782 F. Supp. 1476, 1485-86 (D. Colo. 1991).  Your attempted usurpation of ABI's transaction with Skilcraft breaches your fiduciary duty to ABI.  Breach of this duty entitles ABI to recover "any economic losses incurred to the present time or which will probably be incurred in the future, **including any profit that [you] received as a result of the breach of fiduciary duty, any loss of [ABI's] principal assets caused by the breach of fiduciary duty, and any lost profits which [ABI] could reasonably have expected to earn had the fiduciary duty not been breached.**" *Id.* at 1487–88 (emphasis added).  If ABI is forced to file suit against you, it will seek to recover all commissions and other compensation received by you from ABI since March 26, 2017, the date of ABI's agreement with Skilcraft.

ABI will also pursue remedies for the tortious interference with its contract with Skilcraft.  Under this claim, you would be liable for "pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." *Preston v. Atmel Corp.*, 560 F. Supp. 2d 1035, 1039 (D. Colo. 2008).  ABI would also seek punitive or exemplary damages.

To avoid such liability, I again encourage you to contact me to determine if we may resolve this dispute amicably before ABI is forced to file suit.

### IV.    You must immediately preserve all documents, ESI, and tangible things in any way related to your work at ABI or the allegations in this correspondence.

Finally, you have an immediate and continuing obligation to preserve all documents, ESI, and tangible things in your possession, custody, or control that may relate in any way to your previous work with ABI, your work with any customer of ABI's, or any other allegations referenced in this correspondence or your defenses to those allegations.

These categories include, but are not limited to, emails, text messages, voice messages, mobile phone data, instant messages, diaries, journals, calendars, notebooks, electronic documents (*e.g.,* in Word, Excel, PowerPoint, Adobe, or any other computer program or technology), hard copy documents of any kind, and social media posts, messages, or content of any kind (*e.g.,* on Google+, Facebook, Flickr, Foursquare, Friendster, Instagram, LinkedIn, Meetup, MySpace,

RW000031000

John Rowell
January 10, 2018
Page 7

Pheed, Pinterest, Snapchat, Swarm, Twitter, Tumblr, YouTube, Vine, WhatsApp, web blogs, and any other Internet- or application-based medium). These categories also extend to any location where such information may be stored, including all personal computing devices and personal file storage media/sites, whether physical, Internet-based, or cloud-based.

Please be advised that your preservation obligations extend not only to matters relevant to ABI's potential claims and your defenses, but also to any matters reasonably calculated to lead to the discovery of admissible evidence in any such lawsuit. For example, you must preserve, without limitation, any materials recording, reflecting, or commenting on your experiences at ABI or with any individual at ABI in any way, any materials relating to any of ABI's prior or current customers, any materials relating to any contact you had with Skilcraft LLC or anyone at Skilcraft LLC, your employment history and records, your litigation history and records (including both civil and criminal matters), your income, and any and all matters that could impact your credibility in the potential lawsuit within the meaning of the Federal Rules of Evidence.

These categories of discoverable information and materials are not intended to be an exhaustive list of the information that you are required to preserve. They are illustrative only. Regardless of whether a category is listed, failure to preserve discoverable information could result in sanctions.

Please also be advised that your preservation obligations require you and your respective agents to immediately cease any process, practice, or procedure that might destroy, purge, erase, delete, or alter any documents, ESI, or tangible things that are relevant to ABI's potential claims or your defenses, or are reasonably calculated to lead to the discovery of admissible evidence in the Lawsuit. You must also contact any cellular telephone providers, email providers, personal file storage providers, and social media providers to request that they preserve any electronic data that is on their servers.

In addition to reiterating your obligations, ABI would like to confirm that you have not—from March 26, 2017, to present—deleted, destroyed, discarded, disabled, modified, or otherwise tampered with any documents, ESI, or tangible things fitting the descriptions above. Please confirm by **January 12, 2018, at 5:00 pm MST**, that this has not occurred and detail any materials that have been lost or deleted, explaining the facts and circumstances surrounding the loss or deletion.

Thank you for your prompt attention to this matter. I look forward to speaking with you to arrange for the forensic imaging of your computer and devices containing ABI's information, to arrange for the safe return of ABI's electronically stored information, documents, and other property, to arrange for your repayment of all commissions and other forms of compensation paid to you from March 26, 2017 to the present, and to discuss the recovery of any and all other damages to ABI caused by your breach of contract and tortious conduct. I am hopeful that our discussion will be fruitful, and that the parties might be able to reach an amicable

John Rowell
January 10, 2018
Page 8

resolution of their disputes short of litigation.

Very truly yours,

Danielle L. Kitson / by SEB

Danielle L. Kitson

DLK/SEB

Firmwide:152181250.2 094730.1000

RW000031002

<u>TRANSITION EMPLOYMENT AGREEMENT AND RELEASE OF ALL CLAIMS</u>

This Transition Employment Agreement And Release Of All Claims, which is effective as of the Effective Date, is between John Rowell ("Employee") and Aaron, Bell International, Inc. ("ABI").

I.
RECITALS

A.     Employee is currently employed by ABI, on an at-will basis, pursuant to the terms of an Employment Agreement dated January 4, 2016.

B.     The Parties desire to sever Employee's employment relationship with ABI, but ABI is willing to employ Employee, and Employee is willing to work for ABI, through 1) completion of all of the Transition Deals, or 2) a mutually agreed in writing date in the future, in the event one or more of the Transition Deals appears unlikely to close, whichever occurs first, subject to the terms and conditions set forth in this Agreement.

C.     Both parties wish to resolve their disputes and potential disputes with one another (known and unknown), and both parties wish to eventually terminate their relationship under the terms and conditions set forth in this Agreement.

D.      Should Employee sign this Agreement, Employee will be provided with the consideration set forth in this Agreement.  Should Employee also sign the attached Separation Agreement And Release Of All Claims (attached as Exhibit A) <u>on the Resignation Date</u>, Employee will be provided with the consideration provided for in Exhibit A.

E.     This Agreement sets forth the entire understanding between Employee and ABI concerning Employee's employment with ABI, separation from employment with ABI, and Employee's disputes with ABI, known or unknown.

II.
DEFINITIONS

The following definitions shall be applicable for the purposes of this Agreement:

A.     "Agreement" means this Transition Employment Agreement And Release Of All Claims.

B.     "Employee" means John Rowell.

C.     "Cause" means 1) misconduct, including embezzlement or fraud; 2) criminal activity as evidenced by a conviction or a plea of guilty or nolo contendere in connection with any crime that constitutes a felony involving moral turpitude in the jurisdiction involved; 3) Employee's addiction to alcohol impacting Employee's performance at work or Employee's repeated use of any controlled substance without

RW000031003

prescription or in excess of Employee's prescription; 4) willful and material violations of ABI's policies; or 5) material breach of this Agreement.

D.      "Claims" means any debt, obligation, demand, cause of action, claim for relief, judgment, controversy or claim of any kind whatsoever between Employee and ABI Entities, whether sounding in contract, statute, tort, fraud, misrepresentation, discrimination, retaliation, claim for attorneys' fees or costs, or any other legal theory; including claims under Title VII of the Civil Rights Act of 1964, as amended; claims under the Civil Rights Act of 1991; claims under the Age Discrimination in Employment Act of 1967, as amended; claims under 42 U.S.C. § 1981, § 1981a, § 1983, § 1985, or § 1988; claims under the Americans with Disabilities Act of 1990, as amended; claims under the Rehabilitation Act of 1973, as amended; claims under the Fair Labor Standards Act of 1938, as amended; claims under the Employee Retirement Income Security Act of 1974, as amended; claims under the Family Medical Leave Act of 1993, as amended; claims under the Sarbanes-Oxley Act, as amended; claims under the Genetic Information Nondiscrimination Act of 2008; claims under the Ohio Civil Rights Act, Ohio Rev. Code §§ 4112.01, 4112.02, and 4112.14; claims under the Worker Adjustment and Retraining Notification Act; claims under the National Labor Relations Act; and claims under any other applicable federal, state or local statute, regulation, ordinance or common law principle, excluding, however, claims that cannot be released by private agreement as a matter of law.

E.      "Effective Date" means the first date upon which all of the following have occurred: (1) Employee has executed this Agreement and delivered it to Ralph Bellizzi or his successor, and (2) ABI has executed this Agreement through its authorized representative, and (3) the revocation period set forth in section III.F has expired.

F.      "ABI Entities" means Aaron, Bell International, Inc., and any predecessor or current or former parent, subsidiary or affiliated company, or successor of any of them, or benefit plan maintained by any of them, and the current and former owners, directors, officers, employees, shareholders and agents of any or all of them.

G.      "ABI" means Aaron, Bell International Inc., Employee's current employer.

H.      Transition Deals includes the following deals on which Employee is working on behalf of ABI:

- Skilcraft - based upon 35% commission structure. For the avoidance of doubt, this means that Employee will be paid 35% of payments received by ABI on this Skilcraft deal.

- Applied Composites - based upon 28% commission structure. For the avoidance of doubt, this means that Employee will be paid 28% of payments received by ABI on this Applied Composites deal.

- Northline (acquisition project only; not recapitalization project) based upon a 50% share of gross revenues received applicable to acquisition services only



RW000031004

I.      "Resignation Date" means the date occurring 10 days after the date that all of the Transition Deals have been completed, or as agreed mutually in writing between ABI and Employee.

III.
COVENANTS

A.      <u>Continued Employment</u>

Employee will remain employed as Managing Director through the Resignation Date, subject to the terms of this Agreement, at which point Employee's employment will end.   During this transition period, Employee shall be authorized to act in a non-exclusive capacity.   However, Employee agrees to dedicate his best efforts to the Transition Deals and to devote appropriate attention to ensure that those Transition Deals close as soon as possible.

During this transition period, Employee will continue receiving all commission compensation in accordance with this Agreement.   This excludes base income for management services fees. For the avoidance of doubt, effective immediately Employee will not receive his COO base salary (annualized at $50,000) through the Resignation Date and end of this Agreement.   Employee will receive commissions in accordance as defined herein.

Employee will also receive, and ABI represents and warrants that it has sent to Employee,  checks in the gross amounts of

$5,808.24 associated with a ACE  expenses.

 $2,435.00associated with reimbursement of fees and true up of retention payments

$14,000 associated with ACE deal commissions

$12,500 associated with Skilcraft deal commissions

$602.48 associated with Skilcraft expenses

Finally, while the parties have a current dispute regarding 1) the deduction of certain support and administrative fees from commissions paid to Employee, and 2) certain COO salary payments made to Employee, ABI will waive and release claims to those amounts upon the Effective Date of this Agreement.

Employee will not be entitled to any other consideration.

B.      <u>Employment Status</u>.

Upon execution of this Agreement the Employment Agreement between ABI and Employee, dated January 4th 2016, and modified on February 25th, 2016 is terminated.

Employee agrees to work for ABI under the terms and conditions set forth in this

3



Agreement through the Resignation Date.

At all times until the Resignation Date, Employee's employment may be terminated by ABI at any time for Cause.   If employee is terminated for Cause, he will only receive payments for Transition Deals closed as of the date of his termination. If employee is terminated by ABI without Cause, he will receive the payments specified in this Agreement for any Transition Deals that close within 90 days of the date of his termination.

Within ten days following the Effective Date, ABI will remove Employee's information from all marketing and sales materials, including websites and cease to use Employee's identity in any form for marketing and sales purposes.

C.     Conditions For Eligibility For Severance Benefits Set Forth In Exhibit A.

In order for Employee to be eligible for benefits set forth in the Separation Agreement And Release Of All Claims attached as Exhibit A, Employee must perform work on the Transition Deals with reasonable diligence, and Employee must sign the Release Of All Claims on the Resignation Date.  Employee understands that Employee shall not under any circumstances be entitled to benefits set forth in the Separation Agreement And Release Of All Claims if (1) Employee fails to use reasonable diligence in performing the duties assigned to Employee; (2) Employee voluntarily terminates Employee's employment with ABI prior to the Resignation Date; (3) Employee fails to execute and return the Separation Agreement And Release Of All Claims on the Resignation Date, or (4) if Employee's employment is terminated for Cause or for failing to perform Employee's obligations under this Agreement.

D.     Release Of Claims

As a material inducement to ABI to enter into this Agreement, Employee, as a free and voluntary act, forever releases, discharges and covenants not to sue ABI Entities for any Claims of any kind whatsoever, which may have arisen on or prior to Employee's execution of this Agreement, including but not limited to (1) Claims relating in any way to Employee's employment with ABI, (2) Claims relating in any way to the separation of Employee's employment with ABI, (3) Employee's compensation by ABI, and (4) any other matter, cause or thing whatsoever which may have occurred between Employee and ABI Entities on or prior to Employee's execution of this Agreement.

Employee acknowledges (1) receipt of all compensation and benefits due through the Effective Date (with the exception of those specific amounts still to be paid listed in section 3A); (2) Employee has reported to ABI any and all work-related injuries incurred during employment; and (3) ABI properly provided any leave of absence to Employee in connection with Employee's or a family member's health condition, and Employee has not been subjected to any improper treatment, conduct or actions due to any leave or request for leave.

As a material inducement to Employee to enter into this Agreement, ABI, as a free and voluntary act, forever releases, discharges and covenants not to sue Employee for any Claims of any kind whatsoever.

RW000031006

E.   Release Applies To Representative Actions.

The releases above apply to any Claims brought by any person or agency on behalf of Employee or any class or representative action pursuant to which Employee may have any right or benefit.  Employee promises not to accept any recoveries or benefits which may be obtained on Employee's behalf by any other person or agency or in any class or representative action that may include or encompass any of the released Claims, and Employee assigns any such recovery or benefit to ABI. Employee agrees not to initiate, participate in, or in any way contribute to any private civil action involving the released Claims.

F.   Compliance With Older Workers Benefit Protection Act.

Employee acknowledges that Employee is not entitled to the consideration being provided to Employee under this Agreement unless Employee enters into this Agreement, including the releases of Claims contained in this Agreement.  Employee acknowledges that Employee is waiving claims under the Age Discrimination in Employment Act, as amended, that arose on or prior to Employee's execution of this Agreement.  Employee also acknowledges that Employee has been given at twenty-one (21) days to consider this Agreement and the corresponding Separation Agreement And Release Of All Claims, and that Employee has carefully read and understands all of the provisions of this Agreement.  ABI advises Employee to consult with an attorney prior to signing this Agreement and the Separation Agreement And Release Of All Claims attached as Exhibit A.  Employee acknowledges that Employee's decision to execute this Agreement is knowing and voluntary.  Employee has the right to revoke this Agreement within seven (7) days of signing this Agreement by sending a letter by certified mail indicating Employee's intention to revoke to Ralph Bellizzi.  The waiver of claims under the Age Discrimination in Employment Act, as amended, shall not become effective until the expiration of the revocation period set forth above. Employee agrees that changes to this Agreement or to the Separation Agreement and Release Of All Claims attached as Exhibit A, whether material or immaterial, do not restart the running of the 21-day consideration period.

G.   Matters Not Released.

Notwithstanding anything stated anywhere else in this Agreement, Employee does not release any claims for workers' compensation benefits, unemployment compensation, claims for vested pension benefits, or any other claims or rights that cannot be released by private agreement as a matter of law.

H.   Confidential Information and Competition

Employee's right to receive the benefits of this Agreement is contingent upon Employee's compliance with the terms following Confidentiality protections, which shall survive the end of Employee's employment and be in full force and effect for two (2) years following the Resignation Date:

> Employee will hold in strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not an employee of ABI or to any employee of ABI that does not have access to said Confidential Information,

5

RW000031007

without express written permission from ABI's President. Confidential Information shall mean any trade secrets or ABI proprietary information, including, but not limited to techniques, processes, operating methods, cost, pricing, financial data, business plans and proposals, customer lists, data and information that ABI receives in confidence from any other party, or any other secret or confidential matters of ABI.

Employee agrees that he shall not, during the continuance of this Agreement and within two (2) years after the termination of this Agreement use his position at ABI and / or knowledge gained in his position at ABI to 1) benefit himself or other third party to the detriment of ABI 2) divert or attempt to divert from ABI any business that ABI has, to the knowledge of Employee, enjoyed from any other individuals or entities and/or 3) solicit or induce any employee or ABI to cease employment with ABI. Employee shall not use his knowledge of the ABI marketing pipeline to solicit individuals or entities.

For the avoidance of doubt, the restrictions contained in this Section shall not be read to prevent Employee from working in the investment banking field, so long as Employee complies with the covenants set forth herein.

I.    <u>Confidentiality Of Agreement.</u>
Employee and ABI agree to the following provisions regarding confidentiality of this Agreement:

1.    Except as otherwise specifically provided in this Agreement, Employee / ABI will not disclose (in whole or in part) any of the terms or provisions of this Agreement (including but not limited to the fact or the amount of the payment) or characterize any of the terms and provisions of this Agreement, or disclose any of the negotiations leading to the making of this Agreement to any other person or entity, other than Employee's or ABI's attorneys, professional tax advisors, and spouse.  Employee / ABI represent and warrant that Employee / ABI have not made any disclosure of any of the terms or provisions of this Agreement or any of the negotiations leading to the making of this Agreement to any other person or entity, except to Employee's attorneys, tax advisors, and spouse.

2.    It shall not be a breach of this Agreement for Employee / ABI to disclose the terms and provisions of this Agreement in response to any lawful court order or subpoena, provided Employee / ABI first gives the other Party as much notice as possible of the existence of the subpoena or court order so that the other Party  can timely object to the court order or subpoena.

3.    Employee / ABI agree that Employee / ABI will not solicit nor provoke any inquiry concerning the terms and provisions of this Agreement.

4.    The parties agree that Employee's separation shall be characterized as a voluntary resignation.

6



RW000031008

**J.**   <u>Waiver Of Right To Seek Individual Relief.</u>

Employee represents, as a material term of this Agreement, that there are no charges or disputes pending before any governmental agency or other forum for which approval by the agency or forum is required for dismissal.  Nothing in this Agreement prevents Employee from filing a timely charge or complaint with, or from participating fully and honestly in any investigation or proceeding conducted by, the EEOC, NLRB, or any other federal, state or local agency charged with the enforcement of any laws, or from exercising rights under Section 7 of the National Labor Relations Act to engage in joint activity with other employees. However, if the EEOC, NLRB, or any other state, federal or local government agency commences an investigation or other legal proceeding on Employee's behalf, Employee specifically waives and releases the right, if any, to recover any monetary or other individual relief of any sort whatsoever arising from any such investigation or legal proceeding, except for any individual relief that cannot be waived as a matter of law.

**K.**   <u>Non-Disparagement</u>

Employee agrees not to disparage ABI Entities's products, abilities, or services.

ABI agrees that its President, Ralph Bellizzi, will not disparage Employee in communications with third parties.  For the avoidance of doubt, this provision does not restrict the ABI's internal communications regarding matters of concern to the Company; however, such communications should be maintained as confidential within the organization.

**L.**   <u>Return of Property</u>

On or before the Resignation Date, Employee will destroy or return to Ralph Bellizzi all information that Employee received from ABI Entities, or that Employee received on behalf of ABI Entities, or that Employee created while working for ABI, which relates to ABI Entities's business.  This requirement pertains to all information that is in Employee's possession, custody or control, and includes both paper documents and electronically stored information.   By way of example only, the information Employee must return includes code, data, programs, databases, printed materials, customer lists, mailing lists, account information, samples, prototypes, price lists and pricing information. Employee must also return all physical property belonging to ABI Entities, such as ABI's computer, and phone cards, cellular phones, storage devices, computing devices, keys, key cards, and all of the tangible and intangible property.  Employee represents and warrants that Employee will not retain any copies, electronic or otherwise, of any such information or property after the Resignation Date.

**M.**   <u>Employee's Resignation</u>

Employee will tender Employee's resignation to ABI on the Resignation Date. ABI's records will reflect that Employee voluntarily resigned.

**N.**   <u>Neutral Reference</u>

Should a prospective employer of Employee need to verify Employee's employment with ABI, ABI will confirm Employee's dates of employment and job titles.

RW000031009

## IV.
## ADDITIONAL PROVISIONS

A.     <u>Severability.</u>

In case any one or more of the provisions of this Agreement shall be found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired.  Further, any provision found to be invalid, illegal or unenforceable shall be deemed, without further action on the part of the parties to this Agreement, to be modified, amended and/or limited to the minimum extent necessary to render such clause and/or provision valid and enforceable.

B.     <u>Entire Agreement.</u>

This Agreement supersedes all prior written and verbal promises and agreements between the parties.  This Agreement, and the attached Exhibit A, constitute the entire agreement between the parties, and may be amended, modified or superseded only by a written agreement signed by all parties impacted by the amendment.  No oral statements by any employee of ABI Entities shall modify or otherwise affect the terms and provisions of this Agreement.

C.     <u>Governing Law.</u>

This Agreement shall be construed in accordance with the laws of the state of Colorado.

D.     <u>No Admission Of Liability.</u>

ABI denies that ABI Entities took any improper action against Employee or that ABI Entities violated any federal, state, or local law or common law principle in its treatment or compensation of Employee.  This Agreement shall not be admissible in any proceeding as evidence of any improper conduct by ABI Entities.

E.     <u>No Other Representations.</u>

Employee acknowledges that no promises or representations have been made to induce Employee to sign this Agreement other than those expressly set forth in this Agreement, and that Employee has signed this Agreement as a free and voluntary act.

F.     <u>Assignment.</u>

Employee may not assign Employee's rights or obligations under this Agreement to any other party without the prior written consent of ABI.  ABI may assign this agreement to ABI Entities, or any of them, without Employee's consent.

G.     <u>Authority.</u>

The undersigned representatives each separately represent and warrant that they, respectively, have the right and authority to execute this Agreement and that they, respectively, have not sold, assigned, transferred, conveyed, or otherwise disposed of any Claims or potential Claims relating to any matter covered by this Agreement.



8

H.    <u>Binding Effect.</u>
       This Agreement is binding upon the parties, their heirs, representatives, executors, administrators, successors, and assigns.

I.    <u>No Waiver.</u>
       Failure by any party to enforce any rights or remedies provided in this Agreement shall not be deemed a waiver of those rights.

**YOUR SIGNATURE BELOW ACKNOWLEDGES THAT YOU HAVE READ THIS AGREEMENT CAREFULLY IN ITS ENTIRETY, THAT YOU KNOW AND UNDERSTAND ITS CONTENTS, AND THAT YOU ENTER INTO THIS AGREEMENT FREELY AND AS A VOLUNTARY ACT.**

John Rowell                                           ABI Inc.


_____                    _____
                                                      Ralph Bellizzi, President

Dated:_____, 2017          Dated:_____, 2017

9

RW000031011

## EXHIBIT A

## SEPARATION AGREEMENT AND RELEASE OF ALL CLAIMS

This Separation Agreement And Release Of All Claims, which is effective upon the Effective Date, is between John Rowell ("Employee") and Aaron, Bell International Inc. ("ABI").

### I.
### RECITALS

A.     The parties each signed the Transition Employment Agreement And Release Of All Claims to which this Separation Agreement And Release Of All Claims is attached.

B.     The parties each desire to receive the benefits provided to them in this Agreement, and to provide the consideration required of them in this Agreement.

In consideration of the promises contained in this Agreement, Employee and ABI agree as follows:

### II.
### DEFINITIONS

The following definitions shall be applicable for the purposes of this Agreement:

A.     "Agreement" means this Separation Agreement And Release Of All Claims.

B.     "Employee" means John Rowell.

C.     "Claims" means any debt, obligation, demand, cause of action, claim for relief, judgment, controversy or claim of any kind whatsoever between Employee and XERO, whether sounding in contract, statute, tort, fraud, misrepresentation, discrimination, retaliation, claim for attorneys' fees or costs, or any other legal theory; including claims under Title VII of the Civil Rights Act of 1964, as amended; claims under the Civil Rights Act of 1991; claims under the Age Discrimination in Employment Act of 1967, as amended; claims under 42 U.S.C. § 1981, § 1981a, § 1983, § 1985, or § 1988; claims under the Americans with Disabilities Act of 1990, as amended; claims under the Rehabilitation Act of 1973, as amended; claims under the Fair Labor Standards Act of 1938, as amended; claims under the Employee Retirement Income Security Act of 1974, as amended; claims under the Family Medical Leave Act of 1993, as amended; claims under the Sarbanes-Oxley Act, as amended; claims under the Genetic Information Nondiscrimination Act of 2008; claims under the Worker Adjustment and Retraining Notification Act; claims under the National Labor Relations Act; Claims under the Ohio Civil Rights Act, Ohio Rev. Code §§ 4112.01, 4112.02, and 4112.14; and claims under any other applicable federal, state or local statute, regulation, ordinance or

RW000031012

common law principle, excluding, however, claims that cannot be released by private agreement as a matter of law.

        D.      "Effective Date" means the first date upon which all of the following have occurred: (1) Employee has executed this Agreement and delivered it to Ralph Bellizzi or his successor, and (2) ABI has executed this Agreement through its authorized representative; and (3) the revocation period set forth in section III.D has expired.

        E.      "ABI Entities" means ABI, Inc., and any predecessor or current or former parent, subsidiary or affiliated company, or successor of any of them, or benefit plan maintained by any of them, and the current and former owners, directors, officers, employees, shareholders and agents of any or all of them.

        F.      "ABI" means ABI Inc., Employee's current employer.

        G.      "Resignation Date" means the date on which this Agreement is executed by the Parties.

III.<br>COVENANTS

A.    <u>Consideration To Employee</u>.

        Provided Employee signs this Agreement on the Resignation Date, ABI shall waive, forgive, and forever release any and all Claims it possesses against Employee. ABI has, and Employee agrees that ABI has, paid Employee all fees, commissions and expenses that are due to Employee.

B.    <u>Release Of Claims By Employee</u>.

        As a material inducement to ABI to enter into this Agreement, Employee, as a free and voluntary act, forever releases, discharges and covenants not to sue ABI Entities for any Claims of any kind whatsoever, which may have arisen on or prior to Employee's execution of this Agreement, including but not limited to (1) Claims relating in any way to Employee's employment with ABI, (2) Claims relating in any way to the separation of Employee's employment with ABI, (3) Employee's compensation by ABI, and (4) any other matter, cause or thing whatsoever which may have occurred between Employee and ABI Entities on or prior to Employee's execution of this Agreement.

        Employee acknowledges (1) receipt of all compensation and benefits due through the Resignation Date; (2) Employee has reported to ABI any and all work-related injuries incurred during employment; and (3) ABI properly provided any leave of absence to Employee in connection with Employee's or a family member's health condition, and Employee has not been subjected to any improper treatment, conduct or actions due to any leave or request for leave.

C.    <u>Release Applies To Representative Actions.</u>

        The release above applies to any Claims brought by any person or agency on behalf of Employee or any class or representative action pursuant to which Employee may have any right or benefit.  Employee promises not to accept any recoveries or

11

RW000031013

benefits which may be obtained on Employee's behalf by any other person or agency or in any class or representative action that may include or encompass any of the released Claims, and Employee assigns any such recovery or benefit to ABI. Employee agrees not to initiate, participate in, or in any way contribute to any private civil action involving the released Claims.

D.     <u>Compliance With Older Workers Benefit Protection Act.</u>

Employee acknowledges that Employee is not entitled to the consideration being provided to Employee under this Agreement unless Employee enters into this Agreement, including the releases of Claims contained in this Agreement. Employee acknowledges that Employee is waiving claims under the Age Discrimination in Employment Act, as amended, that arose on or prior to Employee's execution of this Agreement. Employee also acknowledges that Employee has been given at twenty-one (21) days to consider this Agreement and that Employee has carefully read and understands all of the provisions of this Agreement. ABI advises Employee to consult with an attorney prior to signing this Agreement. Employee acknowledges that Employee's decision to execute this Agreement is knowing and voluntary. Employee has the right to revoke this Agreement within seven (7) days of signing this Agreement by sending a letter by certified mail indicating Employee's intention to revoke to Ralph Bellizzi. The waiver of claims under the Age Discrimination in Employment Act, as amended, shall not become effective until the expiration of the revocation period set forth above. Employee agrees that changes to this Agreement, whether material or immaterial, do not restart the running of the 21-day consideration period.

E.     <u>Matters Not Released.</u>

Notwithstanding anything stated anywhere else in this Agreement, Employee does not release any claims for workers' compensation benefits, unemployment compensation, claims for vested pension benefits, or any other claims or rights that cannot be released by private agreement as a matter of law.

F.     <u>Confidential Information and Competition</u>

Employee's right to receive the benefits of this Agreement is contingent upon Employee's compliance with the terms following Confidentiality protections, which shall survive the end of Employee's employment and be in full force and effect for two (2) years following the Resignation Date:

> Employee will hold in strictest confidence and not disclose Confidential Information (as defined below) to anyone who is not an employee of ABI or to any employee of ABI that does not have access to said Confidential Information, without express written permission from ABI's President. Confidential Information shall mean any trade secrets or ABI proprietary information, including, but not limited to techniques, processes, operating methods, cost, pricing, financial data, business plans and proposals, customer lists, data and information that ABI receives in confidence

RW000031014

from any other party, or any other secret or confidential matters of ABI.

Employee agrees that he shall not, during the continuance of this Agreement and within two (2) years after the termination of this Agreement use his position at ABI and / or knowledge gained in his position at ABI to 1) benefit himself or other third party to the detriment of ABI 2) divert or attempt to divert from ABI any business that ABI has, to the knowledge of Employee, enjoyed from any other individuals or entities and/or 3) solicit or induce any employee or ABI to cease employment with ABI. Employee shall not use his knowledge of the ABI marketing pipeline to solicit individuals or entities.

For the avoidance of doubt, the restrictions contained in this Section shall not be read to prevent Employee from working in the investment banking field, so long as Employee complies with the covenants set forth herein.

G.    Confidentiality Of Agreement.
Employee and ABI agree to the following provisions regarding confidentiality of this Agreement:

1.    Except as otherwise specifically provided in this Agreement, Employee / ABI will not disclose (in whole or in part) any of the terms or provisions of this Agreement (including but not limited to the fact or the amount of the payment) or characterize any of the terms and provisions of this Agreement, or disclose any of the negotiations leading to the making of this Agreement to any other person or entity, other than Employee's or ABI's attorneys, professional tax advisors, and spouse.  Employee / ABI represent and warrant that Employee / ABI have not made any disclosure of any of the terms or provisions of this Agreement or any of the negotiations leading to the making of this Agreement to any other person or entity, except to Employee's attorneys, tax advisors, and spouse.

2.    It shall not be a breach of this Agreement for Employee / ABI to disclose the terms and provisions of this Agreement in response to any lawful court order or subpoena, provided Employee / ABI first gives the other Party as much notice as possible of the existence of the subpoena or court order so that the other Party  can timely object to the court order or subpoena.

3.    Employee / ABI agree that Employee / ABI will not solicit nor provoke any inquiry concerning the terms and provisions of this Agreement.

4.    The parties agree that Employee's separation shall be characterized as a voluntary resignation.

H.    Waiver Of Right To Seek Individual Relief.
Employee represents, as a material term of this Agreement, that there are no charges or disputes pending before any governmental agency or other forum for which approval by the agency or forum is required for dismissal. Nothing in this Agreement prevents Employee from filing a timely charge or complaint with, or from participating fully and honestly in any investigation or proceeding conducted by, the EEOC, NLRB, or

RW000031015

any other federal, state or local agency charged with the enforcement of any laws, or from exercising rights under Section 7 of the National Labor Relations Act to engage in joint activity with other employees. However, if the EEOC, NLRB, or any other state, federal or local government agency commences an investigation or other legal proceeding on Employee's behalf, Employee specifically waives and releases the right, if any, to recover any monetary or other individual relief of any sort whatsoever arising from any such investigation or legal proceeding, except for any individual relief that cannot be waived as a matter of law.

I.    **Non-Disparagement.**
Employee agrees not to disparage ABI Entities's products, abilities, or services.

ABI agrees that its President, Ralph Bellizzi, will not disparage Employee in communications with third parties. For the avoidance of doubt, this provision does not restrict the ABI's internal communications regarding matters of concern to the Company; however, such communications should be maintained as confidential within the organization.

J.    **Return of Property**
Employee represents that he has returned to ABI or destroyed all information that Employee received from ABI Entities, or that Employee received on behalf of ABI Entities, or that Employee created while working for ABI, which relates to ABI Entities's business, and that he has retained no copies of such information.   Employee further represents that he has returned all physical property belonging to ABI Entities, such as ABI's computer, and phone cards, cellular phones, storage devices, computing devices, keys, key cards, and all of the tangible and intangible property.

K.    **Neutral Reference**
Should a prospective employer of Employee need to verify Employee's employment with ABI, ABI will confirm Employee's dates of employment and job titles.

IV.    **ADDITIONAL PROVISIONS**

A.    **Severability.**
In case any one or more of the provisions of this Agreement shall be found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired.   Further, any provision found to be invalid, illegal or unenforceable shall be deemed, without further action on the part of the parties to this Agreement, to be modified, amended and/or limited to the minimum extent necessary to render such clauses and/or provisions valid and enforceable.

B.    **Entire Agreement.**
This Agreement supersedes all prior written and verbal promises and agreements between the parties concerning the subject matter of this Agreement.   This Agreement constitutes the entire agreement between the parties, and may be amended, modified or superseded only by a written agreement signed by all parties impacted by the

RW000031016

amendment.  No oral statements by any employee of ABI Entities shall modify or otherwise affect the terms and provisions of this Agreement.

C.      Governing Law.
        This Agreement shall be construed in accordance with the laws of the state of Colorado.

D.      No Admission Of Liability.
        ABI denies that ABI Entities took any improper action against Employee or that ABI Entities violated any federal, state, or local law or common law principle in its treatment or compensation of Employee.  This Agreement shall not be admissible in any proceeding as evidence of any improper conduct by ABI Entities.

E.      No Other Representations.
        Employee acknowledges that no promises or representations have been made to induce Employee to sign this Agreement other than those expressly set forth in this Agreement, and that Employee has signed this Agreement as a free and voluntary act.

F.      Assignment.
        Employee may not assign Employee's rights or obligations under this Agreement to any other party without the prior written consent of ABI.  ABI may assign this agreement to ABI Entities, or any of them, without Employee's consent.

G.      Authority.
        The undersigned representatives each separately represent and warrant that they, respectively, have the right and authority to execute this Agreement and that they, respectively, have not sold, assigned, transferred, conveyed, or otherwise disposed of any Claims or potential Claims relating to any matter covered by this Agreement.

H.      Binding Effect.
        This Agreement is binding upon the parties, their heirs, representatives, executors, administrators, successors, and assigns.

I.      No Waiver.
        Failure by any party to enforce any rights or remedies provided in this Agreement shall not be deemed a waiver of those rights.

RW000031017

YOUR SIGNATURE BELOW ACKNOWLEDGES THAT YOU HAVE READ THIS AGREEMENT CAREFULLY IN ITS ENTIRETY, THAT YOU KNOW AND UNDERSTAND ITS CONTENTS, AND THAT YOU ENTER INTO THIS AGREEMENT FREELY AND AS A VOLUNTARY ACT.

John Rowell                                            ABI Inc.


_____          _____
                                                       Ralph Bellizzi, President


Dated:_____, 2017      Dated:_____, 2017




Firmwide:149482804.6 999999.1765

16

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Case No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC.,
a Colorado corporation,

        Plaintiff,

v.

JOHN ROWELL,

        Defendant.

---

**ABI'S ANSWERS AND RESPONSES TO DEFENDANT'S FIRST SET OF**
**INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

---

Plaintiff Aaron, Bell International, Inc. ("ABI") provides the following objections, answers, and responses to Plaintiff's First Set of Discovery Requests ("Requests"). ABI will produce documents described herein upon the entry of a protective order protecting confidential information.

**PRELIMINARY STATEMENT AND GENERAL OBJECTIONS**

ABI objects to certain of the Requests' instructions and definitions to the extent they impose obligations beyond the Federal Rules of Civil Procedure. The following objections apply to all of the Requests.

1.      ABI objects to the definition of "identify" to the extent it would require ABI to provide contact information for ABI employees, who may be contacted through counsel.

2.      ABI objects to Definition/Instruction No. 9 as ambiguous because it purports to

redefine common words not in need of definition. ABI will interpret the Requests according to their common meaning, without regard for Definition/Instruction No. 9.

### SPECIFIC OBJECTIONS AND ANSWERS TO INTERROGATORIES

1.      Identify all contractual agreements you allege Mr. Rowell breached, the specific provision(s) breached, the manner in which you allege the breach occurred, and the date the alleged breach occurred, and any other way in which you allege Mr. Rowell may not have performed his obligations under the Transition Agreement.

**ANSWER:** ABI provides the following answer, which is based on its current knowledge to date, recognizing that discovery is ongoing. ABI alleges Rowell breached the Transition Employee Agreement and Release of Claims ("Transition Agreement"), including Section III.H, Section III.K, and Section III.L, as follows. Rowell breached his obligations under Section III.H of the Transition Agreement, on January 2, 2018 and perhaps at other times, by failing to take reasonable measures to protect and maintain the confidentiality of the very existence of the Skilcraft transaction, by openly usurping the Skilcraft transaction for his own gain, and by diverting the Skilcraft transaction from ABI. Rowell breached his obligations under Section III.K by disparaging ABI to Skilcraft when he described ABI as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs. Rowell breached his obligations under Section III.L by failing to return all of ABI's information received from ABI, on behalf of ABI, or while working for ABI that related to ABI's business immediately upon notice that ABI was terminating the Transition Agreement on

2

January 12, 2018. Discovery is ongoing and ABI does not know all Rowell's breaches or additional specific dates of his breaches.

2.      Identify: (a) every instance in which Mr. Rowell allegedly failed to take reasonable measures to protect and maintain the confidentiality of the existence of the Skilcraft transaction; (b) every instance in which Mr. Rowell diverted, or attempted to divert, the Skilcraft transaction; and (c) every way in which Mr. Rowell allegedly usurped, or attempted to usurp, the Skilcraft transaction for his own gain.

**OBJECTION:** ABI objects to Interrogatory No. 2 on the basis that it is an impermissible blockbuster or premature contention interrogatory as discovery is ongoing.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections and which is based on its current knowledge to date, recognizing that discovery is ongoing. At one or more points in time, including but not limited to January 2, 2018, Rowell spoke with First Line Advisors LLC about Skilcraft. And on one or more occasions, Rowell spoke with Skilcraft and described ABI to Skilcraft as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs. Discovery is ongoing and ABI does not know all of Rowell's actions that are responsive to this interrogatory.

3.      Identify each and every item received from ABI, on behalf of ABI, or while working for ABI that related to ABI's business that Mr. Rowell allegedly failed to return immediately upon notice that ABI was terminating the Transition Agreement.

**OBJECTION:** ABI objects to Interrogatory No. 3 on the basis that it is an impermissible blockbuster or premature contention interrogatory as discovery is ongoing. ABI further objects that Rowell himself knows best which items he failed to return to ABI upon his termination of employment.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. ABI states that Rowell did not immediately return any ABI information upon notice that ABI was terminating the Transition Agreement. ABI notified Rowell of the termination in a letter dated January 10, 2018, which demanded the return of ABI's information. On January 12, 2018, counsel for ABI had a telephone conversation with Rowell in which he indicated that he would be open to some kind of information return. He then went silent, failing to return multiple telephone calls over the course of the following two weeks. At that point, ABI had no choice but to file suit against Rowell, and indicated as much in a letter to him dated January 24, 2018. It was not until January 29, 2018 that ABI's counsel secured a definite commitment on Rowell's part to return ABI information, and it was not until January 30, 2018 that the parties finally reached an agreement as to the procedure for returning information. ABI received word from the facilitating forensic vendor on February 2, 2018 that the collection of information was complete.

4.      Identify the date on which any item identified in Interrogatory No. 3 was returned to ABI.

**ANSWER:** *See* answer to Interrogatory No. 3 above.

5.      Identify each and every one of your bases that allegedly justified terminating Mr. Rowell for cause.

**OBJECTION:** ABI objects to Interrogatory No. 5 on the basis that it is an impermissible blockbuster contention interrogatory.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. ABI was justified in terminating Rowell's employment under the Transition Agreement because he engaged in misconduct, willfully and materially violated ABI's policies, and materially breached the Transition Agreement, as articulated in ABI's complaint.

6.      Identify, with particularity, each and every ABI trade secret, as described in paragraph 30 of the Complaint, that you alleged Mr. Rowell misappropriated, threatened to misappropriate, or will continue to misappropriate.

**OBJECTION:** ABI objects to Interrogatory No. 6 on the basis that it is an impermissible blockbuster or premature contention interrogatory as discovery is ongoing. ABI further objects that Rowell himself knows best which items he misappropriated

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. ABI states that Rowell misappropriated confidential trade-secret information related to ABI's client Skilcraft. Under Rule 33(d) of the Federal Rules of Civil Procedure, ABI states that it will produce its business records containing the trade-secret information at issue, once a protective order has been entered by the Court.

7.      Identify each and every instance in which Mr. Rowell misappropriated, or threatened to misappropriate, any ABI trade secret.

**OBJECTION:** ABI objects to Interrogatory No. 7 on the basis that it is an impermissible blockbuster or premature contention interrogatory as discovery is ongoing. ABI further objects that Rowell himself knows best which items he misappropriated.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. ABI states that Rowell misappropriated confidential trade-secret information related to ABI's client Skilcraft as further articulated in the complaint and in its interrogatory answers. Under Rule 33(d) of the Federal Rules of Civil Procedure, ABI states that it will produce its business records containing the trade-secret information at issue, once a protective order has been entered by the Court.

8.      Identify the factual basis in support of your contention that, unless restrained, Mr. Rowell will continue to misappropriate, or threaten to misappropriate, ABI's trade secret information.

**ANSWER:** As detailed in the complaint, Rowell surreptitiously and unlawfully communicated with a competing investment bank on a prospective deal with ABI client Skilcraft, in violation of his Transition Agreement and common-law duties to ABI. Without the benefit of discovery, ABI has no reason to believe or trust that Rowell's unlawful actions have ceased, and ABI believes that an injunction is the only way to assure that Rowell abides by his legal obligations.

9.      For each alleged trade secret identified in response to Interrogatory No. 6 identify: (a) all persons who have or have had access and/or ownership rights to the alleged trade secret or confidential information; (b) the nature and source of the rights; and (c) all efforts by you to maintain the secrecy or confidentiality of the alleged trade secrets and confidential information.

**OBJECTION:** ABI objects to Interrogatory No. 9 on the basis that it is an impermissible blockbuster or premature contention interrogatory as discovery is ongoing. ABI further objects that the interrogatory is vague with respect to the meaning of "ownership rights."

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. ABI states that it is a small business, and that during Rowell's tenure of employment, all of ABI's employees had access to, and required access to, ABI's client information in connection with performing their jobs. ABI's computer systems were password protected so that only authorized employees and independent contractors could gain access, and the Goldmine software system utilized by ABI was further password protected, with each employee/contractor having his or her own unique login credentials. Further, ABI's hard-copy files were locked and restricted, with only ABI's President and bookkeeper having keys; and the office itself was locked during nonbusiness hours, as was the ABI President's office door. ABI further protected its trade-secret information by requiring client prospects to sign nondisclosure agreements, by requiring job candidates to sign confidentiality agreements, and by requiring employees and contractors to sign confidentiality agreements.

10.     For each instance identified in response to Interrogatory No. 7, identify your factual basis for alleging that such misappropriation or threatened misappropriation was willful, malicious, or in wanton disregard of ABI's rights.

**OBJECTION:** ABI objects to Interrogatory No. 10 on the same grounds as it objected to Interrogatory No. 7.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. As detailed in the complaint, Rowell surreptitiously and unlawfully communicated with a competing investment bank on a prospective deal with ABI client Skilcraft, in violation of his Transition Agreement and common-law duties to ABI, and as further articulated in the complaint and in the interrogatory responses above. The fact Rowell was doing this in secret

7

indicates that he was intentionally undermining ABI and acting willfully. Under Rule 33(d) of the Federal Rules of Civil Procedure, ABI states that it will produce its business records containing the trade-secret information at issue, once a protective order has been entered by the Court.

11.     Identify each and every allegedly disparaging statement made by Mr. Rowell in violation of any agreement with ABI.

**ANSWER:** ABI provides the following answer, which is based on its current knowledge to date, recognizing that discovery is ongoing. On one or more occasions, Rowell spoke with Skilcraft and described ABI to Skilcraft as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs. Discovery is ongoing and ABI does not know all Rowell's disparaging statements or breaches.

12.     For every allegedly disparaging statement made by Mr. Rowell, identify: (a) the date on which the statement was made; (b) the person(s) to whom the statement was made; (c) the circumstances under which the statement was made; and (d) your basis for asserting that the statement was disparaging.

**ANSWER:** ABI provides the following answer, which is based on its current knowledge to date, recognizing that discovery is ongoing. On one or more occasions, Rowell spoke with John Zurborg of Skilcraft and described ABI as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs. Those statements are disparaging because they are derogatory to ABI's business or the quality of its

business. Discovery is ongoing and ABI does not know all Rowell's disparaging statements, when they were made, to whom, and the circumstances under which they were made.

13.     Identify each and every instance in which Mr. Rowell allegedly breached any duty of loyalty owed to ABI.

**ANSWER:** ABI provides the following answer, which is based on its current knowledge to date, recognizing that discovery is ongoing. ABI alleges Rowell failed to take reasonable measures to protect and maintain the confidentiality of the very existence of the Skilcraft transaction; openly usurped, subverted, and attempted to divert the Skilcraft transaction for his own gain; and disparaged ABI to Skilcraft when he described ABI as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs. To the extent any of those actions took place during Rowell's ABI employment, they constitute a breach of his duty of loyalty to ABI. Discovery is ongoing and ABI does not know all Rowell's breaches.

14.     Identify each and every instance in which Mr. Rowell allegedly acted willfully, maliciously, intentionally, or in wanton disregard of ABI's rights in allegedly breaching any duty of loyalty owed to ABI and your factual basis for alleging that such breaches were willful, malicious, or in wanton disregard of ABI's rights.

**ANSWER:** ABI provides the following answer, which is based on its current knowledge to date, recognizing that discovery is ongoing. ABI alleges Rowell failed to take reasonable measures to protect and maintain the confidentiality of the very existence of the Skilcraft transaction; openly usurped, subverted, and attempted to divert the Skilcraft transaction for his

9

own gain; and disparaged ABI to Skilcraft when he described ABI as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs, and otherwise stated that ABI was incapable of meeting Skilcraft's needs. To the extent any of those actions took place during Rowell's ABI employment, they constitute a breach of his duty of loyalty to ABI. Discovery is ongoing and ABI does not know all Rowell's breaches.

15.     Identify each and every one of ABI's contracts or prospective clients with which Mr. Rowell allegedly interfered.

**ANSWER:** ABI provides the following answer, which is based on its current knowledge to date, recognizing that discovery is ongoing. ABI states that Rowell interfered with the Skilcraft agreement and relationship. Under Rule 33(d) of the Federal Rules of Civil Procedure, ABI states that it will produce its business records regarding Skilcraft, once a protective order has been entered by the Court.

16.     Identify each and every wrongful act allegedly committed by Mr. Rowell that tortiously interfered with any of ABI's existing contracts or prospective business advantage, including the factual basis for your allegation in paragraph 16 of the Complaint that "[Mr.] Rowell's conduct caused Skilcraft to cancel its Investment Banking Agreement with ABI."

**ANSWER:** ABI provides the following answer, which is based on its current knowledge to date, recognizing that discovery is ongoing. ABI alleges Rowell openly usurped, subverted, and attempted to divert the Skilcraft transaction for his own gain; and disparaged ABI to Skilcraft when he described ABI as "grossly understaffed," stated that ABI lacked sufficient resources to service Skilcraft's transaction, stated that ABI did not prioritize Skilcraft's needs,

and otherwise stated that ABI was incapable of meeting Skilcraft's needs. Those actions constitute interference with ABI's prospective business relationship with Skilcraft and any yet-to-be-discovered similar actions would constitute interference with business advantage or, if ABI already had a contract in place, interference with contract. Discovery is ongoing and ABI does not know all Rowell's forms of interference.

17.     Identify each and every benefit that Mr. Rowell has allegedly obtained at ABI's expense and the improper or unlawful means used to obtain each and every benefit.

**OBJECTION:** ABI objects to Interrogatory No. 17 on the basis that it is an impermissible blockbuster or premature contention interrogatory as discovery is ongoing. ABI further objects that Rowell himself knows best the benefits he obtained and unlawful means he used to obtain them.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. ABI believes that Rowell may have obtained some benefits through competing investments banks and ABI will seek that information in discovery, which is ongoing.

18.     Identify the damages you allege to have sustained as a result of each instance of Mr. Rowell's alleged wrongful conduct, including each type and amount of damage, how those damages were calculated, and efforts to mitigate.

**ANSWER:** ABI refers to the damages described in the complaint, its Rule 26 disclosures, and it answer to Interrogatory No. 19, and states that discovery is ongoing.

19.      Identify the factual basis in support of your contention that ABI's loss of the Skilcraft transaction represents a loss of approximately $98,125.

11

**ANSWER:** Rowell caused special damages in the amount of $982,125.00, which includes the estimated fee for the lost Skilcraft transaction, coupled with the cost of the man-hours for lead development, preparation of presentation materials, preparing the data room, contacting and managing potential buyers, and paying Defendant Rowell's portion of the progress payments, all of which are directly attributable to Rowell's conduct. ABI calculated loss of approximately $982,125 as follows:

- Estimated fee for deal: $963,200.

- Lead development: $1,125.

- Prepare presentation materials: $5,500.

- Preparing data room: $4,000.

- Contacting and managing potential buyers, negotiating NDAs: $5,000.

- Rowell's portion of progress payments: $3,300.

- Total: $982,125.

20.     Identify each deal, transaction, or undertaking closed or executed by Mr. Rowell, or under his direction or supervision, and the revenue generated by those deals, transactions, or undertakings.

**OBJECTION:** ABI objects to Interrogatory No. 20 as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case. The closed deals Rowell worked on during his ABI employment are irrelevant to the claims and defenses and therefore overbroad, unduly burdensome, and disproportionate to the needs of the case.

21.     Identify any and all agreements, proposals, contracts, and/or other arrangements, including drafts thereof, relating to Mr. Rowell's compensation, reimbursement, salary, commissions, or any other form of payment by ABI.

**ANSWER:** ABI identifies the employment agreement and Transition Agreement. Under Rule 33(d) of the Federal Rules of Civil Procedure, ABI states that it will produce responsive records, once a protective order has been entered by the Court.

22.     Identify all compensation, reimbursements, salary, commission, and/or any other form of payment (i) earned by, owed to, or made to Mr. Rowell from ABI, or (ii) that Mr. Rowell claims or claimed he is entitled to receive from ABI. For any amount identified in subsection (ii) that ABI has not paid to Mr. Rowell, identify ABI's basis for not providing that amount to Mr. Rowell.

**OBJECTION:** ABI objects to Interrogatory No. 22 to the extent it asks ABI to identify amounts that Rowell claims or claimed he is entitled to receive, which information may not even be within ABI's knowledge. Rowell himself is the best source of that information and ABI objects that it is unduly burdensome and disproportionate to the needs of the case to ask ABI to answer an interrogatory that Rowell uniquely knows the answer to.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. Under Rule 33(d) of the Federal Rules of Civil Procedure, ABI states that it will produce responsive records, once a protective order has been entered by the Court.

23.     Identify any representations, whether oral or written, made by ABI, Mr. Bellizi [sic], or any other ABI representative to Mr. Rowell prior to or near the time of Mr. Rowell's hiring by ABI concerning ABI's business, ABI's financial position, ABI's client base, ABI's

development opportunities, ABI's deal pipeline, Mr. Rowell's compensation or potential compensation at ABI, or Mr. Rowell's option to acquire an equity or ownership interest in ABI.

**OBJECTION:** ABI objects to Interrogatory No. 23 to the extent it calls for ABI to identify oral representations covering such a range of subjective topics.

**ANSWER:** ABI provides the following answer, which falls outside the scope of its objections. Under Rule 33(d) of the Federal Rules of Civil Procedure, ABI states that it will produce responsive records once a protective order has been entered by the Court. As to oral representations, anything discussed would be memorialized in a document, to the best of ABI's knowledge.

24.     Identify (i) any alleged loans made to Mr. Rowell by ABI, Mr. Bellizi, or any other person or entity associated with ABI, (ii) the amount of the alleged loan, (iii) whether the alleged loan was repaid or recouped, (iv) the present status of the alleged loan, (v) and any terms accompanying the alleged loan.

**ANSWER:** Under Rule 33(d) of the Federal Rules of Civil Procedure, without admitting that ABI made any loans to Rowell, ABI states that it will produce responsive records, if any, once a protective order has been entered by the Court.

### SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS
### FOR PRODUCTION OF DOCUMENTS

1.     All documents relied upon to support the allegations in the Complaint.

**OBJECTION:** ABI objects to Request for Production No. 1 on the grounds that it seeks information protected by the attorney-client privilege and the work-product doctrine. ABI's attorneys participated in drafting and signed the complaint, and the documents they relied upon

14

in doing so are not discoverable. ABI is not providing a privilege log because there is no colorable claim that the compilation of documents relied upon in drafting the complaint are not protected.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. ABI relied on the Transition Agreement and, the January 2, 2018 email from First Line Advisors, LLC to Rowell, and those documents will be produced.

2.      All documents you intend to use at trial

**OBJECTION:** ABI objects to Request for Production No. 2 as premature.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. ABI expects it will use the Transition Agreement and the January 2, 2018 email from First Line Advisors, LLC to Rowell at trial. Beyond that, ABI will comply with Rule 26(a) and Rule 26(e) and any orders of the Court regarding the disclosure and exchange of trial exhibits.

3.      All documents relied upon to support your Answer to Mr. Rowell's counterclaims.

**OBJECTION:** ABI objects to Request for Production No. 3 on the grounds that it seeks information protected by the attorney-client privilege and the work-product doctrine. ABI's attorneys participated in drafting and signed Plaintiff's Answer and Defenses to Defendant's Counterclaims, and the documents they relied upon in doing so are not discoverable. ABI is not providing a privilege log because there is no colorable claim that the compilation of documents relied upon in drafting the complaint are not protected.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. ABI relied on the Transition Agreement and, the January 2, 2018 email from First Line Advisors, LLC to Rowell, and those documents will be produced.

4.      All documents received from third parties related to the allegations in the Complaint.

**RESPONSE:** Responsive documents will be produced once a protective order has been entered by the Court.

5.      All documents relating to ABI's hiring, or employment, of Mr. Rowell, including all communication between (i) Mr. Rowell and (ii) ABI, Mr. Bellizi [sic], or any other person associated with ABI that occurred prior to when Mr. Rowell became an ABI employee. For the avoidance of doubt, this request would include any representations made to Mr. Rowell concerning the state of ABI's business or deal pipeline leading up to, or at the time of, Mr. Rowell's hiring.

**RESPONSE:** Responsive documents will be produced once a protective order has been entered by the Court.

6.      All documents relating to Mr. Rowell's personnel, human resources, or employee file (however such materials are referred to at ABI).

**RESPONSE:** ABI will produce Rowell's personnel file once a protective order has been entered by the Court.

7.      All documents, including drafts, relating to any agreement between ABI and Mr. Rowell, including, but not limited to, the Transition Agreement entered into between ABI and Mr. Rowell.

**OBJECTION:** ABI objects to Request No. 7 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

8.     All documents relating to ABI's termination of Mr. Rowell.

**OBJECTION:** ABI objects to Request No. 8 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine.

**RESPONSE:** Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

9.     All documents relating to Mr. Rowell's alleged breach of any employment agreement between ABI and Mr. Rowell, including, but not limited to, the Transition Agreement entered into between ABI and Mr. Rowell.

**OBJECTION:** ABI objects to Request No. 9 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

10.      All documents relating to Mr. Rowell's alleged misappropriation of ABI's trade secrets.

**OBJECTION:** ABI objects to Request No. 10 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

11.      All documents relating to Mr. Rowell's alleged disparagement of ABI.

**OBJECTION:** ABI objects to Request No. 11 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

12.      All documents relating to Mr. Rowell's alleged breach of his duty of loyalty to ABI.

**OBJECTION:** ABI objects to Request No. 12 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

13.     All documents relating to Mr. Rowell's alleged intentional interference with ABI's contracts and prospective business advantage.

**OBJECTION:** ABI objects to Request No. 13 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

14.     All documents relating to Mr. Rowell's unjust enrichment.

**OBJECTION:** ABI objects to Request No. 14 as vague and lacking reasonable particularity. ABI further objects to the extent the request calls for the production of documents protected by the attorney-client privilege or work-produce doctrine. ABI also objects that documents about Rowell's unjust enrichment, if any, are more likely to be in his own possession, custody, or control than in ABI's.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. ABI refers to its responses to Rowell's other requests for production and states that nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

15.     All documents relating to Skilcraft, including, but not limited to, Skilcraft's engagement of ABI to perform investment banking services and Skilcraft's termination of that engagement.

**OBJECTION:** ABI objects to Request for Production No. 15 to the extent it seeks information protected by the attorney-client privilege or work-product doctrine. Because it would be unduly burdensome to do so, ABI is not searching for responsive privilege or work-product documents related to undersigned counsel's representation in this matter, and ABI is not providing a privilege log because there is no colorable claim that the materials are not protected.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

16.     All documents relating to First Line Advisors, firstlineadvisors.com, firlineadvisor.com, Patrick Vaughan, Alison Kennedy, and/or Cresap, Inc.

**OBJECTION:** ABI objects to Request for Production No. 16 to the extent it seeks information protected by the attorney-client privilege or work-product doctrine. Because it would be unduly burdensome to do so, ABI is not searching for responsive privilege or work-product documents related to undersigned counsel's representation in this matter, and ABI is not providing a privilege log because there is no colorable claim that the materials are not protected.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

17.     All documents relating to Mr. Rowell's compensation, including salary, bonuses, commissions, or reimbursements, including any amounts Mr. Rowell claims he is owed by ABI.

**OBJECTION:** ABI objects to Request for Production No. 17 as vague and lacking reasonable particularity to the extent it asks ABI to produce documents relating to amounts Rowell claims he is owed. Rowell is the only one that knows everything he claims he is owed. Based on such a vague request, ABI cannot know which documents are responsive.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. Nonprivileged responsive documents regarding Rowell's compensation will be produced once a protective order has been entered by the Court.

18.     All documents relating to any loan allegedly made to Mr. Rowell by ABI, Mr. Bellizi [sic], or any other person employed by, or related to, ABI.

**RESPONSE:** Nonprivileged responsive documents, if any, will be produced once a protective order has been entered by the Court.

19.     All documents relating to any communication between Mr. Rowell and ABI, Mr. Bellizi [sic], or any person employed by, or related to, ABI occurring since Mr. Rowell left ABI.

**OBJECTION:** ABI objects to Request for Production No. 19 as unduly burdensome and disproportionate to the needs of the case. Rowell himself was necessarily a party to each of the communications the request seeks and ABI objects to his attempt to require ABI to produce what he already has.

20.     All documents relating to any communication, including oral or written, made to Mr. Rowell's ABI email account, ABI mailing address, or ABI phone number after his departure from ABI.

**RESPONSE:** Nonprivileged responsive, reasonably accessible documents will be produced once a protective order has been entered by the Court.

21.     All documents supporting your claim for damages.

**RESPONSE:** Nonprivileged responsive documents will be produced once a protective order has been entered by the Court.

22.      All documents, including invoices, related to sales and/or revenue generated by, or under the supervision of, Mr. Rowell for ABI.

**OBJECTION:** ABI objects to Request for Production No. 22 as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case. The sale or revenue Rowell generated during his ABI employment are irrelevant to the claims and defenses and therefore overbroad, unduly burdensome, and disproportionate to the needs of the case.

23.     All financial statements, balance sheets, and income and expense statements belonging to ABI for the years ending December 31, 2013, December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017.

**OBJECTION:** ABI objects to Request for Production No. 23 as irrelevant, overly broad, unduly burdensome, and disproportionate to the needs of the case to extent it seek information before 2015 and to the extent it requests information beyond what is reflected in ABI's Profit & Loss statements.

**RESPONSE:** ABI provides the following response, which falls outside the scope of its objections. ABI will produce responsive documents for 2015-2017 once a protective order has been entered by the Court.

Dated: September 25, 2018.

AS TO OBJECTIONS, RESPONSES TO
REQUESTS FOR PRODUCTION, AND
FORM:

*s/ Thomas W. Carroll*
Danielle L. Kitson
Stephen E. Baumann II
Thomas W. Carroll
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone:  303.629.6200
Facsimile:  303.629.0200
Email:  DKitson@littler.com
           SBaumann@littler.com
           TCarroll@littler.com

*Attorneys for Plaintiff Aaron, Bell*
*International, Inc.*

**VERIFICATION**

I, Ralph Bellizzi, am employed by Aaron, Bell International, Inc. ("ABI") as President and am authorized to verify interrogatory answers on behalf of ABI. I have reviewed ABI's above answers to Mr. Rowell's interrogatories. The answers were prepared with the assistance of employees and representatives of ABI upon whom I relied, and they are based on the records and information still in existence, presented, or recollected and thus far discovered in the course of reasonable investigation. ABI reserves the right to make any changes in the answers if it appears at any time that omissions or errors have been made in them or that more accurate information is available. Subject to these limitations, the answers are true to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed this _____ day of September, 2018.


_____
Ralph Bellizzi

24

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2018, a true and correct copy of the

foregoing **ABI'S ANSWERS AND RESPONSES TO DEFENDANT'S FIRST SET OF**

**INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS**  was

served on the following by email as follows:

Kevin Burns
Michael Greco
FISHER & PHILLIPS LLP
1801 California Street, Suite 2700
Denver, Colorado 80202
Telephone: (303) 218-3650
Fax: (303) 218-3651
kburns@fisherphillips.com
mgreco@fisherphillips.com

Aaron Herzig
Medora Akers
TAFT STETTINIUS & HOLLISTER
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Telephone: (513) 381-2838
Fax: (513) 381-0205
aherzig@taftlaw.com
makers@taftlaw.com

*Thomas W. Carroll*
Thomas W. Carroll

FIRMWIDE:156517056.2 094730.1001

25

# Exhibit D

**From:** pvaughan@firstlineadvisors.com [mailto:pvaughan@firstlineadvisors.com]
**Sent:** Tuesday, January 02, 2018 3:05 PM
**To:** John Rowell <jrowell@aaron*bell.com>
**Subject:** Skilcraft Follow*up

John,

Thank you for taking the time to speak with me today re: Skilcraft.  As a follow-up, I'd like to discuss potential next steps tomorrow with you and my colleague, Alison Kennedy.

Please let me know how your schedule looks and we can arrange a call.

Finally, can you please reply to this email to confirm you received this?

Best,
Patrick

Patrick Vaughan
SVP Business Development
**First Line Advisors LLC**
www.firstlineadvisor.com
Phone:  (781)-492-2503
Email:  pvaughan@firstlineadvisors.com

First Line Advisors LLC is a Massachusetts limited liability company and I am a Registered Representative. Securities are offered through Cresap Incorporated, a U.S. FINRA registered broker-dealer, located in Radnor, PA (610-341-1320). Cresap Inc. is registered with the Securities and Exchange Commission and is a member of FINRA, SIPC and MSRB.

The information contained in this email is confidential and solely for the intended addressee(s). Unauthorized copying, disclosures, modifications, and/or distribution of this email may be unlawful. If you have received this email in error, please notify the sender immediately and delete it from your system. Cresap Inc. may monitor email communications in accordance with applicable laws and regulations.

# Exhibit E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:18-cv-01015-RBJ

AARON, BELL INTERNATIONAL, INC.,
a Colorado corporation,

       Plaintiff,

v.

JOHN ROWELL, an individual,

       Defendant.

---

**DEFENDANT JOHN ROWELL'S RESPONSES TO PLAINTIFF'S**
**FIRST SET OF REQUESTS FOR ADMISSION**

---

       Pursuant to Federal Rules of Civil Procedure 26 and 36, Defendant John Rowell ("Mr. Rowell") provides the following objections and responses to Plaintiff Aaron, Bell International, Inc.'s ("ABI" or Plaintiff) First Set of Requests for Admission.

## GENERAL OBJECTIONS AND RESERVATIONS

       1.     Mr. Rowell responds to Plaintiff's requests, subject to and without intending to waive, and expressly preserving: (a) any objections to the competency, relevancy, materiality, privilege and admissibility of any of the responses; and (b) the right to object to other discovery requests involved or relating to the subject matter of Plaintiff's requests responded to herein.

       2.     Mr. Rowell objects generally to Plaintiff's requests to the extent they seek information protected from discovery as attorney work product or by the attorney-client

privilege, information gathered or prepared in anticipation of litigation, or information which is otherwise immune or protected from discovery.

3.      Mr. Rowell objects to Plaintiff's requests to the extent that they are improperly broad in scope, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in this action. Where appropriate, Mr. Rowell will provide the appropriate answers to Plaintiff's requests and assert additional objections as warranted.

4.      Mr. Rowell reserves the right to amend or supplement his answers to Plaintiff's requests and to assert additional objections as warranted.

5.      Except for the facts expressly admitted herein, no admission of any nature whatsoever is to be implied or inferred.

6.      Mr. Rowell has not yet completed his investigation of the facts relating to this action, has not yet completed discovery in this action, and has not yet completed his preparation for trial. Accordingly, these responses are necessarily limited in nature, and reflect only that information known to Mr. Rowell at this time.

7.      Mr. Rowell objects to the extent that Plaintiff's discovery requests attempt or purport to impose burdens beyond those required by the Federal Rules of Civil Procedure or any court order.

8.      Mr. Rowell objects to the requests to the extent that any defined term used in the requests is inaccurate, incomplete, or misleading. Mr. Rowell does not concede the accuracy or completeness of any defined term used in the requests, whether or not any specific objection to a defined term is set forth.

9.      Each of Mr. Rowell's General Objections is incorporated by reference into the responses set forth below as if fully set forth therein. The following responses are, therefore, made subject to each of these General Objections. The assertion of the same, similar, or additional objections and specific objections to individual requests, or the failure to assert any additional objection to a request, does not waive any objection by Mr. Rowell.

## **RESPONSES AND OBJECTIONS TO REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**

Admit you and ABI entered into a transition employment agreement (the "Transition Employment Agreement") on or about September 12, 2017.

**RESPONSE: Admit.**

**REQUEST FOR ADMISSION NO. 2:**

Admit under Colorado law your signature and subsequent employment constituted sufficient assent and consideration to the terms of the Transition Employment Agreement.

**RESPONSE: Objection. This request improperly seeks admission of a legal conclusion.**

**REQUEST FOR ADMISSION NO. 3:**

Admit ABI fully performed its obligations under the Transition Employment Agreement.

**RESPONSE: Deny.**

**REQUEST FOR ADMISSION NO. 4:**

Admit ABI restricts access to its trade secrets and confidential information to certain employees on a need-to-know basis.

> **RESPONSE: Mr. Rowell objects to this request to the extent that it is ambiguous as it is unclear whether ABI is referring to the ordinary or legal definition of "trade secrets" and confidential information, and, to the extent that it is referring to the legal definition of these terms and would therefore require Mr. Rowell to make a legal determination regarding whether certain material meets these definitions. Subject to the foregoing general and specific objections, Mr. Rowell admits that, while employed at ABI, he undertook reasonable efforts to protect sensitive information. Mr. Rowell further states that he has made a reasonable inquiry and the information known or readily obtainable by him is insufficient to enable him to admit or deny the remainder of this request.**

**REQUEST FOR ADMISSION NO. 5:**

Admit ABI requires employees who access its trade secrets and confidential information to sign confidentiality agreements.

> **RESPONSE: Mr. Rowell objects to this request to the extent that it is ambiguous as it is unclear whether ABI is referring to the ordinary or legal definition of "trade secrets" and confidential information, and, to the extent that it is referring to the legal definition of these terms and would therefore require Mr. Rowell to make a legal determination regarding whether certain material meets these definitions. Subject to the foregoing general and specific objections, Mr. Rowell admits that,**

> **while employed at ABI, he undertook reasonable efforts to protect sensitive information. Mr. Rowell further states that he has made a reasonable inquiry and the information known or readily obtainable by him is insufficient to enable him to admit or deny the remainder of this request.**

## REQUEST FOR ADMISSION NO. 6:

Admit ABI mandates its trade secrets and confidential information only be accessed through secure connections and only with individualized logins and passwords.

> **RESPONSE: Mr. Rowell objects to this request to the extent that it is ambiguous as it is unclear whether ABI is referring to the ordinary or legal definition of "trade secrets" and confidential information, and, to the extent that it is referring to the legal definition of these terms and would therefore require Mr. Rowell to make a legal determination regarding whether certain material meets these definitions. Subject to the foregoing general and specific objections, Mr. Rowell admits that, while employed at ABI, he undertook reasonable efforts to protect sensitive information. Mr. Rowell further states that he has made a reasonable inquiry and the information known or readily obtainable by him is insufficient to enable him to admit or deny the remainder of this request.**

## REQUEST FOR ADMISSION NO. 7:

Admit you communicated with First Line Advisors regarding Skilcraft.

> **RESPONSE: Mr. Rowell admits that Patrick Vaughan may have called him to discuss Skilcraft but has no recollection of any such conversation taking place.**

**REQUEST FOR ADMISSION NO. 8:**

Admit you communicated with ABI clients and prospective clients, other than Skilcraft, after your employment with ABI was terminated.

**RESPONSE: Mr. Rowell objects to this request to the extent that it is vague and ambiguous, as Mr. Rowell has no way to know who ABI's current prospective clients are.  Subject to the foregoing general and specific objections, Mr. Rowell denies this request.**

Respectfully submitted, this 15th day of March, 2019.

                                        */s/Aaron Herzig*
                                        Aaron Herzig (*pro hac vice*)
                                        Medora Akers (*pro hac vice*)
                                        Taft Stettinius & Hollister LLP
                                        425 Walnut Street, Suite 1800
                                        Cincinnati, Ohio 45202
                                        Tel: (513) 381-2838
                                        Fax: (513) 381-0205
                                        aherzig@taftlaw.com
                                        makers@taftlaw.com

                                        Michael R. Greco, #48320
                                        Kevin J. Burns, #44527
                                        Fisher & Phillips LLP
                                        1801 California Street, Suite 2700
                                        Denver, Colorado 80202
                                        Tel: (303) 218-3650
                                        Fax: (303) 218-3651
                                        mgreco@fisherphillips.com
                                        kburns@fisherphillips.com

                                        *Attorneys for John Rowell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2019, a true and correct copy of the foregoing was

served by electronic mail upon the following:

Colin Barnacle
Ashley Calhoun
Akerman LLP
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
Tel: (303) 260-7712
Fax: (303) 260-7714
colin.barnacle@akerman.com
ashley.calhoun@akerman.com
*Attorneys for Aaron, Bell International, Inc.*

*/s/Medora Akers*